Marc J. Randazza, CA Bar No. 269535
Alex J. Shepard, CA Bar No. 295058
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117
Telephone: 702-420-2001
ecf@randazza.com

*Attorneys for Defendants,*
*Infowars, LLC and Free Speech Systems, LLC*

# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

MATT FURIE,

      Plaintiff,

    vs.

INFOWARS, LLC; FREE SPEECH
SYSTEMS, LLC,

      Defendants.

Case No. 2:18-cv-01830-MWF-JPR

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS INFOWARS, LLC AND FREE SPEECH SYSTEMS, LLC'S MOTION FOR SUMMARY JUDGMENT**

Date: May 6, 2019
Time: 10:00 a.m.
Hon. Michael W. Fitzgerald

Case Filed: March 5, 2018
Trial Date: July 16, 2019

## TABLE OF CONTENTS

1.0     INTRODUCTION ..................................................................................... 1

2.0     FACTUAL BACKGROUND ..................................................................... 1

    *2.1     The Origins and Original Context of Pepe the Frog* ............................ *1*

    *2.2     Pepe the Frog Becomes an Internet Meme and Mr. Furie's Reception* ................. *2*

    *2.3     Pepe's Political Associations and Furie's Enforcement Attempts* ........................ *4*

    *2.4     Mr. Furie's Licensing of Pepe the Frog* ................................................ *5*

    *2.5     The MAGA Poster* ................................................................................ *6*

    *2.6     Defendants FSS and Infowars* ............................................................. *7*

3.0     LEGAL STANDARD ............................................................................... 8

4.0     ARGUMENT ........................................................................................... 9

    *4.1     Defendant Infowars Did Not Engage in the Alleged Conduct* ............................ *9*

    *4.2     The Poster's Use of Pepe the Frog Was a Fair Use* .............................. *9*

        4.2.1   Factor one: purpose and character of the use ..................................... 10

        4.2.2   Factor two: nature of the copyrighted work .......................................... 14

        4.2.3   Factor three: amount and substantiality of portion taken ..................... 15

        4.2.4   Factor four: effect on the market ......................................................... 17

    *4.3.    Furie Abandoned His Copyright in Pepe the Frog and/or Granted an ImpliedLicense to the General Public to Use this Character* ................................. *20*

    *4.4     Furie Cannot Seek Statutory Damages or Attorneys' Fees* .................................... *23*

5.0     CONCLUSION ........................................................................................ 24

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 252 (1986) ...................................................................................8

*Blanch v. Koons*,
467 F.3d 244, 252 (2d Cir. 2006)................................................................. 13

*Braham v. Sony-ATV/Music Publ'g*,
2015 U.S. Dist. LEXIS 155268, *10 (C.D. Cal. Nov. 10, 2015) ...............2

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569, 578, 579 (1994).............................................. 10, 11, 15, 17

*Cariou v. Prince*,
714 F.3d 694, 706 (2d Cir. 2013).................................................................. 13

*Celotex Corp. v. Catrett*,
477 U.S. 317, 322 (1986) ...................................................................................8

*De Forest Radio Tel. & Tel. Co. v. United States*,
273 U.S. 236, 241 (1927) ............................................................................... 21

*Derek Andrew, Inc. v. Poof Apparel Corp.*,
528 F.3d 696 (9th Cir. 2008)........................................................................ 23

*Effects Associates, Inc. v. Cohen*,
908 F.2d 555, 558 (9th Cir. 1990) .............................................................. 21

*Equals Three, LLC v. Jukin Media, Inc.*,
139 F. Supp. 3d 1094, 1108 (C.D. Cal. 2015)...................................... 17, 20

*Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) ........................... 21

*Grumpy Cat Ltd. v. Grenade Bev. LLC*,
2017 U.S. Dist. LEXIS 222401, *2-3 (C.D. Cal. Dec. 1, 2017)....................... 2, 3

*Hampton v. Paramount Pictures Corp.*,
279 F.2d 100, 104 (9th Cir. 1960) .......................................................... 20, 22

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811, 821 (9th Cir. 2003) .................................................................... 17

*Leadsinger, Inc. v. BMG Music Pub.*,
  512 F.3d 522, 529 (9th Cir. 2008) .................................................................... 10

*Marya v. Warner/Chappell Music, Inc.*,
  131 F. Supp. 3d 975, 992-93 (C.D. Cal. 2015) .......................................... 20, 22

*Mattel, Inc. v. Walking Mountain Prods.*,
  353 F.3d 792, 799-800 (9th Cir. 2003) ...................................................... 10, 14

*Melchizedek v. Holt*,
  792 F. Supp. 2d 1042, 1051-54 (D. Ariz. 2011) ................................................ 21

*Micro Star v. FormGen Inc.*,
  154 F.3d 1107, 1114 (9th Cir. 1998) .................................................................. 23

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146, 1167, 1168 (9th Cir. 2007) ........................................... 15, 17, 20

*Satava v. Lowry*,
  323 F.3d 805, 810, 812 (9th Cir. 2003) ....................................................... 15, 16

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170, 1177 (9th Cir. 2013) ....................................... 11, 14, 15, 17

*Stewart v. Abend*,
  495 U.S. 207, 236 (1990) .................................................................................. 10

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110, 1118 (9th Cir. 2000) .................................................................. 15

**STATUTES**

17 U.S.C. § 107 ............................................................................................ 9, 10

17 U.S.C. § 412 .......................................................................................... 23, 24

**RULES**

Rule 56 ................................................................................................................ 8

**RANDAZZA** | LEGAL GROUP

## 1.0   INTRODUCTION

This is a case about an artist who dedicated one of his works to the public after seeing it become an internet meme.  Years later, he decided that the public's use of the meme conflicted with his personal politics.  Accordingly, he embarked on a campaign to censor any uses, no matter how fair, that appeared at odds with his politics.  The Court should grant summary judgment in Defendants' favor.

## 2.0   FACTUAL BACKGROUND

### 2.1   The Origins and Original Context of Pepe the Frog

In November 2003, Mr. Furie published a comic book "Play Time," which featured, among other characters, a crudely-drawn frog named Pepe.  (SUF ¶ 1.)  From 2006 to 2010 Mr. Furie published four comics in his "Boy's Club" series featuring Pepe and several roommates, as well as a compilation of this series.  (SUF ¶¶ 2-6.)

These comics all show Pepe the Frog as drug-addled scatological humor subject. (SUF ¶¶ 1-6.) Pepe the Frog became popular on the internet in part because of his catchphrase "feels good man."  (SUF ¶ 8.)

In 2016, in order to plan for this litigation campaign, Mr. Furie pulled out a stand-alone drawing of Pepe, and then published "Pepe in Blue Shirt."  (SUF ¶ 7.)  Mr. Furie did not file an application for copyright registration for any of these works until, at the earliest, September 2017.  (SUF ¶¶ 1-7, 40.)

Pepe the Frog, in his current form, is not even likely an original Furie creation. The character "El Sapo Pepe" is an Argentinian anthropomorphic frog that has existed since at least 1988, and shows featuring the character started to be broadcast in

Argentina and other Central American countries since at least this time.  (SUF ¶ 69.)
El Sapo Pepe shares many physical characteristics with Pepe the Frog.  (*See id.*)  It is
curious that after Mr. Furie traveled to Mexico in 2004, where shows featuring El Sapo
Pepe would air, and after publishing Play Time, Pepe the Frog suddenly started to look
significantly more like El Sapo Pepe.  (SUF ¶ 70.)  El Sapo Pepe has also been available
on the Internet since before Mr. Furie started drawing Pepe the Frog.  Mr. Furie claims
that this is a mere coincidence.  (SUF ¶ 71.) However, Mr. Furie's works are full of such
"coincidental" rip-offs of earlier works.  (*See id.*)

## 2.2   Pepe the Frog Becomes an Internet Meme and Mr. Furie's Reception

Pepe the Frog caught on as an internet "meme phenomenon"[1] by 2010, as third
parties started posting pictures of Pepe the Frog online.  (SUF ¶¶ 9-10.)  Once it became
a meme, Furie received copies of these works featuring the character.  (SUF ¶ 11.)  Mr.
Furie permitted this use, and even when they were sold for profit, he would ask for
copies of this bootleg merchandise without requesting the seller stop.  (SUF ¶¶ 11, 20.)
In 2010, Mr. Furie told the web site <knowyourmeme.com> that he was aware of Pepe
the Frog's use as a meme, that he didn't care about unauthorized use of the character,
that he was happy about it becoming a meme, and that the character "kind of just took

---

[1] "A meme is 'an idea, behavior, style, or usage that spreads from person to person within a culture.'" *Grumpy Cat Ltd. v. Grenade Bev. LLC*, 2017 U.S. Dist. LEXIS 222401, *2-3 (C.D. Cal. Dec. 1, 2017) (quoting *Meme*, Merriam-Webster Online Dictionary (November 22, 2017, 8:57 PM), https://www.merriamwebster.com/dictionary/meme); *see also Braham v. Sony-ATV/Music Publ'g*, 2015 U.S. Dist. LEXIS 155268, *10 (C.D. Cal. Nov. 10, 2015) (same).  "Some memes go viral and spread widely across the internet."  *Id.* at *3 (citing Terrica Carrington, Note, *Grumpy Cat or Copy Cat? Memetic Marketing in the Digital Age*, 7 Geo. Mason J. Int'l Com. L. 139, 142 (2016)).  "A viral meme can launch an average person – or pet – to fame."  *Id.* (citing Carrington, *supra*, at 143-45).

1  a life of its own." (SUF ¶ 18.) In April 2015 Mr. Furie said he supported third parties

2  profiting off of their unauthorized use of Pepe the Frog. (SUF ¶ 19.)

3        By 2014, celebrities such as Katy Perry and Nicki Minaj posted Pepe memes.

4  (SUF ¶ 12.)[2]  Also starting that year, users of the online message board 4chan began

5  posting thousands of unauthorized works of Pepe, referring to them as "rare Pepes,"

6  attempting to sell them. (*Id.*) Internet users also created several different versions of

7  Pepe the Frog memes. (*See id.*) In 2016 and 2017, the Russian embassy in the UK and

8  Wendy's published Pepe memes. (SUF ¶ 13.)

9        In the face of this rampant use of Pepe the Frog as a meme, Furie seemed

10  unperturbed.  In July 2015, he said he did not care about these unauthorized uses; that

11  it was in fact "cool;" that he was inspired by the inventive ways third parties were using

12  Pepe; and that he wanted to make comics based off these interpretations  (SUF ¶ 20.)

13  He also stated that he had no objection to people using Pepe the Frog simply because

14  he created the character, since he also used characters from popular culture in his

15  artwork without authorization. (SUF ¶ 20.) Indeed, much of Mr. Furie's work features

16  depictions of other people's characters, including The Terminator, Freddy Krueger, and

17  The Incredible Hulk, though he claims these are not direct copies for which he would

18  need a license, but rather are merely his own versions that are "inspired" by these pre-

19  existing works (or that the similarities are merely coincidental). (SUF ¶ 71.)

20

21  _____

22      [2] The history of Pepe the Frog as a meme is thoroughly laid out on the web site <knowyourmeme.com>.  This district has previously found that <knowyourmeme.com> is a credible source on the history and development of internet memes.  *See Grumpy Cat*, 2017 U.S. Dist. LEXIS 222401 at *3 (citing <knowyourmeme.com> page for the "Grumpy Cat" meme).

23

### 2.3    Pepe's Political Associations and Furie's Enforcement Attempts

Beginning in 2015, the "alt-right" began using images of Pepe the Frog.  (SUF ¶ 14.)  In 2015, Donald Trump retweeted an image of himself as Pepe the Frog.  (SUF ¶ 13.)  In 2016, internet users posted memes of Pepe the Frog as conservative French politician Marine Le Pen and Donald Trump, Jr. shared an image on his <Instagram.com> account displaying Pepe the Frog alongside Donald Trump and other conservative political figures.  (SUF ¶¶ 13, 16.)

Around September 2016, the Clinton campaign referred to the Frog as a "white supremacist symbol," and the media began to repeat this claim.  (SUF ¶ 15.)  Even after the election, the popular television show "Family Guy" included a depiction of Pepe and referred to it as "Pepe the Alt-Right Frog."  (SUF ¶ 17.)  According to Furie, Pepe became associated with Donald Trump in the 2016 presidential election.  (SUF ¶ 25.)

Around the time Hillary Clinton's campaign claimed that the frog was a "hate symbol," Mr. Furie gave media interviews on the subject.  He told *New York Magazine* that he "realized that Pepe is beyond my control . . . He's like a kid, he grew up and now I have to set him free to live his life."  (SUF ¶ 21.)  He told *The Daily Dot* that Pepe the Frog's use in so many pro-Trump memes was "just a phase."  (SUF ¶ 22.)  Even in the face of the "alt-right" appropriating Pepe the Frog, Mr. Furie told *The Atlantic* that he was not bothered by this, and in fact had never been bothered by third-party use of Pepe the Frog; that he recognized "people reinvent him [Pepe the Frog] all these different ways.  It's kind of a blank slate.  It's just out of my control what people are doing with it;" and that he had no regrets about losing control over Pepe the Frog

1  because "it's been kind of interesting to see all the evolutions of Pepe. Yeah, no

2  regrets." (SUF ¶ 23) (emphasis added.)

3       Mr. Furie did eventually attempt to change the ubiquitous image of Pepe the

4  Frog through a "SavePepe" campaign with alternative images of the character. (SUF ¶

5  26.) These attempts failed to satisfy him, and so Mr. Furie "killed" Pepe the Frog by

6  drawing the character's funeral. (*See id.*) This did not stop third parties from using the

7  character, however. In May 2017, political cartoonist Ben Garrison drew a comic of

8  Pepe the Frog dressed as "a Monopoly guy or something" walking away from Mr. Furie,

9  who is shouting "B-but I killed you!" and saying "Who the hell are you?" (SUF ¶ 27.)[3]

10  In his explanatory notes of the comic, Mr. Garrison states that "Pepe is a meme that

11  can't be eliminated with an official declaration or wave of a hand from some 'authority.'

12  **He's part of the public domain of free speech**." (*Id.*) (emphasis added.)[4]

13       It was not until August 2017 that Mr. Furie attempted to enforce his alleged

14  copyright interests in Pepe the Frog, (SUF ¶ 29.) At no point previously had Mr. Furie

15  sent a single takedown request or cease and desist letter to anyone who had made an

16  unauthorized use of Pepe the Frog, despite Mr. Furie's admitted knowledge of

17  widespread unauthorized use. (*See id.*)

18      **2.4    Mr. Furie's Licensing of Pepe the Frog**

19       Despite Pepe the Frog's rampant popularity as a meme, Furie did not capitalize

20  on it until the alt-right made it popular. Starting in October 2015, Mr. Furie entered

21

22      [3] Mr. Furie had seen this comic before filing this lawsuit and does not consider it to infringe his copyright in any depiction of Pepe the Frog. (SUF ¶ 27.)

23      [4] Interestingly, Furie agrees that when Pepe is used in ways that do not politically displease him, it is simply "free speech." (SUF ¶ 27.)

RANDAZZA | LEGAL GROUP

into licensing agreements with third parties; he only made ███████████ ██████████.  (SUF ¶¶ 30-36.)  Two of these agreements were for the use of the character in a card game, and Furie was commissioned to reproduce unlicensed drawings of Pepe the Frog by third parties; at the height of the meme's popularity, the artist was paid to copy derivative works.  (SUF ¶¶ 34, 36-37.)

The only monetarily significant licensing agreement Mr. Furie entered into was with the Chinese company Xi'an Momo IT Ltd. for use of Pepe the Frog in connection with "emoji" symbols ██████.  (SUF ¶ 35.) These seven agreements are the only licensing agreements regarding any of Mr. Furie's works ever, and the earliest was entered into in 2015, at the height of Pepe the Frog's alt-right popularity.  (SUF ¶¶ 38-39.)  Mr. Furie even admitted that Pepe the Frog's popularity as an internet meme was a financial windfall for him.  (SUF ¶ 24.)

### 2.5   The MAGA Poster

In January 2017, Jon Allen drew a collage of several politically significant figures during the 2016 presidential election season, including President Trump, Ann Coulter, Kellyanne Conway, and Roger Stone, known as the "MAGA Poster."  (SUF ¶¶ 42-43.) The poster, as part of the collage, also includes a depiction of Pepe the Frog based on an image of the character drawn by an unknown third party.  (SUF ¶ 44.)  Mr. Allen used this image as a reference and then made stylistic changes to add "volume and dimension" because he "needed it to look like [his] own tile of the poster, the illustration," and to make it fit with the rest of the collage, including changes to the shape of the mouth (changing it from a frown to a smile), the pupils, and the texture of

1   the image.  (SUF ¶¶ 46-47.)  Mr. Allen was aware of Pepe the Frog as a meme when he

2   made the MAGA Poster, but was not aware of Mr. Furie's existence.  (SUF ¶ 45.)

3   Shortly after this lawsuit was filed, Mr. Allen wrote a statement explaining his

4   intent.  (SUF ¶ 48.)  Mr. Allen used the MAGA Poster to discuss alternative media

5   figures and the role they played in the 2016 election of Donald Trump, as well as the

6   absurdity of the election and the role that sharing memes played in it.  (SUF ¶ 54.)  Mr.

7   Allen was aware that memes played a significant role in the election and that Pepe the

8   Frog in particular was a "meme zeitgeist" that the general public knew about and used

9   in pro-Trump contexts.  (SUF ¶¶ 49, 51.)  Mr. Allen wanted to include humor in an

10  otherwise serious poster, and Pepe the Frog personified the absurdity of the 2016

11  election, particularly given how this cartoon frog became a personality of his own,

12  associated with one of the candidates.  (SUF ¶¶ 52, 55.)  The smug smile of Pepe the

13  Frog in the MAGA Poster symbolizes how the character had reached the height of

14  relevance, communicating to the viewer, "Yeah, I had a part in this."  (SUF ¶ 53.)

15  Due to the significance Pepe the Frog in particular had in the 2016 election, and

16  the lack of any other meme or cartoon character in the election, the MAGA Poster

17  would not have communicated the same message without Pepe the Frog.  (SUF ¶¶ 56,

18  58.)  Despite creating the allegedly offending poster, Mr. Furie has not sued Mr. Allen.

19  **2.6   Defendants FSS and Infowars**

20  Starting April 23, 2017, FSS began selling copies of the MAGA Poster on its

21  <infowarsstore.com> and <infowarsshop.com> web sites.  (SUF ¶ 63.)  FSS owns and

22  operates these sites and <infowars.com>.  (SUF ¶ 64.)  FSS, not Infowars, purchased

23

**RANDAZZA** | LEGAL GROUP

copies of the MAGA Poster from Mr. Allen and made out checks for these purchases to Mr. Allen, totaling $8,125.  (SUF ¶¶ 66-67.)  Infowars played no role in the sale of the poster, as it is merely a holding company that has no employees and conducts no business of its own.  (SUF ¶¶ 61-62.)[7]  Defendants played no role in the creation of the MAGA Poster and did not ask Mr. Allen to create it.  (SUF ¶¶ 60, 65.)  Alex Jones, as the head of FSS, had read articles prior to FSS selling the MAGA Poster quoting Mr. Furie as stating, essentially, that Pepe the Frog was free to use by the general public, and thought there was no issue in selling the MAGA Poster due to these statements and Mr. Furie's lack of copyright enforcement efforts.  (SUF ¶ 59.)  The MAGA Poster was not a prominent seller on FSS's store, and FSS only received gross revenues of approximately $31,407.44, netting $13,671.44 from the poster.  (SUF ¶ 68.)

## 3.0   LEGAL STANDARD

Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmovant must come forth with sufficient evidence for which a jury could reasonably find for that party, and a mere "scintilla of evidence" is insufficient.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

---

[7] Though the <prisonplanet.com> and <infowars.com> terms of use pages refer to Infowars, this is an error, as Infowars has no relation to these web sites.  (SUF ¶ 62.)

**4.0   ARGUMENT**

### 4.1   Defendant Infowars Did Not Engage in the Alleged Conduct

There is no evidence suggesting that Defendant Infowars engaged in any conduct alleged.   As explained in Section 2.6,   Infowars is an intellectual property holding company that does no business of any kind and does not operate any web sites.  (SUF ¶¶ 61-62.)  FSS, not Infowars, operates the business at <infowars.com> and related web sites.  (SUF ¶ 64.)  FSS, not Infowars, purchased copies of the MAGA Poster from Mr. Allen; the purchase orders and checks to Mr. Allen are from FSS.  (SUF ¶ 66-67.)

The only argument that Infowars is in any way liable is that the terms of service pages on <prisonplanet.com> and <infowars.com> refer to Infowars, LLC.  However, David Jones testified that these are mistakes, as the sites are operated by FSS and Infowars has no involvement in the operation of the sites.  (SUF ¶ 62.)

Mr. Furie alleges only that Defendants engaged in direct infringement of his copyrights.  Yet the record shows that Infowars played no role in the purchase, sale, or distribution of the MAGA Poster.  It did not engage in any act of infringement. Infowars is not a proper defendant and the Court must grant judgment in its favor.

### 4.2   The Poster's Use of Pepe the Frog Was a Fair Use

Even if Infowars did participate in the alleged conduct, Mr. Furie cannot prevail against it, or against FSS, because his claim is foreclosed by fair use.  17 U.S.C. § 107 sets out a four-factor test for determining whether a use of a copyrighted work is a fair use that does not infringe an author's copyright.  These factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  The use of a copyrighted work "for purposes such as criticism [or] comment . . . is not an infringement of copyright."  17 U.S.C. § 107.  "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (alteration in original) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).  Accordingly, "the analysis is a flexible one[,]" to be "perform[ed] on a case-by-case basis" and "in light of the copyright law's purpose 'to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works.'"  *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 529 (9th Cir. 2008) (quoting *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 799-800 (9th Cir. 2003)).

### 4.2.1   Factor one: purpose and character of the use

The first factor determines "whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose of different character, altering the first with new expression, meaning, or message," i.e., whether the use is "transformative."  *Campbell*, 510 U.S. at 579 (citations omitted).  Other factors in the fair use analysis weigh less the more transformative a use is.  *See id.*  "[A]n allegedly infringing work is typically viewed as transformative as long as new expressive content or message is apparent."  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013).  Placing a copyrighted work in a new context can make a use

of that work transformative.  *See Wall Data Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006) (citing *Campbell*, 510 U.S. at 578-79).

There are two aspects of the depiction of Pepe the Frog in the MAGA Poster: physical and contextual.  Physically, Jon Allen did not copy an image created by Mr. Furie; he instead used another image of Pepe drawn by a third party.  Given the ubiquitous "meme-ification" of the character, it is unsurprising that he chose a third party's depiction.[8]  Mr. Allen then made alterations to the shading, the shape of the mouth, the pupils, and the texture to "make it look more naturalistic" and fit with the style of the rest of the poster.  (SUF ¶¶ 46-47.)  This case thus deals with a derivative work of a derivative work, not literal copying.  The image of Pepe the Frog in the poster only shows the character's face, and not the entire body, nor all of one of the comics.  (SUF ¶ 43.)  A comparison of the MAGA Poster with Furie's works shows that there are clear differences between Allen's poster and any depiction of Pepe drawn by Furie.  (SUF ¶¶ 1-7, 43.)[9]  Notably, all but one of the works allegedly infringed do not show Pepe the Frog with red lips, and the eyes in all but one of Mr. Furie's works contain only a single white circle instead of the three appearing in Mr. Allen's drawing.  (*See id*.)  The reddish coloring of Pepe the Frog in the MAGA Poster is also completely different from the green color in Furie's Pepe.  (*See id*.)  There are considerable physical differences between the MAGA Poster and Mr. Furie's works.

---

[8] In fact, in two of Mr. Furie's licensing deals, the licensee did not even use Mr. Furie's original work – but found a third-party depiction of Pepe the Frog, and then asked Mr. Furie to re-draw these third-party depictions of the character.  (SUF ¶¶ 34, 36.)

[9] Mr. Furie does not specify which of his works the poster allegedly infringes, instead claiming he generally has a copyright in the character of Pepe the Frog.  It is thus necessary to compare Mr. Allen's depiction of the character with all depictions of the character in which Mr. Furie claims copyright.

1        More significant, though, is the context of the use of Pepe the Frog in Allen's

2  MAGA Poster.  Pepe was supposedly created as a "peaceful frog-dude" doing drugs

3  and making scatological jokes.  (SUF ¶¶ 1-6, 8.)  By 2010, Pepe the Frog had become

4  an internet meme, as third parties copied images of the character.  (SUF ¶¶ 9-10.)

5  Starting at least in 2014, famous celebrities started posting memes featuring Pepe the

6  Frog.  (SUF ¶ 12].)  From 2015 to 2017, prominent politicians, foreign embassies, and

7  multi-national fast-food chains were using Pepe memes, including depictions of the

8  character alongside Donald Trump.  (SUF ¶¶ 13, 16.)  Starting in 2015, the politically

9  conservative "alt-right" began using Pepe in political memes.  (SUF ¶¶ 14.)  Third

10  parties continued to use Pepe throughout 2016 in this manner, and Hillary Clinton's

11  campaign published an "explainer" about it being a "white nationalist symbol."  (SUF

12  ¶ 15.)  Pro-Clinton media entities repeated this tale.  (*See id.*)  The television show *Family*

13  *Guy* featured "Pepe the Alt-Right Frog."  (SUF ¶ 17.)  Multiple periodicals asked Furie

14  about this association with the "alt-right" and he admitted that the character had been

15  transformed from its original context.  (SUF ¶¶ 20-23.)  Mr. Furie said that Pepe the

16  Frog became "a symbolic identifier for online hate" and became associated with

17  President Trump, "which is never what he was meant to be."  (SUF ¶ 25.)

18        Despite being just a cartoon frog, Pepe played a significant role in the 2016

19  Presidential election and became associated, through memes, with President Trump.

20  This is why Jon Allen in January 2017 included him in a collage of prominent figures,

21  both politically and in general internet culture, who played a role in helping Donald

22  Trump get elected as President.  (SUF ¶¶ 42-43, 48-49.)  Mr. Allen's poster was a one-

23

1   pane graphic novel about the 2016 election and a depiction of its key players in getting

2   Trump elected.  Mr. Allen understood that Pepe had taken on a life of his own and was

3   a "meme zeitgeist," and he wanted to include this key figure in the election, given the

4   fact that a **presidential candidate** weighed in on him.  (SUF ¶¶ 51-53, 55.)

5          Contextually, the use of Pepe the Frog in the MAGA Poster is highly

6   transformative.  Pepe the Frog is only one of 12 faces in the MAGA Poster, and is one

7   of the least prominent figures in it, taking up only a small percentage of the total poster.

8   (SUF ¶ 43.)  As a collage, it is highly transformative.  *See, e.g., Cariou v. Prince*, 714 F.3d

9   694, 706 (2d Cir. 2013) (noting that a collage's "composition, presentation, scale, color

10  palette, and media are fundamentally different and new compared to the" original);

11  *Blanch v. Koons*, 467 F.3d 244, 252 (2d Cir. 2006) (reasoning that the collage and the

12  original image had "sharply different" purposes).

13         In the MAGA poster, Pepe the Frog's smile indicated that he was part of Donald

14  Trump's victory (SUF ¶ 53), and being part of political figures and alternative media

15  members, is far removed from his original context of just "feel[ing] good, man."  (SUF

16  ¶ 8.)  Though the character's use in the MAGA Poster may not be a direct parody, it

17  certainly does parody the drug-using and bathroom-humor frog, transforming him into

18  one of the faces on a Mount Rushmore of conservative figures from the 2016 campaign.

19          This use is a commentary on the nature of and key players in the 2016 election.

20  It provides a context entirely different from any work of Mr. Furie's featuring the

21  character, and is thus highly transformative.  The main inquiry is whether the MAGA

22  Poster "supersedes" Mr. Furie's works, and there is no plausible argument that the

23

RANDAZZA | LEGAL GROUP

poster, with its entirely different content, message, and context, while commenting on Pepe's role in the election, is a substitute for Mr. Furie's works.

Given the highly transformative nature of the MAGA Poster, the first fair use factor weighs strongly in Defendants' favor.

### 4.2.2   Factor two: nature of the copyrighted work

This "factor typically has not been terribly significant in the overall fair use balancing." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 799-800 (9th Cir. 2003). It also considers "the extent to which a work has been published," as "[p]ublished works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred." *Seltzer*, 725 F.3d at 1178.

First, whether Pepe the Frog was even original is unlikely, given its striking similarity to El Sapo Pepe. (*See* SUF ¶¶ 69-71.)  Original or not, the character has been shown in published materials for well over a decade, and has been published thousands of times by third parties.  Accordingly, the "nature" of the work is somewhat unique. Even if it were original, it took on a life of its own – with unknown thousands of people making new and transformative uses of Pepe the Frog.  (SUF ¶¶ 9-17.)  This "meme-ification" of the character was so widespread that even Mr. Furie copied other people's works depicting Pepe the Frog – at the request of a licensee.  This "nature" of a work is one that only could arise in the context of the Internet and Internet memes.

This Court should recognize that the nature of the work – something that had already traveled deeply into the public domain as a meme – weighs heavily in favor of a later transformative use being a fair use.

### 4.2.3   Factor three: amount and substantiality of portion taken

"The third factor looks to the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Seltzer*, 725 F.3d at 1178. This is because "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87.  Wholesale copying of a work does not preclude a finding of fair use and the use of an entire copyrighted image may be reasonable if it serves the defendant's intended purpose.  *See Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000).  It is also important to look at only the protectible elements of the original work, rather than the entire work itself, in this analysis.  *See Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 115-16 (2d Cir. 1998).  Elements of a work "that are standard, stock, or common to a particular subject matter or medium are not protectable . . . ." *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003). Given how Furie claims it is "coincidence" that Pepe the Frog and El Sapo Pepe are strikingly similar, this cuts against much of the Frog/Toad being protectable.  If they are so similar, just because they are both depicting similar amphibians, it is not as if the later one can be deemed to be so "original" as to be highly protectable on its own (as opposed to an element of the protectable comic book it originally appeared in).

Further, there is relatively little of Mr. Furie's work used in the MAGA Poster. Whichever elements *are* protectable in any event, Allen did not even work from a Furie drawing to create his depiction of Pepe.  (SUF ¶ 44.)  Then, Furie does not specify which of his copyrighted works was infringed, so we must look at them collectively.

The vast majority of the works at issue are Mr. Furie's comics, *Play Time* and *Boy's Club*. The depiction of Pepe the Frog in *Play Time* is little more than a crude blob in a vaguely frog-like form with no color scheme, and it is difficult to see how any element of this comic was used in the MAGA Poster. (SUF ¶¶ 1, 43.) *Boy's Club* collectively features Pepe the Frog in fewer than half its pages, and the depictions of the character it does feature does not typically contain elements seen in the MAGA Poster, such as red lips or three white spots in the character's eyes. (SUF ¶¶ 2-6, 43.) The remaining features, the general facial shape and eye shape, are not likely protectible or are entitled only to "thin" protection, as they are inevitable parts of any depiction of a cartoon frog. *See Lowry*, 323 F.3d at 810, 812. They have just as much in common with El Sapo Pepe as they do Pepe the Frog. (SUF ¶ 69.)

Even if the MAGA Poster contained a full-body depiction of Pepe the Frog in his original color scheme without alteration, however, this would not weigh against fair use. Mr. Allen included Pepe in the MAGA Poster to comment on the use of memes in the 2016 presidential election and the prominent role that the Pepe meme played during that election. (SUF ¶¶ 49, 52-55.) It also served as a commentary on the absurdity of the 2016 election, particularly the absurdity that a cartoon frog played such a prominent role that he became associated with Donald Trump and Hillary Clinton decried him. (SUF ¶¶ 52-53.) Due to the role Pepe memes played in the election, and the lack of any other way to express that, the MAGA Poster would not have carried the same meaning if it had omitted him. (SUF ¶¶ 56, 58.) Thus, the use of a single depiction of Pepe, dissimilar from the vast majority of drawings Mr. Furie made of the character,

and which used a third party's drawing as a reference, was necessary for the authorial purpose of the MAGA Poster.

Considering the amount and substantiality of Mr. Furie's works taken, along with the necessity of this taking for the purpose of the MAGA Poster, this factor weighs in Defendants' favor.

### 4.2.4   Factor four: effect on the market

This factor considers "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (citing Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4]). "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use." *Seltzer*, 725 F.3d at 1179.  Transformative works are less likely to have an adverse impact on the original work than a use which merely supersedes the original.  *See Kelly*, 336 F.3d at 821.

Harm to the plaintiff's market cannot be presumed where the use in question is transformative and market substitution is unlikely; in such cases, the plaintiff must show "[e]vidence of substantial harm to it," *see Campbell*, 510 U.S. at 593.  This factor does not favor a plaintiff who can only show "hypothetical" market harm. *See Perfect 10*, 508 F.3d at 1168; *see also Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1108 (C.D. Cal. 2015) (finding that mere allegation of loss of licensing revenue from alleged

infringer was circular, and that in absence of either side providing evidence of market harm, this factor was neutral).  If anything, third party use of Pepe *increased* the market.

It is important to keep in mind that the only kind of market harm considered here is the degree to which the defendant's use serves as a *market substitute* for the original.  The only kind of harm Mr. Furie can allege is his claim that he does not like Pepe the Frog's association with the "alt-right" and hate groups.  (SUF ¶ 28.)  But an unwelcome political association is not market harm recognized under this factor.  Furie cannot allege or prove any effect on any market for Pepe the Frog.  In fact, he has admitted that he cannot quantify *any* loss of income caused by sale of the MAGA Poster and has waived the ability to seek such damages.  (SUF ¶ 41.)  If any evidence establishing such alleged harm exists, Mr. Furie has deliberately withheld it and should not be able to introduce it now.  Nor has Mr. Furie retained or disclosed an expert who could opine on even the potential harm of the sale of the MAGA Poster.

But even assuming, *arguendo*, Mr. Furie could introduce evidence of some harm to his market, it is not substantial.  As explained in Section 4.2.1, *supra*, the MAGA Poster is a derivative work of a derivative work of Mr. Furie's works (if Furie's work is not a derivative itself).  It carries a different message and context than Furie's comics, and there is no evidence that consumers will forego purchasing a copy of these comics because they had quenched their thirst for seeing a cartoon frog enjoying a drug-fueled good time by purchasing the MAGA Poster.  Instead, the vast majority of consumers of Pepe the Frog get their Pepe fix by going online and looking at unauthorized memes of the character as opposed to authorized depictions drawn by Mr. Furie or a licensee.

RANDAZZA | LEGAL GROUP

Rather than harming Mr. Furie, Pepe the Frog's status as a meme, built on the efforts of thousands of anonymous individuals, has been a financial windfall to him. (SUF ¶ 24.)  He had never licensed Pepe the Frog[11] until late 2015, by which point the character had become meme and his association with the "alt-right" and Donald Trump had already started.  (SUF ¶¶ 30, 38.)  Aside from one licensing agreement with a Chinese company, Mr. Furie has only earned ███████████████ from each of these licensing deals.  (SUF ¶¶ 30-36.)  And the Chinese agreement was for use of Pepe the Frog in connection with emojis in smart phone apps, not political posters, and only in China, Hong Kong, Taiwan, and Macau.  (SUF ¶ 35.)  And Mr. Furie entered into this licensing agreement in June 2016, the middle of a presidential election season, when the popularity of Pepe as a meme was high *because* of its political associations.

Rather than harming the character's commercial appeal, Pepe the Frog's association with political conservatives skyrocketed it.  Even if this association were somehow harmful to Mr. Furie's licensing opportunities, there is no evidence that the MAGA Poster contributed to this harm; to the contrary, it is far more likely the MAGA Poster added value to the market for Mr. Furie.

This leaves Mr. Furie with only a single argument regarding market harm: revenue he could have acquired if Jon Allen or FSS had obtained a license to sell the MAGA Poster.  But this circular argument does not entitle Mr. Furie to a presumption or finding of market harm given the highly transformative nature of the MAGA Poster and the lack of any proof of actual harm or lost licensing revenue.  *See Perfect 10*, 508

---

[11] Pepe the Frog is the only character or work Mr. Furie has ever licensed.  (SUF ¶ 39.)

1    F.3d at 1168; *see also Equals Three*, 139 F. Supp. 3d at 1108.  Due to the lack of evidence

2    of effect on the market, this factor weighs in favor of Defendants.

3        All of the fair use factors thus weigh in Defendants' favor, and FSS's sale of the

4    MAGA Poster is a fair use under copyright law.  The Court should grant summary

5    judgment in Defendants' favor.

6    **4.3    Furie Abandoned His Copyright in Pepe the Frog and/or Granted**

7           **an Implied License to the General Public to Use this Character**

8        A creator can abandon copyright in his works.  Copyright abandonment "must

9    be manifested by some overt act indicative of a purpose to surrender the rights and

10   allow the public to copy." *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th

11   Cir. 1960).[12]  That clearly happened here.

12       Public statements in news articles are sufficient to amount to abandonment.  In

13   *Marya v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 992-93 (C.D. Cal. 2015), the

14   lyricist of the popular song "happy birthday" stated in an interview with *TIME Magazine*

15   that she "had no complaint to make on the use of the words because she long ago

16   resigned herself to the fact that her ditty had become common property of the nation."

17   The court found that the "clear implication from the article is that Patty told the *TIME*

18   journalist that she had surrendered any claim she may have had to the *Happy Birthday*

19   lyrics," which could constitute an overt act expressing an intent to abandon her

20   copyright. *Id.* at 993 (emphasis original);[13] *see also Melchizedek v. Holt*, 792 F. Supp. 2d

21

22   _____

[12] The court in *Hampton* found that a mere "lack of action" does not constitute abandonment, but the case did not deal with an author who publicly stated he was fine with unauthorized use of his works.  *See id.*

23   [13] The court did not grant a motion for a directed verdict on this defense because there were outstanding questions as to what the lyricist actually told the reporter and whether *TIME* was paraphrasing her.  *See id.*  That is not the case here, as the record shows what Mr. Furie's specific words were and what he meant by them.

1042, 1051-54 (D. Ariz. 2011) (finding author's public statements indicating he was not interested in protecting his work were overt acts that could indicate an intent to abandon copyright protection).

Similarly, "a nonexclusive license may be granted orally, or even be implied from conduct." *Effects Associates, Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir. 1990).  An implied license can be found where the copyright holder engages in conduct "from which [the] other [party] may properly infer that the owner consents to his use." *See De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) ("Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it").

Starting at least since 2010, Mr. Furie made public statements indicating that he had abandoned copyright in Pepe the Frog.  As shown in Sections 2.2 and 2.3, from 2010 to 2016 Mr. Furie made numerous statements to media outlets that he was happy about Pepe the Frog becoming a meme, that he was not bothered (and was in fact inspired) by rampant unauthorized use of the character, that he was aware of third parties making a profit off these unauthorized works but did nothing to stop them, and that he had lost control over the character.  (SUF ¶¶ 18-23.)

Even after Furie started to publicly lament Pepe the Frog's memetic politics, he took no steps to enforce any alleged copyrights.  He instead attempted to counter this negativity with positive depictions of Pepe the Frog and eventually "killed" the character.  (SUF ¶ 26.)  The public ignored the character's "death" and continued to

meme-ify Pepe, with political cartoonist Ben Garrison responding to Mr. Furie's "funeral" comic by showing that Pepe the Frog had moved past Furie and was "part of the public domain of free speech." (SUF ¶ 27.)  It was not until August 2017, months after FSS began selling the MAGA Poster, that Furie attempted to walk back his clear public abandonment.  Furie had not once, in the 14-year life of Pepe the Frog, attempted to enforce any rights. (SUF ¶ 29.)  Due to his public statements and lack of enforcement efforts, Allen and FSS reasonably believed that Furie had abandoned his rights to the public and otherwise had impliedly licensed its use. (SUF ¶ 59.)

The above statements are precisely the kind of "overt act[s]" that "manifest . . . a purpose to surrender the rights and allow the public to copy." *Hampton*, 279 F.2d at 104.  Indeed, this court found that less substantial statements to constitute proof of abandonment in *Marya*, 131 F. Supp. 3d at 992-93.  The only reason the court in *Marya* did not rule on whether the artist's statements there did not constitute abandonment as a matter of law is that there was ambiguity as to her specific words. That is not the case here; Mr. Furie was quoted verbatim in his interviews with media outlets, and he admits these quotes are accurate.  (SUF ¶¶ 18-23.) Furthermore, although a mere lack of enforcement efforts by itself does not constitute abandonment, there is no case law to suggest that a lack of enforcement has no bearing at all on this analysis.  Mr. Furie's statements encouraging the general public to use Pepe, combined with a decade or more of rampant unauthorized use with no enforcement efforts, shows that Mr. Furie intended to, and in fact did, abandon any copyright interest he may have had in Pepe the Frog.  Even if Mr. Furie did not abandon his copyright for all purposes, he certainly

1    abandoned it for purposes of making derivative works in light of his explicit approval

2    of third parties remixing his work into internet memes.  *See Micro Star v. FormGen Inc.,*

3    154 F.3d 1107, 1114 (9th Cir. 1998).  And, if it is not deemed abandoned, his knowledge

4    and acquiescence of the global use of Pepe the Frog constitutes an implied license.

5    **4.4    Furie Cannot Seek Statutory Damages or Attorneys' Fees**

6         Mr. Furie alleges that he created the character of Pepe the Frog in 2003, his latest

7    date of first publication is December 20, 2016, and he did not seek registration of any

8    of his works until September 2017 at the earliest.  (SUF ¶¶ 1-7, 40.)  As explained in

9    Section 4.1, *supra*, Infowars was never involved in the sale of the MAGA Poster.  FSS

10   began offering the poster for sale, and sold its first copy, on April 23, 2017.  (SUF ¶

11   63.)  There is no evidence that FSS sold more than one version of the poster.

12        To receive statutory damages or attorneys' fees in a copyright case, a plaintiff

13   must either have applied for registration prior to the commencement of infringement

14   or must have applied for registration within three months after the first publication of

15   his work.  *See* 17 U.S.C. § 412.  Mr. Furie did not do this.

16        This leaves the question of what constitutes "commencement" of an act of

17   infringement and when it is considered complete for purposes of the Copyright Act.

18   The Ninth Circuit addressed this issue in *Derek Andrew, Inc. v. Poof Apparel Corp.,* 528

19   F.3d 696 (9th Cir. 2008).  The plaintiff's date of first publication of its copyrighted hang

20   tags for use with clothing was in 2003, it had an effective date of registration of June

21   15, 2005, and the defendant's initial act of selling infringing copies occurred on May 9,

22

23

2005.  *See id.* at 699-700.  The defendant continued to sell infringing copies after the effective date of registration.  *See id.* at 700.

The Ninth Circuit follows other courts on the question of "commencement" and held that "the first act of infringement in a series of ongoing infringements of the same kind marks the commencement of one continuing infringement under § 412."  *Id.*  The court made the same conclusion regarding the availability of attorneys' fees.  *See id.* at 701-02.  While post-registration infringements can be considered new "commencements" of infringing activity, they must be sufficiently different from the initial act of infringement.  *See id.*  For example, placing the same infringing tags on new articles of clothing post-registration did not constitute a new commencement of infringement.  *See id.*

Mr. Furie did not seek registration of any of his works until after FSS's alleged infringement commenced on April 23, 2017, and he sought registration more than 3 months after even the latest initial publication of his alleged works.  He is thus precluded from seeking statutory damages or attorneys' fees under 17 U.S.C. § 412.

**5.0**    **CONCLUSION**

The Court should grant summary judgment in Defendants' favor.

Memo in Support of Motion for Summary Judgment
2:18-cv-01830-MWF-JPR

Dated: April 8, 2019

Respectfully submitted,

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza

Marc J. Randazza, CA Bar No. 269535
Alex J. Shepard, CA Bar No. 295058
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

*Attorneys for Defendants,*
*Infowars, LLC and*
*Free Speech Systems, LLC*

Case No. 2:18-cv-01830-MWF-JPR

### **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 8, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that a true and correct copy of the foregoing document is being served via transmission of Notice of Electronic Filing generated by CM/ECF.

Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza