NANCY SCHROEDER (SBN 280207)
(nancy.schroeder@wilmerhale.com)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 S. Grand Ave., Suite 2100
Los Angeles, CA 90071
Telephone: +213 443 5300
Facsimile: +213 443 5400

LOUIS W. TOMPROS (*pro hac vice*)        WILLIAM C. KINDER (*pro hac vice*)
(louis.tompros@wilmerhale.com)           (will.kinder@wilmerhale.com)
STEPHANIE LIN (*pro hac vice*)           WILMER CUTLER PICKERING
(stephanie.lin@wilmerhale.com)               HALE AND DORR LLP
WILMER CUTLER PICKERING                   7 World Trade Center
    HALE AND DORR LLP                     New York, NY 10007
60 State Street                           Telephone: +1 212 230 8800
Boston, MA 02109                          Facsimile: +1 212 230 8888
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000

*Attorneys for Plaintiff Matt Furie*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT FURIE,<br><br>        Plaintiff,<br><br>    vs.<br><br>INFOWARS, LLC; FREE SPEECH SYSTEMS, LLC,<br><br>        Defendants. | 2:18-cv-01830-MWF-JPR<br><br>**MATT FURIE'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 6, 2019<br>Time: 10:00 a.m.<br>Hon. Michael W. Fitzgerald<br>Case Filed: March 5, 2018<br>Trial Date: July 16, 2019 |

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-2, Plaintiff Matt Furie submits the following Statement of Genuine Disputes of Material Fact in support of its opposition to Defendants' Motion for Summary Judgment.

### PLAINTIFF MATT FURIE'S
### <u>STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT</u>

| DEFENDANTS' PURPORTED UNCONTROVERTED FACT | PLAINTIFF'S RESPONSE |
|---|---|
| 1.     On November 18, 2003, Matt Furie published the comic book Play Time.  This comic features Pepe the Frog, who is one of multiple characters in the comic.  Pepe the Frog is not drawn in color in any panel in the comic.  The character is drawn crudely and each eye contains only a single white spot in them. | Disputed. The characterization of Pepe the Frog as being drawn "crudely" is wrong (or, at best) a matter of judgment. In some panels, Pepe the Frog contains three white spots in each eye.<br><br>*Evidence:*<br>Infowars Ex. 1 (Dkt. 88-5); Infowars Ex. 1 (Dkt. 88-5) at FURIE_INFO_00000046. |
| 2.     From April 2006 to July 2007, Matt Furie published the comic book Boy's Club 1.  This comic features Pepe the Frog, who is one of multiple characters in the comic.  Only one drawing of Pepe the Frog in his comic is in color, and it shows the character with green, instead of red, lips.  Each eye of Pepe the Frog contains only a single white spot in them.  Pepe the Frog appears in 20 of the comic's 44 pages. | Disputed.  Pepe the Frog is shown with two white spots in each eye in some panels, and three white spots in each eye in other panels. Pepe the Frog appears in 21 of the comic's 44 pages.<br><br>*Evidence:*<br>Infowars Ex. 2 (Dkt. 88-6); Infowars Ex. 2 (Dkt. 88-6) at FURIE_INFO_00000131, |

| | |
|---|---|
| | FURIE_INFO_00000132, FURIE_INFO_00000133. |
| 3.      On June 30, 2008, Mr. Furie published the comic book Boy's Club 2.  This comic features Pepe the Frog, who is one of multiple characters in the comic.  Only two drawings of Pepe the Frog in this comic are in color, and they show the character with green, instead of red, lips.  Each eye of Pepe the Frog contains only a single white spot in them.  Pepe the Frog appears in 25 of the comic's 44 pages. | Disputed.  Pepe the Frog is shown with three white spots in each eye in some panels.  Pepe the Frog appears in 26 of the comic's 44 pages.<br><br>***Evidence:***<br>Infowars Ex. 3 (Dkt. 88-7); Infowars Ex. 3 (Dkt. 88-7) at FURIE_INFO_00000298. |
| 4.      On August 30, 2009, Mr. Furie published the comic book Boy's Club 3.  This comic features Pepe the Frog, who is one of multiple characters in the comic.  Pepe the Frog is not drawn in color in this comic.  Each eye of Pepe the Frog contains only a single white spot in them.  The character appears in 16 of the comic's 44 pages. | Disputed.  Pepe the Frog appears in 17 of the comic's 44 pages.<br><br>***Evidence:***<br>Infowars Ex. 4 (Dkt. 88-8). |
| 5.      On September 30, 2010, Mr. Furie published the comic book Boy's Club 4.  This comic features Pepe the Frog, who is one of multiple characters in the comic.  Pepe the Frog is drawn in color on one page of the comic and it shows the character with green, instead of red, lips.  Each eye of Pepe the Frog contains only a single white spot in them.  Pepe the Frog appears in 25 of the comic's 44 pages. | Disputed.  Pepe the Frog is shown with one half of a dot in each eye in one panel, and multiple lines through each eye in another panel.<br><br>***Evidence:***<br>Infowars Ex. 5 (Dkt. 88-9) at FURIE_INFO_00000152, FURIE_INFO_00000154. |
| 6.      On June 30, 2016, Mr. Furie published Boy's Club Collective Edition, a compilation of the prior volumes of Boy's Club.  This comic features Pepe the Frog, who is one of multiple characters in the comic. Pepe the Frog is drawn in color on two pages of the book and they show the | Disputed.  Pepe the Frog is sometimes shown with lines, one half, two, or three white spots in each eye.  Pepe the Frog appears |

| | |
|---|---|
| character with green, instead of red, lips.  Each eye of Pepe the Frog contains only a single white spot in them.  Pepe the Frog appears in 83 of the book's 180 pages. | in 86 of the book's 180 pages.<br><br>***Evidence:***<br>Infowars Ex. 6 (Dkt. 88-10); Infowars Ex. 6 (Dkt. 88-10) at FURIE_INFO_00000182, FURIE_INFO_00000186, FURIE_INFO_00000188, FURIE_INFO_00000189, FURIE_INFO_00000228, FURIE_INFO_00000229, FURIE_INFO_00000230, FURIE_INFO_00000248, FURIE_INFO_00000249, FURIE_INFO_00000250. |
| 7.     On December 20, 2016, Mr. Furie published a visual work titled Pepe in Blue Shirt.  This work depicted Pepe the Frog. | Undisputed. |
| 8.     Mr. Furie created Pepe the Frog as a "peaceful frog-dude" who lived alongside animal roommates and became famous in part because of his catchphrase "feels good man," and who featured prominently in internet memes by, at the latest, 2014. | Undisputed. |
| 9.     Pepe the Frog had become an internet "meme phenomenon" by 2010, and was a meme prior to this time. | Disputed.  Mr. Furie testified that the "meme phenomenon was kind of peaking for Pepe the Frog" in 2010.  He did not testify that Pepe became a "meme phenomenon."<br><br>***Evidence:***<br>Infowars Ex. 9 (Dkt. 88-13) at 48:3-5. |
| 10.     Pepe the Frog began as a comic book character in Mr. Furie's works, after which point | Disputed.  Mr. Furie's testimony regarding third |

4

| | |
|---|---|
| third parties cut images of Pepe the Frog from these comics and "posted them online as a meme. And then it just kind of went viral after that and it became popular.  Specific drawings that [Mr. Furie] made of Pepe became popular internet memes." | parties' use of Pepe stated that those third parties "posted online as a meme. And then it just kind of went viral after that and it became popular.  Specific drawings that [Mr. Furie] made of Pepe became popular internet memes."<br><br>***Evidence:***<br>Infowars Ex. 9 (Dkt. 88-13) at 59:25-60:3. |
| 11.    Once Pepe the Frog became a meme, Mr. Furie started to receive examples of unauthorized works featuring the character.  Mr. Furie did not "feel any particular happiness or unhappiness about it.  [He] was just kind of witnessing it as a phenomenon." | Disputed. Mr. Furie's testimony was not that items received from third parties bearing Pepe the Frog were "unauthorized works."<br><br>***Evidence:***<br>Infowars Ex. 9 (Dkt. 88-13) at 60:4-11. |
| 12.    By 2014, famous celebrities such as Katy Perry and Nicki Minaj began publishing memes featuring Pepe the Frog.  Also starting in 2014, users of the online message board 4chan began posting thousands of unauthorized works featuring Pepe the Frog and calling them "rare Pepes" as if they were trading cards, and assigning a fictitious value to them despite the fact that they were all unauthorized uses of Pepe the Frog.  Third parties created various versions of Pepe the Frog, such as "Sad Frog," "Smug Frog," "Angry Pepe," "Poo Poo Pee Pee," "Nu Pepe," "Well Meme'd," and an off-brand version called "Peep the Toad." | Disputed. The statements regarding "users of the online message board 4chan" and "[t]hird parties creat[ing] various versions of Pepe" is hearsay based on documents not produced during fact discovery and should not be considered on that basis.  It is undisputed that by 2014, famous celebrities such as Katy Perry and Nicki Minaj began publishing meme featuring Pepe the Frog.<br><br>***Evidence:*** |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| | Fed. R. Civ. P. 37(c); Fed. R. Evid. 801, 802. |
| 13.    In 2015, then-Presidential candidate Donald J. Trump retweeted an image of himself as Pepe the Frog.  In January 2016, the Russian embassy in the UK published a meme of Pepe the Frog in reaction to news about an upcoming meeting between British Prime Minister Theresa May and President Trump.   In late 2016, internet users posted memes of Pepe the Frog as conservative French politician Marine Le Pen.  In January 2017, the fast food chain Wendy's posted a meme depicting its mascot as Pepe the Frog. | Disputed. This statement is hearsay only supported by documents not produced during fact discovery and should not be considered on that basis.<br><br>***Evidence:***<br>Fed. R. Civ. P. 37(c); Fed. R. Evid. 801, 802. |
| 14.    Beginning in 2015, several groups connected with the politically conservative "alt-right" began using images of Pepe the Frog and including in these depictions "white supremacist language and symbols, Nazi symbols, and other offensive imagery."  This included users of the 4chan engaging in a campaign to "reclaim" Pepe by mixing depictions of the character with offensive material such as Nazi propaganda images.    Throughout 2015 and the 2016 presidential campaign, there was an increasing "number of memes juxtaposing Pepe with racist, anti-Semitic, and other bigoted imagery and themes . . . ." | Undisputed. |
| 15.    In 2015 and 2016, third parties continued to use Pepe the Frog in images depicting the character as or with then-Presidential candidate Donald J. Trump alongside other conservative political figures.  Around September 2016, news media began referring to Pepe the Frog as a "white nationalist symbol" and then-candidate Hillary Clinton posted an "explainer" stating that "Pepe had been coopted by the alt-right and other white supremacists as a symbol associated with anti-Semitism and white supremacy." | Undisputed. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| 16.   On September 10, 2016, President Donald Trump's son, Donald Trump Jr., shared an image on his account on the social media site <instagram.com> displaying Pepe the Frog alongside Donald Trump and several other conservative political figures. | Disputed. This statement is hearsay supported by documents not produced during fact discovery and should not be considered on that basis.<br><br>***Evidence:***<br>Fed. R. Civ. P. 37(c); Fed. R. Evid. 801, 802. |
| 17.   An episode of the television show "Family Guy" titled "Pawtucket Pete" that first aired December 9, 2018 included a depiction of Pepe the Frog and referred to it as "Pepe the Alt-Right Frog." | Disputed. This statement is hearsay only supported by documents not produced during fact discovery and should not be considered on that basis.<br><br>***Evidence:***<br>Fed. R. Civ. P. 37(c); Fed. R. Evid. 801, 802. |
| 18.   Mr. Furie stated in an August 2010 interview with the online publication KnowYourMeme.com and in response to the question "How about the people that actually crop out Pepe's face and use it, how do you feel about people remixing your work?", that "I don't really mind . . . I was like it doesn't look the greatest but I don't care."  In response to the question "Do you consider yourself now as sort of a meme creator? Maybe have some influence on the social web," Mr. Furie answered "I think it kind of just took a life of its own.  I do think it's kind of an interesting phenomenon that out of anything else in the comic it took off.  Seems kind of random.  But I am happy that it was."  Mr. Furie testified that, as of August 2010, he was happy about Pepe the Frog becoming a meme. | Disputed. Mr. Furie's answer to the interview question is misquoted, as published in the online publication *knowyourmeme.com*, and should read as follows: "I think it just kinda took a life of its own.  I do think it's kind of an interesting phenomenon that out of anything else in the comic took off.  Seems kinda random but I'm happy that it has."<br><br>***Evidence:***<br>Furie Ex. 47 (Dkt. 88-47) at FSS000322. |

7

| | |
|---|---|
| 19.   Mr. Furie stated in an interview with the online publication The Daily Dot in April 2015, in response to a question about third parties profiting from unauthorized use of Pepe the Frog, that "I believe in supporting people's decisions to profit off of Pepe in order to provide them with the most positive business experience possible.  I strive to be an advocate for Pepe in both love and enterprise and hope to help business people to have an empowering and joyful experience while making an ocean of profits as limitless as the universe." | Disputed.  Mr. Furie's comments made to the Daily Dot in April 2015 were in response to the question "What about people profiting off of Pepe?"  In addition, Mr. Furie's answer was sarcastic and a joke.<br><br>***Evidence:***<br>Infowars Ex. 14 (Dkt. 88-18) at Response to Request No. 4;  Furie Ex. 64 (Dkt. 88-64) at FSS000345-352;  Furie Ex. 74, FURIE_INFO_00000989;  Furie Ex. 70 [Furie Dep. Tr. at 158:3]. |
| 20.   Mr. Furie stated in an interview with the publication Vice.com dated July 28, 2015, in response to the question "You don't feel weird about [Pepe the Frog] being completely removed from its original context in your comics?", that "I don't really see it as being something that's negative.  It's this almost post-capitalist kind of success.  I'm not making any money off of it, but it's become its own thing in internet culture . . . I'm just flattered by it.  I don't really care.  I think it's cool.  In fact, I'm getting kind of inspired by all the weird interpretations of it.  I wanna use it to my own advantage and try to come up with comics based on other people's interpretations of it."  Later in the interview, Mr. Furie is asked "But your main complaints are just a couple specific aesthetic things, and not a principled objection to art being used by people other than the original artist," to which Mr. Furie responds "No, because I do art outside of Boy's Club, and I reference Terminator or Ronald McDonald or other pop- | Disputed.  First, Mr. Furie's answers to the interview questions are misquoted and should read as follows: "I don't really see it as being something that's negative.  It's this almost post-capitalist kind of success.  I'm not making any money off of it, but it's become its own thing in internet culture . . . I'm just flattered by it.  I don't really care.  I think it's cool.  In fact, I'm getting kind of inspired by all the weird interpretations of it. I wanna use it to my own advantage and try to come up with comics based on other people's |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| cultural stuff that I didn't come up with," and that if he saw third parties selling works incorporating Pepe the Frog, he would ask for a copy of the item. | interpretations of it." Second, Mr. Furie was asked "But your main complaints are just a couple specific aesthetic things, and not a principled objection to art being used by people other than the original artist." His answer was ""No, because I do art outside of Boy's Club, and I reference Terminator or Ronald McDonald or other pop-cultural stuff that I didn't come up with." Finally, Mr. Furie's testimony regarding third party use was "If I see someone selling something on Etsy, like a Pepe pin or something, I just ask them to send me some." Mr. Furie's comments did not say that he would ask for a copy instead of asking them to stop the use.<br><br>***Evidence:***<br>Infowars Ex. 14 (Dkt. 88-18) at Responses to Request for Admission Nos. 2 & 12; Furie Ex. 9 (Dkt. 85-9) at FSS000332, FSS000334. |
| 21.   Mr. Furie stated in an interview with New York Magazine's online publication *Select/All* in September 2016 that "I've realized that Pepe is beyond my control . . . He's like a kid, he grew up and now I have to set him free to live his life.  It's | Undisputed. |

9

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| all good . . . I just sit back, relax, and let the Pepes fall where they land[.]" | |
| 22.     Mr. Furie stated in an interview with the online publication The Daily Dot in September 2016, in response to the question "How do you feel about Pepe's use in so many pro-Trump memes, especially the more racist-xenophobic variations we've seen," that "It's just a phase, it's not the first time Pepe has been reclaimed for evil, and no one will care about it come November.  I predict that his sly, lovable, and charming status will be intact as early as next week." | Disputed. The question asked in the interview was "How do you feel about Pepe's use in so many pro-Trump memes, especially the more racist/xenophobic variations we've seen?" <br><br> ***Evidence:*** <br> Infowars Ex. 19 (Dkt. 88-23). |
| 23.     Mr. Furie stated in an interview with The Atlantic on September 13, 2016, in response to a question of whether the unauthorized use of Pepe the Frog bothered him, "It's never bothered me.  In fact, it's been kind of inspiring to me seeing how mostly kids and teenagers and the kind of youthfulness of Pepe is what I'm attracted to.  And it's been an inspiration, and something that I'm proud of."  When asked about the character's affiliation with the "alt-right," Mr. Furie stated "My feelings are pretty neutral.  This isn't the first time that Pepe has been used in a negative weird context.  I just think that people reinvent him all these different ways.  It's kind of blank slate.  It's just out of my control what people are doing with it.  My thoughts on it are more of amusement."  When asked whether he had "any regrets about Pepe for not having more control over his image," Mr. Furie responded "I don't have any regrets about anything.  I do my own thing.  And if, anything, it's been kind of interesting to see all the evolutions of Pepe.  Yeah, no regrets." | Disputed.  First, this mischaracterizes the question Mr. Furie was asked.  Mr. Furie was responding to a question about whether the "ubiquity of [Pepe's] use and people using him in different contexts" bothered him.  His response was, "It's never bothered me, in fact it's been kind of inspiring to me, just seeing how mostly kids and teenagers, and kind of youthfulness of Pepe is what I'm attracted to, and it's been an inspiration and something that I'm proud of." <br><br> Second, the response attributed to Mr. Furie about Pepe the Frog's affiliation with the "alt-right," as quoted, is |

| | |
|---|---|
| | actually **Defendants' counsel** loosely reading from Mr. Furie's quoted response in the *Atlantic* article.  Mr. Furie's response, as recited in the article, is as follows: "My feelings are pretty neutral, this isn't the first time that Pepe has been used in a negative, weird context. … I just think that people reinvent him in all these different ways, it's kind of blank slate.  It's just out of my control, what people are doing with it and my thoughts on it, are more of amusement."<br><br>Third, Mr. Furie responded to a question about whether he had "any regrets about Pepe or not having more control over his image."  Mr. Furie's response was, "I don't have any regrets about anything.  I do my own thing, and if anything, it's been kind of interesting to see all the evolutions of Pepe.  Yeah, no regrets."<br><br>***Evidence:***<br>Infowars Ex. 9 (Dkt. 88-13) at 155:8-156:10; Furie Ex. 75 FSS000339-000344. |
| 24.    Mr. Furie testified that Pepe the Frog's popularity as an internet meme eventually turned into a financial windfall for him. | Undisputed. |

| | |
|---|---|
| 25.    Mr. Furie testified that, as far as the general public was concerned, Pepe the Frog became "a symbolic identifier for online hate, which is never what he was meant to be," and also became associated with Donald Trump, in the lead-up to the 2016 presidential election. | Disputed.  Mr. Furie's testimony was did not refer to the general public. Mr. Furie testified that "in the election, Pepe became, at least in the public's perception, a symbolic identifier for online hate, which is never what he was meant to be."<br><br>***Evidence:***<br>Infowars Ex. 9 (Dkt. 88-13) at 162:6-8. |
| 26.    In 2016, as a response to Pepe the Frog's use as an "alt-right" meme and being associated with hate groups, Mr. Furie collaborated with the Anti-Defamation League on a campaign to "SavePepe" and produce positive images of the character. When these attempts failed, Mr. Furie "killed" Pepe the Frog by drawing a comic showing the character's friends attending his funeral. | Disputed.  The citation to Infowars Ex. 14 at Response No. 6 does not concern any of the information in this statement.  The statement mischaracterizes Mr. Furie's motivations for "killing" Pepe the Frog.  Mr. Furie drew the comic strip portraying Pepe the Frog's funeral after growing frustrated with the attention he was receiving from Pepe the Frog's association with hate groups.<br><br>***Evidence:***<br>Infowars Ex. 9 (Dkt. 88-13) at 59:17-18; 60:20-61:3. |
| 27.    In May 2017, political cartoonist Ben Garrison drew a comic of Pepe the Frog dressed as "a Monopoly guy or something" walking away from Mr. Furie, who is shouting "B-but I killed you!" and saying "Who the hell are you?"  Mr. | Disputed.  Mr. Furie testified that he had seen the comic prior to his deposition, not necessarily before filing of this lawsuit. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| Furie had seen this comic before filing this lawsuit and does not consider it to infringe his copyright in any depiction of Pepe the Frog.  In his explanatory notes of the comic, Mr. Garrison states that "Pepe is a meme that can't be eliminated with an official declaration or wave of a hand from some 'authority.'  He's part of the public domain of free speech." | The information regarding Mr. Garrison's explanatory notes is hearsay only supported by documents not produced during fact discovery and should not be considered on that basis.<br><br>***Evidence:***<br>Infowars Ex. 9 (Dkt. 88-13) at 57:25-58:4; Fed. R. Civ. P. 37(c); Fed. R. Evid. 801, 802. |
| 28.     Mr. Furie testified that the use of Pepe the Frog as a "hate symbol" around 2016 had affected his ability to license the character. | Disputed.  Mr. Furie testified that a licensee "dropped the Pepe clothing line after the controversy. Q.  What controversy? A. The public's perception of Pepe the Frog becoming a hate symbol."<br><br>***Evidence:***<br>Infowars Ex. 9 (Dkt. 88-13) at 122:3-7. |
| 29.     The earliest cease and desist letter or takedown request Mr. Furie issued regarding alleged infringement of his copyright in Pepe the Frog was sent in August to September 2017.  He had not made any attempt to enforce his copyrights prior to this time. | Disputed.  Mr. Furie issued a cease and desist letter in August 2017.<br><br>***Evidence:***<br>Furie Ex. 76 [FURIE_INFO_00001247]; Furie Ex. 65 (Dkt. 85-65) at FSS000143. |
| 30.     On October 19, 2015, Mr. Furie entered into a licensing agreement with Bored Teenager LLC for the use of Pepe in connection with a clothing line.    Mr.    Furie    made    approximately ▇▇▇▇▇▇▇▇ in royalties from this agreement. | Disputed.  The amount of royalties that Mr. Furie made from this agreement is ascertainable from the |

| | |
|---|---|
| | license agreement and sales records themselves.<br><br>***Evidence:***<br>Infowars Ex. 22 (Dkt. 88-26). |
| 31.    On November 6, 2015, Mr. Furie entered into a licensing agreement with Furry Puppet Studio Inc. for the use of Pepe the Frog as a stuffed animal.   Mr. Furie ██████████████ ████████ from this agreement. | Disputed.  The amount of royalties that Mr. Furie made from this agreement is ascertainable from the license agreement and sales records themselves.<br><br>***Evidence:***<br>Infowars Ex. 23 (Dkt. 88-27). |
| 32.    On December 2, 2016, Mr. Furie entered into a licensing agreement with WattzUp Power, Inc. for the use of Pepe the Frog in connection with a phone charging device.  Mr. Furie did not receive any revenue from this agreement because the product was never produced. | Undisputed. |
| 33.    On January 26, 2016, Mr. Furie entered into a licensing agreement with Romance Apocalypse LLC for use of an image of Pepe in the 2017 film Good Time starring Robert Pattinson.  He was paid ██████████ for this license.  An image of Pepe the Frog in a comic was used in a scene of the film featuring a flashback of people having sex while a drug dealer is sampling a portion of the drug "acid" taken from a Sprite bottle. | Disputed. The statement "[a]n image of Pepe the Frog in a comic was used in a scene of the film featuring a flashback of people having sex while a drug dealer is sampling a portion of the drug 'acid' taken from a Sprite bottle" relies on hearsay only supported by documents not produced during fact discovery and should not be considered on that basis. The amount of royalties that Mr. Furie made from |

14

| | |
|---|---|
| | this agreement is ascertainable from the license agreement and sales records themselves. *Evidence*: Fed. R. Civ. P. 37(c); Fed. R. Evid. 801, 802; Infowars Ex. 25 (Dkt. 88-29). |
| 34.    On April 25, 2016, Mr. Furie entered into a licensing agreement with Fjerry LLC for the use of Pepe the Frog illustrations drawn by Mr. Furie in a card game.  The licensee wanted to use Pepe the Frog because it had become an internet meme and commissioned Mr. Furie to copy the unauthorized works of third parties for use in the game.  Mr. Furie earned ███████████████ from this agreement. | Disputed.  Mr. Furie did not copy works, nor were the works unauthorized.  FJerry LLC commissioned Mr. Furie to draw images of Pepe the Frog that resembled those included in the licensing agreement, which were inspired by Mr. Furie's character Pepe the Frog.  The amount of royalties that Mr. Furie made from this agreement is ascertainable from the license agreement and sales records themselves. *Evidence:* Infowars Ex. 9 (Dkt. 88-13) at 40:21-24; 41:9-11; 147:19-24; Infowars Ex. 28 (Dkt. 88-32). |
| 35.    On June 7, 2016, Mr. Furie entered into a licensing agreement with Xi'an Momo IT Ltd. for ██████████████ for the use of Pepe the Frog in connection with "emoji" symbols usable on smart phone applications.  The region of operation covered by the agreement is China, Hong Kong, Taiwan, and Macau. | Undisputed. |

| | |
|---|---|
| 36.     In February 2018, Mr. Furie entered into a licensing agreement with What Do You Meme, LLC for use of image of Pepe the Frog in connection with a card game.  This agreement provided for ████████.     The licensee commissioned Mr. Furie to copy the unauthorized works of third parties for use in the game. | Disputed.  Mr. Furie did not copy works, nor were the works unauthorized.  Mr. Furie testified that "I did my own version of these images and licensed them to use in the game." <br><br> *Evidence:* <br> Infowars Ex. 9 (Dkt. 88-13) at 56:14-16. |
| 37.     On February 26, 2018, Mr. Furie stated in an email to What Do You Meme, LLC that "Pepe has taken a strange turn in terms of public perception and I have been rejecting all licensing of the frog meme due to the controversy." | Undisputed. |
| 38.     Mr. Furie did not enter into any licensing agreements regarding Pepe the Frog other than the above ones.  The earliest licensing agreement he entered into was in October 2015. | Disputed.  Mr. Furie recently entered into an additional licensing agreement (after the close of fact discovery). |
| 39.     Pepe the Frog is the only character or work Mr. Furie has ever licensed. | Undisputed. |
| 40.     Mr. Furie did not file any applications for any alleged copyright at issue until, at the earliest, September 1, 2017. | Disputed.  There is not just one "copyright at issue"— there are seven. <br><br> *Evidence:* <br> Furie Ex. 32 (Dkt. 85-32); <br> Furie Ex. 33 (Dkt. 85-33); <br> Furie Ex. 34 (Dkt. 85-34); <br> Furie Ex. 35 (Dkt. 85-35); <br> Furie Ex. 36 (Dkt. 85-36); <br> Furie Ex. 37 (Dkt. 85-37); <br> Furie Ex. 38 (Dkt. 85-38). |
| 41.     Mr. Furie admits that he cannot quantify any income lost due to sale of the MAGA Poster.  He has waived any argument regarding actual damages caused by sale of the MAGA Poster. | Disputed.  Mr. Kinder's letter to Mr. Randazza states that "Plaintiff *has* suffered actual harm in the |

| | |
|---|---|
| | form of lost expected licensing revenue." (emphasis added)  Mr. Kinder's letter further explains that "Plaintiff intends to pursue the alternative remedy of disgorgement of Defendants' profits and/or statutory damages."  Mr. Furie did not waive, nor has he waived, actual damages.  Mr. Furie also has license agreements showing a market for derivative works of Pepe the Frog and has sold posters featuring his work. Pepe's association with widely despised figures harms the market for derivative works featuring Pepe.<br><br>***Evidence:***<br>Infowars Ex. 35 (Dkt. 88-39); Furie Ex. 31 (Dkt. 85-31); Furie Ex. 89 [Furie Dep. Ex. 13]; Furie Ex. 90 [Furie Dep. Ex. 33]; Furie Ex. 93. |
| 42.    Mr. Allen  created  the  MAGA  Poster  in January 2017. | Disputed.  Mr. Allen created the first version of a MAGA Poster in January 2017.<br><br>***Evidence:***<br>Infowars Ex. 36 (Dkt. 88-40) at 20:1-9; Furie Ex. 5 (Dkt. 88-5) at 23:11-13. |

| | |
|---|---|
| 43.    The MAGA Poster is a collage of several politically significant figures during the 2016 presidential election season, including President Trump, Ann Coulter, Kellyanne Conway, and Roger Stone. | Undisputed as to each of the MAGA Posters. |
| 44.    Jon Allen used an image of Pepe the Frog as his reference point when creating the MAGA Poster.  He found this image through a Google image search.  The image he used was not drawn by Mr. Furie. | Undisputed as to each of the MAGA Posters. |
| 45.    When he created the MAGA Poster, Mr. Allen was aware of Pepe the Frog as a meme but was not aware of Mr. Furie's existence. | Undisputed as to the first version of a MAGA Poster. |
| 46.    Mr. Allen made changes in the shading, shape of the mouth, pupils, and texture of the image of Pepe the Frog he used in the MAGA Poster to "make it look more naturalistic" and fit in better with the rest of the figures around the character. | Disputed.  Mr. Allen testified that "I tried to give him more naturalistic qualities, to fit in with the style of the other characters.  I gave him an iris around the eye.  I tried to make it look more naturalistic, as though he's sort of sitting in – he's existing in the space with them."  When asked about the naturalistic qualities, Mr. Allen answered, "[t]he shading, the texture.  If you were to zoom in on the original file, you'd see all these tiny little details, so things like that."  Mr. Allen testified to differences between Pepe the Frog in the MAGA Posters and Pepe in a Blue Shirt as being "shape of the mouth, the pupils, texture." |

| | *Evidence:* Infowars Ex. 36 (Dkt. 88-40) at 129:6-18, 152:12-20. |
|---|---|
| 47.    The image of Pepe the Frog Mr. Allen used as a reference for the MAGA Poster did not have many realistic elements and was very flat.  He made stylistic changes to the image so that it would have "volume and dimension," and he added detail work to "give it a more naturalistic feel."    He needed to make these changes "[b]ecause [he] needed it to look like [his] own tile of the poster, the illustration."  The character in the MAGA Poster also looks happy and has a smirk, whereas the image Mr. Allen used as a reference looks sad. | Disputed.  Mr. Allen testified to making the elements of Pepe the Frog more realistic, not to give Pepe the Frog "realistic elements" as characterized by the statement.  Mr. Allen testified that he attempted to make Pepe look more realistic "mainly in the value.  If we were to look at the actual real file and zoom in, there's – my work, all my work is very detailed.  So it's all about the detail work, the subtleties of the line work.  The original source, it's a very flat style with a very consistent, almost mechanical line.  I create my own brushes in the program as well, so all my line work has a taper to it, to give it a more naturalistic feel.  So everything from the brushes that I make to the use of different multiple values to create dimension – I really tried to make it stylistically fit in with the poster.  I wanted to differentiate it but have it be recognizable."  When asked why he changed some elements of Pepe, Mr. |

|  |  |
|---|---|
|  | Allen testified "[b]ecause I needed it to look like my own tile of the poster, of the illustration." **Evidence:** Infowars Ex. 36 (Dkt. 88-40) at 167:1-20, 178:9-12. |
| 48.     Mr. Allen wrote a statement shortly after this litigation was filed explaining his authorial intent in creating the MAGA Poster. | Disputed.  Mr. Allen's statement was to explain his "views and inspiration for" creating the first version of the MAGA Posters. **Evidence:** Infowars Composite Ex. 38 (Dkt. 88-42) at Allen Dep. Ex. 10. |
| 49.     Mr. Allen included Pepe the Frog in the MAGA Poster collage "because it was a meme that was a part of the 2016 presidential discussion.  It was in the dialogue," since Mr. Allen observed Donald J. Trump Jr. posting a meme of his father as Pepe the Frog and "basically people were using the meme to debate, argue online, and sort of Pepe was being – he was being appropriated by one side – by the Trump camp to show support of him, support of . . . Trump's run.  So I thought that was really interesting."  Mr. Allen observed that Pepe the Frog's use as a meme "had this very immature quality to it, and I was . . . assuming that there was like a demographic of young people that were supporting Trump just because of the meme, because it was the sort of like this weird, sarcastic inflection method that was being used with online media." | Disputed.  Although this language is Mr. Allen's testimony, it is a post facto justification in response to this litigation, and does not evidence his actual intent at the time of making the first version of the MAGA Posters. **Evidence:** Infowars Ex. 36 (Dkt. 88-40) at 109:13-110:7, 110:22-111:6. |

| | |
|---|---|
| 50.   When he created the MAGA Poster, Mr. Allen was not aware of Pepe the Frog's association with extremist hate groups such as neo-Nazis. | Disputed.  First, Mr. Allen's testimony stated that he was "not aware of Pepe the Frog's association with Richard Spencer" when he used Pepe the Frog in the first version of the MAGA Posters.  Second, Mr. Allen testified that during the 2016 Presidential election cycle "[t]here were people who thought it was a hate symbol."<br><br>***Evidence:***<br>Infowars Statement of Uncontroverted Facts (Dkt. 88-3) at ¶ 55; Infowars Ex. 36 (Dkt. 88-40) at 114:18-21. |
| 51.   Mr. Allen understood Pepe the Frog to be a "meme zeitgeist" because "[i]t's so recognizable. It's – this thing that has taken on a life of its own Like a lot of people know about it.  It's just known. People – when it's something that people known and recognize that taps into this zeitgeist, it's like this – it's this vein in the culture.  It's like a big vein in the culture that everyone is somehow aware of. | Undisputed. |
| 52.   Mr. Allen included Pepe the Frog in the MAGA Poster because he "felt that the image needed some type of humor, it needed some type of parody, it needed something that was ridiculous. It needed something that represented the culture on the Internet in regards to the 2016 election."  He felt Pepe the Frog's inclusion was humorous "it's just this juxtaposition with all these real characters and how, you know, it was sort of – he had this conversation in the 2016 election – like the fact | Disputed.  This mischaracterizes the context of Mr. Allen's quote about the image of Pepe the Frog.  Mr. Allen said his use of Pepe the Frog was "intended as satirical political commentary" and in response to the question |

21

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| that it was a meme that had – that was in the conversation . . . Pepe was a part of, like, this weird conversation in the 2016 election.  This election was ridiculous.  And the fact that somehow this cartoon frog is like a part of it, I was like, 'This is so strange.  This is weird.  Like, I have to put this in here.'" | "what is satirical political commentary," Mr. Allen responded that the image "needed some type of humor, it needed some type of parody, it needed something that was ridiculous.  It needed something that represented the culture on the Internet in regards to the 2016 election."  In addition, though this is Mr. Allen's testimony, it is a post facto justification in response to this litigation, and does not evidence his actual intent at the time of making the first version of the MAGA Posters.<br><br>***Evidence:***<br>Infowars Ex. 36 (Dkt. 88-40) at 120:22-121:10. |
| 53.    Mr. Allen included Pepe the Frog in the MAGA Poster because he "wanted to show that the memes had an influence on the election.  This is funny.  People are losing their minds over a cartoon frog.  That's why I gave him a little smirk.  It's looking back at us.  In . . . my reference point, he's frowning, he's sad.  Here he's looking back and he's like, 'Yeah, I had a part in this.'"  Mr. Allen thought the entire discussion of people "losing their minds" over Pepe the Frog as a hate symbol was ridiculous. | Disputed.  Although this language is Mr. Allen's testimony, it is a post facto justification in response to this litigation, and does not evidence his actual intent at the time of making the first version of the MAGA Posters.<br><br>***Evidence:***<br>Infowars Ex. 36 (Dkt. 88-40) at 168:6-23. |
| 54.    Mr. Allen used the MAGA Poster generally to discuss alternative media figures in the 2016 Presidential election and also as a parody of Pepe | Disputed.  Mr. Allen testified that "I'm making a *satirical* parody of the |

22

| | |
|---|---|
| the Frog as a meme during that time.  Pepe the Frog is used to symbolize the sharing of memes during the election. | meme. The meme is one aspect of many …" (emphasis added).  Mr. Allen further testified that "the frog, Pepe, represents the phenomenon of memes."  Finally, Mr. Allen testified, in response to the question "What is Pepe the Frog's self-interest?" that "He represents the Internet."  In addition, though this is Mr. Allen's testimony, it is a post facto justification in response to this litigation, and does not evidence his actual intent at the time of making the first version of the MAGA Posters.<br><br>***Evidence:***<br>Infowars Ex. 36 (Dkt. 88-40) at 123:15-16, 123:20-21, 128:22-23; Furie Ex. 73 [Allen Dep. Tr. at 122:15-16] |
| 55.    Mr. Allen was aware that, during the 2016 Presidential election season, "there were people who though [Pepe the Frog] was hilarious.  There were people who thought it was a hate symbol.  There were people that were using it for all these different forms of communications.  What I found really interesting about it was how many different types of associations it could have, and the fact that – you know, the fact that Donald J. Trump like retweeted it, it was so bizarre, and the reaction that was really like, 'Whoah.'" | Disputed.  Mr. Allen's testimony was that "there were people who thought [Pepe the Frog] was hilarious.  There were people who thought it was a hate symbol.  There were people that were using it for all these different forms of communication.  What I found really interesting about it was how many different types of |

| | |
|---|---|
| | associations it could have, and the fact that – you know, the fact that Donald J. Trump like retweeted it, it was so bizarre, and the reaction that was really like, 'Whoa.'"<br><br>***Evidence:***<br>Infowars Ex. 36 (Dkt. 88-40) at 170:1-14. |
| 56.   Mr. Allen does not believe the MAGA Poster would have carried the same message in relation to the sharing of Internet memes if he had used a character other than Pepe the Frog. | Disputed.  In response to whether using a different meme, not a different character, would change the message of the first version of the MAGA Posters, Mr. Allen responded "I don't think [the MAGA Posters] would have had the same message."  His comments do not indicate what that message would be.<br><br>***Evidence:***<br>Infowars Ex. 36 (Dkt. 88-40) at 147:2-6. |
| 57.   Prior to the character's use in the 2016 Presidential election, Mr. Allen had not seen Pepe used for political purposes or associated with political figures. | Undisputed. |
| 58.   Mr. Allen was not aware of any cartoon figures other than Pepe the Frog who played a significant role in the 2016 Presidential election. | Undisputed. |
| 59.   In 2014 or 2015, Alex Jones read a Daily Dot article where Mr. Furie said "'This is free to use, everybody free to air.  Pepe belongs to everybody.'"  He also read other statements from | Disputed.  The statement quoted, as if attributed to Mr. Furie, is actually Mr. Jones recounting what he |

| | |
|---|---|
| Mr. Furie stating that the public was free to use Pepe the Frog, and was under the impression Mr. Furie had given the general public free license to use Pepe the Frog due to these statements and his lack of enforcement efforts. | claimed to remember Mr. Furie saying in news interviews.  Also, Mr. Jones's demeanor and other testimony, coupled with the satirical content in the article he describes, creates a strong inference that Mr. Jones was testifying falsely when he stated that he read this article and others like it.<br><br>***Evidence:***<br>Furie Ex. 64 (Dkt. 85-64) at FSS000348; Furie Ex. 52 (Dkt. 85-52) at 2:5-20; Furie Ex. 71 [Alex Jones Dep. Tr. at 14:10-14; 19:13-25; 22:3-6]. |
| 60.    Defendants did not have any role in the design of the MAGA Poster. | Disputed.  Alex Jones signed a version of the MAGA Posters for sale on the *infowars.com* store.  Alex Jones also approved the design of the MAGA Posters before they went on sale.<br><br>***Evidence:***<br>Furie Ex. 57 (Dkt. 85-57) at 30:19–24; Furie Ex. 77 [Alex Jones Dep. Ex. 24 at 6:10-17]. |
| 61.    Defendant Infowars is an intellectual property holding company that does not have any employees and does not produce any content or own or operate any web sites.  It is a legally distinct entity from Defendant FSS. | Disputed.  Infowars and Free Speech Systems are operationally and legally linked, as evidenced by the Terms of Service for *infowars.com* and |

25

| | |
|---|---|
| | *prisonplanet.com.* Infowars also has employees, evidenced by email addresses and operational responsibilities for such employees. |
| | ***Evidence:*** Furie Ex. 61 (Dkt. 85-61) at 8; Furie Ex. 78 [FURIE_INFO_00000367-FURIE_INFO_00000387]; Furie Ex. 79 [FSS004768]; Furie Ex. 80 [David Jones Dep. Ex. 15]; Furie Ex. 81 [Allen_Furie_0000114]; Ex. 91 at 1, 3, 6. |
| 62.    The fact that the terms of service on the web sites <prisonplanet.com> and <infowars.com>, which are operated by FSS, refer to Infowars, LLC is an error because Infowars "does not act and do any business, have any checking accounts, have any letterheads, do any business, report any income, or do anything." | Disputed.  Infowars and Free Speech Systems are operationally and legal linked, as evidenced by the Terms of Service for *infowars.com* and *prisonplanet.com.* Additionally, even after having notice of this supposed error, in the form of this lawsuit, the Terms of Service were not changed for a substantial amount of time. |
| | ***Evidence:*** Furie Ex. 61 (Dkt. 85-61) at 8; Furie Ex. 78 [FURIE_INFO_00000367-FURIE_INFO_00000387]; Furie Ex. 79 [FSS004768]; Furie Ex. 80 [David Jones Dep. Ex. 15]; Furie Ex. 81 |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| | [Allen_Furie_0000114]; Ex. 91 at 1, 3, 6. |
| 63.   FSS offered the MAGA Poster for sale starting April 23, 2017 and sold its first copy on this day.   It was available for sale on the <infowarsstore.com> and <infowarsshop.com> web sites. | Disputed.  Infowars and Free Speech Systems offered the first version of the MAGA Posters for sale starting April 23, 2017, as evidenced by their operational and legal connection.  On March 6, 2017, Infowars released what it called a "New Limited Edition" MAGA Poster.  Prior to selling MAGA Posters, Infowars employees stated "*we* look forward to working with you in offering your poster to *our* listeners and supporters." <br><br> ***Evidence:*** <br> Furie Ex. 78 [FURIE_INFO_00000367-00000387]; Furie Ex. 79 at FSS004768; Furie Ex. 81 [Allen_Furie_0000114]; Furie Ex. 80 [David Jones Dep. Ex. 15]; Ex. 72 [David Jones Dep. at 120:11-15]; Ex. 86 [FURIE_INFO_00000085-00000086]. |
| 64.   FSS is the operating company in charge of running Alex Jones's business which started on the web site <infowars.com>. | Disputed.  Infowars, LLC appeared during the period of initial infringement as operating the website *infowars.com.* |

| | |
|---|---|
| | **Evidence:**<br>Furie Ex. 79 at FSS004768. |
| 65.    Defendants did not create the MAGA Poster and did not ask Mr. Allen to create the poster. | Disputed.  Defendants were involved in signing versions of the MAGA Poster that were offered for sale at an increased price.<br><br>**Evidence:**<br>Furie Ex. 77 [Alex Jones Dep. Ex. 24 at 6:10-17]; Furie Ex. 71 [Alex Jones Dep. at 68:22-69:13]. |
| 66.    FSS purchased copies of the MAGA Poster from Jon Allen. | Disputed.  Infowars purchased copies of MAGA Posters through its employees.<br><br>**Evidence:**<br>Furie Ex. 81 [Allen_Furie_0000114]; Furie Ex. 82 [Allen_Furie_0000027]; Furie Ex. 83 [Allen_Furie_0000031]; Furie Ex. 84 [Allen_Furie_0000036]; Furie Ex. 85 at FSS004752. |
| 67.    All purchase orders were made by FSS, rather than Infowars, and all payment checks to Mr. Allen for copies of the MAGA Poster were made out by FSS, not Infowars. | Undisputed, to the extent that "Infowars" refers to Infowars, LLC. |
| 68.    Gross revenues of FSS attributable to the sale of the MAGA Poster amounted to $31,407.44, and FSS netted $13,671.44. | Disputed.  Defendants admitted that the gross revenue by "Defendants," which included both Free Speech Systems and Infowars, amounted to $31,407.44.  Additionally, |

28

| | |
|---|---|
| | Defendants applied an improper methodology in calculating net revenue.<br><br>***Evidence:***<br>Infowars Ex. 41 (Dkt. 88-45) at Response No. 3; Furie Ex. 87 [FSS004840-004869]; Furie Ex. 88 [FSS004870-004871]. |
| 69.    The character "El Sapo Pepe" is an Argentinian anthropomorphic frog that has existed since at least 1988, and shows featuring the character started to be broadcast in Argentina and other Central American countries since at least this time.    El Sapo Pepe shares many physical characteristics with Pepe the Frog. | Disputed.  Although this language is Mr. Allen's testimony, it is a post facto justification in response to this litigation, and does not evidence his actual intent at the time of making the first version of the MAGA Posters. |
| 70.    Mr. Furie traveled to Tijuana and San Felipe, Mexico in the summer of 2004.    Mr. Furie's depiction of Pepe the Frog changed drastically from Play Time, which pre-dated this visit, to his depiction in Boy's Club, which post-dated this visit, and began to look significantly more like El Sapo Pepe. | Disputed.  The depiction of Pepe the Frog did not "change drastically" nor did Pepe the Frog begin "to look significantly more like El Sapo."<br><br>***Evidence:***<br>Furie Ex. 68 (Dkt. 85-68) at 757; Infowars Ex. 1 (Dkt. 88-4); Infowars Ex. 2 (Dkt. 88-5). |
| 71.    Mr. Furie has several pieces of art published on his web site depicting characters that are strikingly similar, if not directly copied from, popular pre-existing characters such as The Terminator, The Incredible Hulk, Alf, and Freddy Krueger.  Mr. Furie stated during his deposition that he did not copy any of these characters directly, and that he only drew "inspiration" from | Disputed.  Portions of the cited materials to support this fact are missing from the exhibits.  Mr. Furie's pieces depict characters that are similar to, in that they have drawn inspiration |

29
PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| them or that any similarities are merely coincidental. | from, popular pre-existing characters.<br><br>***Evidence:***<br>Furie Ex. 70 [Furie Dep. Tr. at 73:24-74:21, 75:15-77:2, 82:19-24, 87:22-88:10, 100:6-10, 114:2-6]. |

**PLAINTIFF MATT FURIE'S**
**RESPONSES TO INFOWARS'S PURPORTED CONCLUSIONS OF LAW**

| DEFENDANTS' PURPORTED CONCLUSION OF LAW | PLAINTIFF'S RESPONSE |
|---|---|
| 1.      "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." | Fed. R. Civ. P. 56(a). |
| 2.      Fed. R. Civ. P. 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  The movant has the initial burden of demonstrating the absence of any dispute as to a material fact, with all inferences being made in favor of the nonmovant.  *See id*. at 323.  Once the movant meets its burden, the burden then shifts to the nonmovant to present specific facts showing that a genuine issue for trial exists.  To demonstrate a genuine issue, the nonmovant must come forth with sufficient evidence for which a jury could reasonably find for that party, and a mere "scintilla of evidence" is insufficient. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding Federal Rule of Civil Procedure 56. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 3.      "The fair use doctrine [under copyright law] thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  Accordingly, "the analysis is a flexible one[,]" to be "perform[ed] on a case-by-case basis" and "in light of the copyright law's purpose 'to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works.'" | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately |

| | |
|---|---|
| | reflect the state of controlling law. |
| 4.      The first fair use factor determines "whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose of different character, altering the first with new expression, meaning, or message," i.e., whether the use is "transformative." Other factors in the fair use analysis weigh less the more transformative a use is. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 5.      "[A]n allegedly infringing work is typically viewed as transformative as long as new expressive content or message is apparent."  "This is so even where . . . the allegedly infringing work makes few physical changes to the original or fails to comment on the original."      Placing a copyrighted work in a new context can make a use of that work transformative. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 6.      The use of a copyrighted work in a collage can be highly transformative. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| | Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 7.    In addition to the transformative nature of a work, whether a use is commercial also bears on the first factor analysis, though this consideration weighs less heavily the more transformative a use is. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 8.    The second fair use factor considers whether the copyrighted work allegedly infringed is factual or expressive in nature, though this "factor typically has not been terribly significant in the overall fair use balancing." | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| 9.    The second fair use factor also considers "the extent to which a work has been published," as "[p]ublished works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred." | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 10.    "The third [fair use] factor looks to the quantitative amount and qualitative value of the original work used in relation to the justification for that use."   This is because "the extent of permissible copying varies with the purpose and character of the use." | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 11.    Wholesale copying of a work does not preclude a finding of fair use and the use of an entire copyrighted image may be reasonable if it serves the defendant's intended purpose. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| | authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 12.     In the third fair use factor analysis, it is also important to look at only the protectible elements of the original work, rather than the entire work itself, in this analysis. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 13.     Elements of a work "that are standard, stock, or common to a particular subject matter or medium are not protectable . . . ."  And a composite of artistic choices along with common elements found in nature is entitled only to "thin" protection. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 14.     The fourth fair use factor considers "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of | Disputed to the extent this represents an incomplete and/or inaccurate description of the |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." | controlling law surrounding fair use. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 15.   "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' [the fourth fair use] factor weighs in favor of fair use." | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 16.   Transformative works are less likely to have an adverse impact on the original work than a use which merely supersedes the original. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| | reflect the state of controlling law. |
| 17.    Harm to the plaintiff's market cannot be presumed where the use in question is transformative and market substitution is unlikely; in such cases, the plaintiff must introduce "[e]vidence of substantial harm to it" and must make this showing "by a preponderance of the evidence." | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 18.    The fourth fair use factor does not favor a plaintiff who can only show "hypothetical" market harm. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding fair use.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 19.    Copyright abandonment "must be manifested by some overt act indicative of a purpose to surrender the rights and allow the public to copy." | Undisputed. |
| 20.    It is possible for a copyright holder to abandon some, but not all, rights in a work. | Disputed to the extent this represents an incomplete and/or inaccurate |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT
Case No. 2:18-cv-01830-MWF-JPR

| | |
|---|---|
| | description of the controlling law surrounding abandonment. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 21.   Public statements in news articles can be evidence sufficient to amount to abandonment. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding abandonment. Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 22.   "[A] nonexclusive license may be granted orally, or even be implied from conduct." | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding nonexclusive license.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which |

| | |
|---|---|
| | accurately reflect the state of controlling law. |
| 23.     An implied license can be found where the copyright holder engages in conduct "from which [the] other [party] may properly infer that the owner consents to his use." | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding implied license.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 24.     To receive statutory damages, a copyright plaintiff must either have applied for registration prior to the commencement of infringement or must have applied for registration within three months after the first publication of his work. | Disputed to the extent this represents an incomplete and/or inaccurate description of the controlling law surrounding statutory damages.  Mr. Furie has responded to Defendants' cited case law in his opposition, and presented his own authorities in support of denying Defendants' motion, which accurately reflect the state of controlling law. |
| 25.     "[T]he first act of infringement in a series of ongoing infringements of the same kind marks the commencement of one continuing infringement under § 412," for purposes of both statutory damages and attorneys' fees. | Undisputed. |
| 26.     While post-registration infringements can be    considered    new    "commencements"    of | Undisputed. |

| | |
|---|---|
| infringing activity, they must be sufficiently different from the initial act of infringement. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: April 15, 2019

Respectfully submitted,

By: /s/ *Louis W. Tompros*
**Wilmer Cutler Pickering Hale and Dorr LLP**
Nancy Schroeder (SBN 280207)
350 S. Grand Ave. Suite 2100
Los Angeles, CA 90071
Tel.: (213) 443-5300
Fax: (213) 443-5400
nancy.schroeder@wilmerhale.com

Louis W. Tompros (*pro hac vice*)
Stephanie Lin (*pro hac vice*)
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
louis.tompros@wilmerhale.com
stephanie.lin@wilmerhale.com

William C. Kinder (*pro hac vice*)
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Tel.: (212) 295-6509
Fax: (212) 230-8888
will.kinder@wilmerhale.com

*Attorneys for Plaintiff*

MATT FURIE