Marc J. Randazza, CA Bar No. 269535
Alex J. Shepard, CA Bar No. 295058
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117
Telephone: 702-420-2001
ecf@randazza.com

*Attorneys for Defendants,*
*Infowars, LLC and Free Speech Systems, LLC*

# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MATT FURIE,<br><br>        Plaintiff,<br><br>    vs.<br><br>INFOWARS, LLC; FREE SPEECH SYSTEMS, LLC,<br><br>        Defendants. | Case No. 2:18-cv-01830-MWF-JPR<br><br>**REPLY IN SUPPORT OF DEFENDANTS INFOWARS, LLC AND FREE SPEECH SYSTEMS, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 6, 2019<br>Time: 10:00 a.m.<br>Hon. Michael W. Fitzgerald<br><br>Case Filed: March 5, 2018<br>Trial Date: July 16, 2019 |

### TABLE OF CONTENTS

1.0    INTRODUCTION .................................................................................................. 1

2.0    ADDITIONAL FACTUAL BACKGROUND ........................................................ 1

3.0    ARGUMENT .......................................................................................................... 3

    *3.1    Defendants Met and Conferred as to Abandonment, Implied License, Statutory Damages, and Attorneys' Fees .......................................................... 3*

    *3.2    Defendants Did Not Violate Fed. R. Civ. P. 37(c)(1) .................................... 4*

    *3.3    Mr. Furie's Evidentiary Objections are Baseless ........................................ 7*

    *3.4    The Poster's Use of Pepe the Frog Was a Fair Use .................................... 8*

        **3.4.1 Factor one: purpose and character of the use** .................................... 8

        **3.4.2 Factor two: nature of the copyrighted work** ................................... 13

        **3.4.3 Factor three: amount and substantiality of portion taken** ........... 14

        **3.4.4 Factor four: effect on the market** ................................................. 15

        **3.4.5 Defendants Did Not Act in Bad Faith – Whatever that Means** ......... 19

    *3.5    Furie Abandoned His Copyright in Pepe the Frog and/or Granted an Implied License to the General Public to Use this Character .......................... 20*

    *3.6    Furie Cannot Seek Statutory Damages or Attorneys' Fees ............................ 21*

4.0    CONCLUSION ...................................................................................................... 22

RANDAZZA | LEGAL GROUP

# TABLE OF AUTHORITIES

**Cases**

*Assurance Co. of Am. v. Nat'l Fire & Marine Ins. Co.,*
2012 U.S. Dist. LEXIS 76170, *11 (D. Nev. June 1, 2012) ................................ 5

*Blanch v. Koons,*
467 F.3d 255, 252 (2d Cir. 2006) ............................................................. 13

*Braham v. Sony/ATV Music Publ'g,*
2015 U.S. Dist. LEXIS 155268, *9 (C.D. Cal. Nov. 10, 2015) ........................ 7

*Burnett v. Twentieth Century Fox Film Corp.,*
491 F. Supp. 2d 962, 971 ....................................................................... 16

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569, 578, 579, 592, 593 (1994) .............................. 8, 11, 15, 16

*Campinha-Bacote v. Evansville Vanderburgh Sch. Corp.,*
2015 U.S. Dist. LEXIS 181652, *23-25 (S.D. Ind. Nov. 5, 2015) ................... 16

*Cariou v. Prince,*
714 F.3d 694, 706 (2d Cir. 2013) ............................................................. 13

*Derek Andrew, Inc. v. Poof Apparel Corp.,*
528 F.3d 696, 701 (9th Cir. 2008) ........................................................... 21

*Dhillon v. Does 1-10,*
2014 U.S. Dist. LEXIS 24676, *2-3 (N.D. Cal. Feb. 25, 2014) ...................... 12

*Equals Three, LLC v. Jukin Media, Inc.,*
139 F. Supp. 3d 1094, 1107, 1108 (C.D. Cal. 2015) .................................. 15

*Fisher v. Dees,*
794 F.2d 432, 436 (9th Cir. 1986) ........................................................... 16

*Fodor v. L.A. Unified Sch. Dist.,*
2014 U.S. Dist. LEXIS 188398, *3 (C.D. Cal. June 3, 2014) ........................ 21

RANDAZZA | LEGAL GROUP

*Grumpy Cat Ltd. v. Grenade Bev., LLC,*

    2017 U.S. Dist. LEXIS 222401, *3 (C.D. Cal. Dec. 1, 2017) .......................... 7, 14

*Hampton v. Paramount Pictures Corp.,*

    279 F.2d 100, 104 (9th Cir. 1960) ...................................................................... 20

*Kelly v. Arriba Soft Corp.,*

    336 F.3d 811, 821 (9th Cir. 2003) ...................................................................... 15

*Kienitz v. Sconnie Nation LLC,*

    766 F.3d 756, 758 (7th Cir. 2014) ...................................................................... 13

*L.A. News Serv. V. CBS Broad., Inc.,*

    305 F.3d 924 (9th Cir. 2002), as amended, 313 F.3d 1093 ............................... 13

*L&L Franchise, Inc. v. Tsai,*

    2008 U.S. Dist. LEXIS 126311, *6 (S.D. Cal. Mar. 7, 2008) ............................. 4

*Marya v. Warner/Chappell Music, Inc.,*

    131 F. Supp. 3d 975, 992-93 (C.D. Cal. 2015) .................................................. 20

*Mattel, Inc. v. Walking Mountain Prods.,*

    353 F.3d 792, 799-800 (9th Cir. 2003) ............................................................. 13

*Monge v. Maya Magazines, Inc.,*

    688 F.3d 1164, 1173 n.6, 1175, 1180-81 (9th Cir. 2012) ................... 10, 11, 15, 19

*Perfect 10, Inc. v. Amazon.com, Inc.,*

    *508 F.3d 1146 (9th Cir. 2007)* ......................................................................... 10

*Perfect 10, Inc. v. Amazon.com, Inc.,*

    154 F.3d 1107, 1114, 1167 (9th Cir. 1998) .................................................. 14, 15

*Philpot v. Alternet Media, Inc.,*

    2018 U.S. Dist. LEXIS 203500, *8 (N.D. Cal. Nov. 30, 2018) ....................... 10, 14

*SEC v. Samuel H. Sloan & Co.,*

    369 F. Supp. 994, 995 (S.D.N.Y. 1973) .............................................................. 5

iv

Reply in Support of Motion for Summary Judgment
2:18-cv-01830-MWF-JPR

*Seltzer v. Green Day, Inc.*,

    725 F.3d 1170, 1178, 1179 (9th Cir. 2013) ........................................ 14, 15

*Sun Trust Bank v. Houghton Mifflin Co.*,

    268 F.3d 1257, 1280-81 (11th Cir. 2001) ........................................ 16, 19

*Wall Data Inc. v. L.A. County Sheriff's Dep't*,

    447 F.3d 769, 778 (9th Cir. 2006) ........................................................ 8

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,

    227 F.3d 1110, 1118 (9th Cir. 2000) .................................................... 14

*Zacchini v. Scripps-Howard Broadcasting Co.*,

    433 U.S. 562, 573 (1977) ............................................................. 16, 19

**Statutes**

17 U.S.C. § 107 ........................................................................................ 8

**Rules**

Fed. R. Civ. P. 37 ............................................................................. 4, 5, 7

Fed. R. Civ. P. 56. ................................................................................... 7

Fed R. Civ. P. 26 .................................................................................... 4

Fed. R. Evid. 801 .................................................................................... 7

RANDAZZA | LEGAL GROUP

**1.0    INTRODUCTION**

This case should never have been brought.  Furie most likely infringed upon Pepe the Toad when he "created" Pepe the Frog.  Even if he did not, he publicly declared that Pepe the Frog was free to use.  Even if he had not, Mr. Allen had every right, under Fair Use, to create a graphical representation of the key figures in the 2016 election, and to include this character – as Pepe the Frog was a key figure in the election. And, even if none of that were true, Furie's hope for statutory damages and attorneys' fees is fatally flawed.  Mr. Furie's suit is not how copyright law works.  Furie is essentially trying to bring a Trademark Dilution claim in disguise here – as the cartoon character at issue would not qualify for protection under the Dilution Act.

**2.0    ADDITIONAL FACTUAL BACKGROUND**

Mr. Furie alleges that the primary point of comparison between the MAGA Poster and his works is "Pepe in Blue Shirt."  However, as explained in Defendants' Opposition to Mr. Furie's Motion for Partial Summary Judgment (the "Furie Motion"), Mr. Furie did not create this image himself.  Instead, it is a derivative work based off a meme created by third parties called "Sad Frog" that started in 2009.  (*See* Doc. No. 95 at 9-16.)  The image used as the basis for this meme appears to have been taken from a panel in "Boy's Club 1," which shows Pepe the Frog enjoying the fact that he has "time for pizza on a bagel."  (Doc. No. 88-6 at 18.)  For the sake of comparison, the "Boy's Club 1," "not good man," and "Pepe in Blue Shirt" images are shown side-by-side:

"Boy's Club 1" (2006)          "Not good man" (2009)          "Pepe in Blue Shirt" (2016)







The Court will notice that the 2009 image, drawn by an unknown artist, is very similar to the 2006 drawing by Furie. However, it is elongated and colorized. Then, Furie's version, in 2016, is a direct copy of the 2009 version – but not of his own 2006 version.

From 2009 to the present, the "not good man" image served as the base for a meme known as "Feels Bad Man," "Sad Frog," or "You Will Never," in which Pepe the Frog is depressed and expresses disappointment or regret; in other words, the exact opposite message of Pepe the Frog's signature phrase "feels good man." (Doc. Nos. 95-6 & 95-7.) There was a significant proliferation of these memes online from 2009 to 2016, the time during which Pepe the Frog hit its peak popularity as an internet meme. (Doc. Nos. 95-6 to 95-7, 95-9 to 95-14, 95-16). Mr. Furie acknowledged in July 2015, before allegedly drawing "Pepe in Blue Shirt" that the depiction of Pepe the Frog in the "Sad Frog" meme had become Pepe's "accepted outfit." (Doc. No. 88-21 at 6.) And in at least 4 of the licensing agreements Mr. Furie entered into for use of Pepe the Frog, he was commissioned to recreate this meme, or variations of it that he himself had not created. (*See* Doc. No. 88-27 at 8 (showing color images of "Sad Frog" meme and "Feels Bad Man" meme); Doc. No. 88-28 at 3-4 (showing color images of "Sad

Frog" meme); Doc. No. 88-36 at 7-8, Exhibits A & C (showing third-party memes incorporating the "Sad Frog" image); Doc. No. 95-15 at 4-5 (same).)

After discovery closed, Mr. Furie entered into another licensing agreement with Momo Entertainment Limited ("Momo") for use of Pepe the Frog very similar to his prior agreement with Xi'an Momo IT LTD, the only licensing agreement which provided substantial revenue to Mr. Furie.  (*See* Momo licensing agreement, FURIE_INFO_00012055-12066, attached as **Exhibit 1**.)  The image showing the character of Pepe the Frog for use in this licensing agreement is a "Sad Frog" meme image. (*See id.* at -12066.)  Indeed, it appears that Mr. Furie's primary motivation for registering "Pepe in Blue Shirt" was to attempt to claim ownership of a seven year-old meme his licensees kept asking him to draw or for his permission to use.  The monetary compensation for this agreement is identical to that in the Xi'an Momo IT LTD agreement, further eliminating any claim Mr. Furie has that any undesirable political associations[1] of Pepe the Frog have hurt Mr. Furie's ability to license the character.

## 3.0   ARGUMENT

### 3.1   Defendants Met and Conferred as to Abandonment, Implied License, Statutory Damages, and Attorneys' Fees

Mr. Furie argues that Defendants failed to meet and confer regarding all issues presented in Defendants' Motion other than fair use and Furie's copying of Pepe the Toad.  This is not accurate.  While counsel for Defendants mentioned only these two issues in an initial email on March 15, 2019, this does not mean they did not discuss anything further.  During counsels' telephone call that day, counsel for Defendants stated that Defendants would also move for summary judgment on the issues of

---

[1] Furie devotes significant attention to trying to smear Alex Jones with irrelevant *ad hominem* as if that has something to do with copyright infringement.  (*See* Doc. No. 92 at 21-22.)  Not only is it defamatory, but it is classless and reveals more about how his counsel must lack confidence in their legal position more than it says anything about Defendants.

abandonment, implied license, and possibly statutory damages and attorneys' fees.  (*See* declaration of Marc J. Randazza ["Randazza Decl."], attached as **Exhibit 2**, at ¶¶ 6-9.) Moreover, months before Defendants filed their Motion, counsel for the parties had discussed the issue of the availability of statutory damages, *and counsel for Mr. Furie encouraged Defendants to seek summary judgment on the availability of statutory damages*, which Mr. Furie would oppose, in an email dated January 28, 2019.  (*See* Randazza Decl. at ¶ 9; *see also* January 28, 2019 email from Will Kinder, attached as **Exhibit 3**.)[2]  Yet now, they complain that they have been surprised that Defendants raised this issue as well as the issues that *they themselves raised in their own motion.*  If this kind of game-playing will be the basis for a denial or exclusion, Due Process will "feel bad, man."

Although Defendants' basis for seeking summary judgment as to Infowars not being a property party and not having engaged in any allegedly infringing conduct should not have been a surprise to Mr. Furie, it is true that counsel for Defendants did not discuss this issue during the meet-and-confer call on March 15.

### 3.2   Defendants Did Not Violate Fed. R. Civ. P. 37(c)(1)

Mr. Furie claims that several of Defendants' exhibits should be excluded for failing to comply with Fed. R. Civ. P. 37(c)(1), which provides that a party may not rely on evidence in support of a motion that should have been disclosed under Rule 26 but was not, unless the non-disclosure is substantially justified or harmless.  The exhibits not previously disclosed are all screenshots of publicly available web sites to which Mr. Furie had equal access.  Such documents need not be disclosed in discovery.  *See L&L Franchise, Inc. v. Tsai*, 2008 U.S. Dist. LEXIS 126311, *6 (S.D. Cal. Mar. 7, 2008) (finding that non-disclosure of results of Google search conducted by defendant prior to filing

---

[2] As explained in Defendants' Motion, the analysis regarding availability of statutory damages and attorneys' fees under the Copyright Act is the same.  There is thus no prejudice in Mr. Furie having to respond to the issue of attorneys' fees availability despite not expressly inviting a summary judgment motion on the issue.

RANDAZZA | LEGAL GROUP

summary judgment motion was harmless under Fed. R. Civ. P. 37(c)(1) because "the documents are simply copies of web pages which . . . were found through a simple 'Google' internet search.  Thus, because either party could have conducted the simple search and discovered these same web pages, these documents need not be subject to discovery") (citing *SEC v. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995 (S.D.N.Y. 1973)); *see also Assurance Co. of Am. v. Nat'l Fire & Marine Ins. Co.*, 2012 U.S. Dist. LEXIS 76170, *11 (D. Nev. June 1, 2012) (declining to exclude exhibits at trial not disclosed during discovery under Fed. R. Civ. P. 37, as they were obtained from court web site and "because the documents were readily and equally available to all parties, there was no duty to disclose them during discovery") (citing *Sloan*, 369 F. Supp. at 995).

Rule 37(c)(1) exclusion is appropriate in instances where, for example, the bases for an expert witness's opinions are held back until the last minute or a party sits on documents exclusively in its control, such that the requesting party is prejudiced by not being able to conduct adequate discovery.  It is not meant to sanction parties for failing to obtain and authenticate all publicly available documents that will be attached to a summary judgment motion prior to discovery closing.  Every single document Mr. Furie seeks to exclude is a screenshot from a publicly-accessible web site, and none of them should be excluded.  This is also the case for every document attached to Defendants' Opposition that was not previously disclosed in discovery, and exclusion is not appropriate for any such documents either.

Even if these documents were not publicly available, exclusion would not be appropriate because Defendants' non-disclosure is harmless.[3]  Exhibits 11 and 12 to the Motion are simply the best evidence available of documents Mr. Furie admits exist and to which he refers in his SAC.  (*See* Doc. No. 47 at ¶¶ 43-44.)  Exhibit 13, a screenshot of Pepe the Frog being used in an episode of "Family Guy," is provided in

[3] Despite acknowledging that he had already received them during discovery, Mr. Furie asks for the exclusion of Exhibits 10 and 15-21.  There is no basis for excluding them.

RANDAZZA | LEGAL GROUP

1  support of Defendants' fair use defense, which Mr. Furie knew about before discovery

2  commenced, and David Jones referred to this episode of Family Guy during his

3  deposition.  (*See* transcript excerpts of deposition of David Jones, attached as **Exhibit**

4  **4**, at 50:21-51:5.)  Exhibits 26 and 27 merely provide context for Mr. Furie's licensing

5  agreement regarding the film "Good Time" about which Mr. Furie must have known,

6  given that he entered into the agreement himself.  Exhibit 43, an article regarding the

7  history of Pepe the Toad, is evidence in support of an affirmative defense Defendants

8  raised well before the close of discovery.  Mr. Furie does not explain how he was

9  prejudiced by Defendants not disclosing this evidence earlier, just that he was.[4]  But

10  there is nothing in these documents that calls for additional depositions or follow-up

11  discovery requests; they are simply web screenshots that Mr. Furie could also have

12  obtained at any time.

13       The same goes for the exhibits to Defendants' Opposition to Mr. Furie's Motion.

14  Exhibits 2-5, 8-12, and 14 all show the existence of the "not good man" image that Mr.

15  Furie stole for his alleged "Pepe in Blue Shirt" work.  Defendants' Opposition explains

16  how Mr. Furie knew of this image, which became the basis for the subsequent extremely

17  prominent "Sad Frog" meme, and that he was even commissioned to copy

18  unauthorized works of Pepe the Frog which incorporated this image.  (*See* Doc. No. 95

19  at 9-16.)  Mr. Furie had actual knowledge of these exhibits, and he cannot claim surprise

20  or prejudice for their non-disclosure.[5]  Non-disclosure of Exhibit 18 to the Opposition

21  is harmless for the same reasons Exhibit 43 to Defendants' Motion is.  And Exhibits 6-

22

23       [4] Mr. Furie also asserts that Defendants did not disclose this evidence until "well after the close of fact discovery."  This is confusing because fact discovery ended only 10 days before Defendants

24  filed their Motion, and 17 days before Defendants filed their opposition to Mr. Furie's Motion.

25       [5] Indeed, Exhibit 10 to Defendants' Motion, the <knowyourmeme.com> page for Pepe the Frog, contains a hyperlink in its first paragraph to Exhibit 2 to Defendants' Opposition, the page for

26  the "Sad Frog" meme.  (*See* Doc. No. 88-14.)  Exhibit 10 to the Motion even contains as its headline thumbnail image a "Sad Frog" meme.  Mr. Furie cannot claim surprise here.  (*See id.*)

27

7, the social media posts by Katy Perry and Nicki Minaj featuring Pepe, are merely the best evidence of documents which Mr. Furie acknowledges exist.

Fed. R. Civ. P. 37(c)(1) does not call for exclusion of this evidence.[6]

### 3.3   Mr. Furie's Evidentiary Objections are Baseless

Mr. Furie objects to several pieces of evidence as inadmissible hearsay, but there are no grounds for this objection. Exhibit 10 is a printout of the <knowyourmeme.com> page for Pepe the Frog which details the history and use of the meme and its many variations. This Court has previously found that <knowyourmeme.com> is a reliable source for this information. *See Grumpy Cat Ltd. v. Grenade Bev., LLC*, 2017 U.S. Dist. LEXIS 222401, *3 (C.D. Cal. Dec. 1, 2017) (citing <knowyourmeme.com> page for the "Grumpy Cat" meme); *see also Braham v. Sony/ATV Music Publ'g*, 2015 U.S. Dist. LEXIS 155268, *9 (C.D. Cal. Nov. 10, 2015) (referring to <knowyourmeme.com> as possible evidence of etymology of song lyric "Haters Gonna Hate"). Even if it were not, the page itself visually displays the many different uses of Pepe the Frog as a meme at various different times described in the page's text. It is thus not making "statements" excluded by Fed. R. Evid. 801  Mr. Furie's hearsay objections related to the <knowyourmeme.com> page are thus baseless.

Mr. Furie also claims Exhibit 12, the "Deplorables" Instagram post by Donald J. Trump, Jr., is also hearsay.[7]  But the document is unquestionably of Trump Jr.'s Instagram profile, with a time stamp, and shows the "Deplorables" image. The same is true for Exhibit 13, the Youtube video showing a clip of a "Family Guy" episode featuring Pepe the Frog. There is no disputable matter asserted in this screenshot; it

---

[6] Further, if Furie truly believes that he cannot fairly defend against this evidence, the Defense stipulates to him taking whatever additional discovery that they may *reasonably* seek under Fed. R. Civ. P. 56(d).

[7] This argument is especially frivolous because Mr. Furie's SAC attaches this image. (Doc. No. 47 at ¶ 43.)

RANDAZZA | LEGAL GROUP

shows a depiction of Pepe the Frog in the episode. And the same goes for Exhibit 26, a clip from the film "Good Time" showing Pepe the Frog.

Exhibit 21, the cartoon of Pepe the Frog by Ben Garrison, contains explanatory notes which Mr. Furie alleges are hearsay. But Mr. Garrison's notes are not introduced to prove, by themselves, that Pepe the Frog is "part of the public domain of free speech," but rather to show that a prominent political cartoonist expressed this opinion after Mr. Furie attempted to "kill" the character.

### 3.4    The Poster's Use of Pepe the Frog Was a Fair Use

Mr. Furie's claim for copyright infringement is foreclosed by fair use. 17 U.S.C. § 107 sets out a four-factor test for determining whether a use of a copyrighted work is a fair use that does not infringe an author's copyright. These factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

### 3.4.1   Factor one: purpose and character of the use

The first factor determines "whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose of different character, altering the first with new expression, meaning, or message," i.e., whether the use is "transformative." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (citations omitted). Other factors in the fair use analysis weigh less the more transformative a use is. *See id.* Placing a copyrighted work in a new context can make a use of that work transformative. *See Wall Data Inc. v. L.A. County Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006) (citing *Campbell*, 510 U.S. at 578-79).

Mr. Furie once again misleadingly compares "Pepe in Blue Shirt" to the image of Pepe the Frog appearing in the MAGA Poster to contend there are no significant physical differences between them.  But this is dishonest because, as explained in Defendants' Opposition to Mr. Furie's Motion for Partial Summary Judgment, Mr. Furie did not create the image the artist, Jon Allen, used.  Instead, Mr. Allen used an image of the "Sad Frog" meme which has been popular and widely used by the general public since 2009, and Mr. Furie later lied to the Copyright Office by claiming it was his own original work, "Pepe in Blue Shirt." (*See* Doc. No. 95 at 9-16.)  The allegedly distinctive elements of Pepe the Frog allegedly copied in in the MAGA Poster are reddish-brown lips, three white dots in the character's pupils, bulging eyes, and puffy eyelids.  Going by what Mr. Furie himself has created, Pepe the Frog is drawn with three white dots in his eyes on only 3 pages between "Play Time" and "Boy's Club 1," and this depiction does not appear in any work by Mr. Furie between 2007 and 2015. (*See* Doc. Nos. 88-5 & 88-6.)  And prior to "Pepe in Blue Shirt," none of Mr. Furie's alleged works displayed Pepe the Frog with reddish-brown lips.  Instead, these are features added and made popular by numerous third parties over the course of several years starting in 2009; they are distinctive characteristics of the "Sad Frog" meme, not of Mr. Furie's Pepe.  This leaves "puffy eyelids" as the only protectable element that appears in the MAGA Poster.

Mr. Furie argues that Mr. Allen's changes to the "Sad Frog" meme image he used as the base for the MAGA Poster are only minimal and thus non-transformative but provides no explanation for this contention, instead stating only that the character is recognizable as Pepe the Frog.  Yes, that is the point; Mr. Allen used the character's inclusion in the poster as a means of commenting on the significant role internet memes in general, and Pepe as a meme in particular, played in the 2016 presidential election.  It would be impossible to provide this commentary without including a character

recognizable as Pepe.  Mr. Furie states that a side-by-side comparison of "Pepe in Blue Shirt"[8] and the MAGA Poster shows minimal alterations, but this is untrue.  The MAGA Poster Pepe's expression is changed from a frown to a sly smile; the poster shows only Pepe's head, rather than his entire body or even torso; the character's eyes are changed to be more realistic, with realistic irises and pupils added and the three white dots serving as reflections of light in the character's eyes; and the coloring is changed entirely to a monochrome red to invoke the color "red" as associated with the Republican party.  These are significant physical changes that serve to make the MAGA Poster's depiction of Pepe the Frog transformative.

Mr. Furie appears to completely ignore the record in arguing that the use of Pepe the Frog in the MAGA Poster is not contextually transformative.  Use of a work in a different context can make the use transformative.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 154 F.3d 1107, 1114 (9th Cir. 1998) (finding that "a search engine puts images 'in a different context' so that they are 'transformed into a new creation'").  In one of the very few cases that have dealt with memes and copyright, the court in *Philpot v. Alternet Media, Inc.*, 2018 U.S. Dist. LEXIS 203500, *8 (N.D. Cal. Nov. 30, 2018) recognized that "[t]he main inquiry is whether the use of Willie Nelson, *in the specific context used* [as a meme], was transformative" (emphasis added).

Mr. Furie is correct that "the 'heart' of a claim for transformative use is 'the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.'"  *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1175 (9th Cir. 2012).  That is exactly what the use of Pepe in the poster does.  Mr. Allen included the character in the poster to symbolize the sharing of memes during the 2016 presidential election; to express the ridiculousness of the election, as evidenced by the

---

[8] The more apt comparison, of course, would be between the "Sad Frog" meme created by a third party Mr. Allen actually altered for use in the poster, rather than a drawing Mr. Allen had never seen before this lawsuit.

1   fact that a presidential candidate's campaign issued an "Explainer" claiming that a

2   cartoon frog had become a hate symbol and how people were "losing their minds" over

3   this fact; to show how Pepe had become associated with the Presidential candidacy of

4   Donald Trump; and to express, through Pepe's sly smile, that he contributed to Donald

5   Trump's victory.  (Doc. No. 88-40 at 121:5-10, 122:8-13, 122:17-123:21, 128:22-129:5,

6   168:6-23, 170:1-14.)[9]  Mr. Allen may not have used the poster as an academic and

7   written critique of Mr. Allen's artistic style, but that is not Mr. Allen's medium.  His

8   expressive medium is graphic art.  This use by Allen was unquestionably an artistic

9   comment on the role that many political figures, including Pepe and internet memes,

10  played in the 2016 election.  The poster is thus transformative commentary, and the

11  highly transformative nature of this use largely negates the significance of FSS's

12  commercial use of the poster, given there is no likelihood of the poster "superseding"

13  any of Mr. Furie's works.  *See Campbell*, 510 U.S. at 579.  This is not a trivial difference

14  in purpose; Mr. Allen is providing commentary on a presidential election and Pepe's

15  specific role in that election.  He is not simply adding a random object to a pre-existing

16  image of Pepe and calling it a day.

17       Mr. Furie's argument to the contrary appears to be based on the faulty premise

18  that, to be transformative, a work can only discuss a single subject, and because the

19  entire MAGA Poster was not about Pepe the Frog in particular it cannot be

20  transformative.  Mr. Furie cites no authority in support of this completely made-up

21  argument.  In fact, the case he *does* cite on this factor, *Monge*, states that a work need

22  only be *partly dedicated to commentary on a pre-existing work to be transformative.  See* 688 F.3d

23

24       [9] Mr. Furie's only response to this testimony, reserved for his Statement of Genuine Disputes
    of Fact, rather than his Opposition itself, is that "it is a post facto justification in response to this
25  litigation, and does not evidence [Mr. Allen's] actual intent at the time of making the first version of
    the MAGA Posters." (Doc. No. 93 at 20-23, ¶¶ 48-50, 52-54.)  Mr. Furie provides no support for this
26  claim, however, and baselessly slandering the credibility of a witness does not create a genuine dispute
    of material fact.
27

RANDAZZA | LEGAL GROUP

at 1175 (emphasis added).  Furie's asked-for change in the law would make little sense and would preclude many fair uses, for example, political cartoons that use the likenesses of more than one cartoon character.  Aside from this, Mr. Furie does not, and cannot, dispute that by the time of the 2016 election Pepe the Frog became an enormously popular internet meme (through no creative effort of his own)[10] and was strongly associated with Donald Trump and the "alt-right."  He has expressly stated that this use and association is entirely different than what he intended the character to mean.  (Doc. No. 88-13 at 162:2-10, 163:1-9.)  A significant part of the poster's meaning is this association and the role Pepe played in the election, making the use of Pepe transformative.

Although he reserves this discussion for the fourth fair use factor, Mr. Furie's repeated lie[11] that he was harmed because of undesirable political associations weighs on this factor as well.  In *Dhillon v. Does 1-10*, 2014 U.S. Dist. LEXIS 24676, *2-3 (N.D. Cal. Feb. 25, 2014), a candidate for California State Assembly commissioned a headshot to be used as a "positive marketing tool," and then the defendants posted a completely unaltered copy of the headshot on a blog that criticized and commented on the plaintiff's politics.  In holding that this use "is precisely what the Copyright Act envisions as a paradigmatic fair use," the Court found that "[t]he plaintiff's argument that the defendants' use of the headshot photo in connection with the article commenting on and criticizing her political views has altered the meaning or message

---

[10] Mr. Furie has testified that he attributes Pepe the Frog's popularity as an internet meme to "[r]andom forces" and cannot explain the phenomenon of the character becoming a meme.  (Doc. No. 95-18 at 48:3-12.)

[11] To try and ramp up the drama, Furie keeps claiming that he was harmed by Pepe (the Frog)'s association with right wing politics.  Meanwhile, all of the evidence showed that Furie toiled in poverty and obscurity until this association came to be.  Thereafter, he began getting licensing deals adding up to an excess of $1 million.  (*See* Doc. No. 88-35 at 2 and **Exhibit 1** at Section 7.)  Nevertheless, even if the association with the Right were "harmful" to Furie, this "harm" occurred well before Allen drew the MAGA poster, and well before FSS sold a single copy.  Finally, as discussed below, this "harm" is not the kind of harm that Title 17 addresses.

Reply in Support of Motion for Summary Judgment
2:18-cv-01830-MWF-JPR

of the original work is, in effect, a concession that the defendant's use was transformative under the first factor of the fair use analysis." *Id.* at \*14-15, 19; *see Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014) (finding that a t-shirt depicting an altered, but still recognizable, portrait of a politician in order to comment on his politics was complementary, rather than a substitute for the original, under the first fair use factor).  Putting aside the issue of Furie being unable to provide any evidence that the sale of the MAGA Poster caused any alleged harm, his complaints of undesirable political associations amounts to an admission that the MAGA Poster is transformative.

Mr. Furie provides no response to the fact that use of Pepe the Frog is made more transformative by being part of a visual depiction of political figures.  *See Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013) (noting that a collage's "composition, presentation, scale, color palette, and media are fundamentally different and new compared to the" original); *see also Blanch v. Koons*, 467 F.3d 255, 252 (2d Cir. 2006) (reasoning that the collage and the original image had "sharply different" purposes). Similarly, transformation is more likely where a copyrighted work is incorporated into other material, such as in a montage.  *See L.A. News Serv. V. CBS Broad., Inc.*, 305 F.3d 924 (9th Cir. 2002), as amended, 313 F.3d 1093 (finding use of a segment of a riot clip in a promotional video was deemed to be fair use).

Given the highly transformative nature of the MAGA Poster, the first fair use factor weighs strongly in Defendants' favor.

### 3.4.2  Factor two: nature of the copyrighted work

This "factor typically has not been terribly significant in the overall fair use balancing." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 799-800 (9th Cir. 2003). Mr. Furie claims that this factor weighs heavily against a finding of fair use, but that is not true; this factor typically does not play a significant role in the fair use analysis.

RANDAZZA | LEGAL GROUP

Mr. Furie claims that Pepe the Frog's status as an internet meme that had been widely used for the better part of a decade with no control exerted by its creator has no bearing on this factor, but he cites a case that did not deal with fair use.  In fact, it appears there are only two federal cases that have ever dealt with memes and copyright law, *Grumpy Cat*, 2017 U.S. Dist. LEXIS 222401 and *Philpot*, 2018 U.S. Dist. LEXIS 203500, and neither case discusses the second fair use factor in any detail.  There is an unsettled legal question of whether the creator of a work, which later becomes a popular internet meme through no effort of the creator (who approvingly allows the work to become a meme), can claim that this factor weighs in his favor when essentially all the creative expression and meaning in the meme is contributed by unauthorized third parties.  It is far from clear that this factor weighs in Mr. Furie's favor.

### 3.4.3   Factor three: amount and substantiality of portion taken

"The third factor looks to the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013). Wholesale copying of a work does not preclude a finding of fair use and the use of an entire copyrighted image may be reasonable if it serves the defendant's intended purpose.  *See Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000).

Mr. Furie's argument as to substantial taking primarily relies on "Pepe in Blue Shirt" and the claim that Pepe the Frog enjoys copyright protection as a character independent of Mr. Furie's works.  However, as explained in Section 2.0, *supra*, and Defendants' Opposition, "Pepe in Blue Shirt" is not Mr. Furie's original work.  And as also explained in the Opposition, the character of Pepe is not entitled to copyright protection because it lacks distinctive and consistent physical and conceptual qualities, is not sufficiently "delineated," and is not "especially distinctive." (Doc. No. 95 at 16-20.)  Mr. Furie also provides no argument addressing the fact that substantial copying

1  of a work, even the entire work, may be a fair use if it is necessary for the user's purpose.

2  Mr. Allen's use of Pepe the Frog's head was necessary to identify the character as Pepe;

3  if Mr. Allen had failed to do so, the poster would not have communicated the same

4  message and commentary on the 2016 election.

5      Considering the amount and substantiality of Mr. Furie's works taken, along with

6  the necessity of this taking for the purpose of the MAGA Poster, this factor weighs in

7  Defendants' favor.

8          **3.4.4   Factor four: effect on the market**

9      This factor considers "not only the extent of market harm caused by the

10  particular actions of the alleged infringer, but also 'whether unrestricted and widespread

11  conduct of the sort engaged in by the defendant . . . would result in a substantially

12  adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590

13  (citing Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4]).

14  "Where the allegedly infringing use does not substitute for the original and serves a

15  'different market function,' such factor weighs in favor of fair use." *Seltzer*, 725 F.3d at

16  1179.  Transformative works are less likely to have an adverse impact on the original

17  work than a use which merely supersedes the original. *See Kelly v. Arriba Soft Corp.*, 336

18  F.3d 811, 821 (9th Cir. 2003).

19      Harm to the plaintiff's market cannot be presumed where the use in question is

20  transformative and market substitution is unlikely; in such cases, the plaintiff must show

21  "[e]vidence of substantial harm to it." *See Campbell*, 510 U.S. at 593; *see also Equals Three,*

22  *LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1107 (C.D. Cal. 2015) (finding that

23  "where a work is transformative, market harm may not so readily be inferred and there

24  is no presumption of market harm") (citing *Monge*, 688 F.3d at 1180-81).  This factor

25  does not favor a plaintiff who can only show "hypothetical" market harm. *See Perfect*

26  *10*, 508 F.3d at 1168; *see also Equals Three*, 139 F. Supp. 3d at 1108 (finding that mere

27

*RANDAZZA | LEGAL GROUP*

1  allegation of loss of licensing revenue from alleged infringer was circular, and that in
2  absence of either side providing evidence of market harm, this factor was neutral).  If
3  anything, third party use of Pepe *increased* the market.  That is what every piece of
4  evidence Mr. Furie produced shows us.

5      The only kind of market harm copyright law is meant to address is the degree to
6  which the defendant's use serves as a *market substitute* for the original.  *See Burnett v.*
7  *Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 971 (finding that market harm
8  may come in the form of criticism or "destructive parody" that "may quite legitimately
9  aim at garroting the original, destroying it commercially as well as artistically") (quoting
10  *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986)).  The operative question is not the
11  allegedly infringing work's "potential to destroy or diminish the market for the original
12  . . .", **but rather whether it is likely to fulfill "the demand for the original**." *Fisher*,
13  794 F.2d at 436 (emphasis added).  Avoiding harm to reputation, such as the use of a
14  work "in the 'wrong context' or if the false impression is given that [the author] has
15  endorsed its use . . . is simply and clearly not the purpose of copyright law." *Campinha-*
16  *Bacote v. Evansville Vanderburgh Sch. Corp.*, 2015 U.S. Dist. LEXIS 181652, *23-25 (S.D.
17  Ind. Nov. 5, 2015) (regarding mnemonic model intended for healthcare services, finding
18  no likely market harm for use of model in educational setting when plaintiff stated she
19  did not want it being used in educational settings because it might lessen the perceived
20  validity of the model).  "[I]t is not copyright's job to 'protect the reputation' of a work
21  or guard it from 'taint' in any sense except an economic one – specifically, where
22  substitution occurs." *Sun Trust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1280-81
23  (11th Cir. 2001) (Marcus, J., concurring) (quoting *Campbell*, 510 U.S. at 592); *see also*
24  *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573 (1977) (holding that "[t]he
25  goals of patent and copyright law . . . focus[] on the right of an individual to reap the
26  reward of his endeavors and have little to do with protecting feelings or reputation").

27

1   The only kind of harm Mr. Furie can allege is his claim that he does not like Pepe

2   the Frog's association with the current President of the United States and the "alt-right."

3   But an unwelcome political association is not market harm recognized under this factor;

4   instead, it is a complaint that a work is being "tainted" or used in the wrong context,

5   but copyright law does not give an author a monopoly over the artistic contexts in

6   which a work may appear.   Furie cannot allege or prove any effect on any market for

7   Pepe the Frog.   In fact, he has admitted that he cannot quantify *any* loss of income

8   caused by sale of the MAGA Poster and has waived the ability to seek such damages.

9   (*See* Doc. No. 88-13 at 134:22-135:8; Doc. No. 88-39 at 3.)

10   Mr. Furie relies on the argument that if unauthorized uses of his work became

11   widespread he would hypothetically suffer market harm.   But, again, he is not being

12   candid. There has been rampant unauthorized use of Pepe the Frog in memes (all of

13   which took just as much of Mr. Furie's works as the MAGA Poster), yet Mr. Furie

14   stood by and let this happen without attempting to enforce his alleged copyright, even

15   going so far as to publicly announce his approval of this phenomenon.   Mr. Furie did

16   not start licensing Pepe the Frog until late 2015, 12 years after publishing "Play Time"

17   and only once Pepe had become a "meme phenomenon." (*See* Doc. No. 88-13 at 47:24-

18   48:16.)   This also, not coincidentally, happens to be when the "alt-right" and political

19   conservatives began to make particularly heavy use of Pepe the Frog and associated the

20   character with then-candidate and current President Donald Trump.   (*See* Doc. No. 88-

21   12 at Response No. 6; Doc. No. 88-14.)   None of these initial licensing agreements

22   made much money for Mr. Furie.   (*See* Doc. No. 88-13 at 44:18-45:19, 51:20-53:20;

23   Doc. Nos. 88-26 to 88-27.)   It was not until mid-2016, when third parties allegedly

24   began using Pepe the Frog to promote politics that Furie apparently does not like, and

25   the character's association with Trump's candidacy was in full swing, that Mr. Furie

26   entered into a lucrative licensing deal with Xi'an Momo IT LTD. (*See* Doc. No. 88-13

RANDAZZA | LEGAL GROUP

at 27:20-24, 28:11-30:7; Doc. No. 88-35.)  And it does not appear that there was any sort of delayed negative impact on Mr. Furie's licensing market caused by this right-wing affiliation, either, since Mr. Furie was recently able to secure an equally lucrative licensing agreement with another company for Pepe the Frog.  (*See* **Exhibit 1**.)

Thus, Mr. Furie obtained **literally all of his licensing revenue for Pepe the Frog after the character started to become associated with the "alt-right" and Donald Trump**.  Yet he claims these affiliations harmed his derivative works market.[12] His only evidence of this is a an email from "Bored Teenager" dated December 2, 2016 in which the licensee stated that "Zumiez dropped [a Pepe clothing line]" and that "[t]he hate symbol thing hurt us."  (Doc. No. 85-31 at 2.)  Of course, none of this bears on what happened in this case – even this happened before Mr. Allen made the MAGA Poster.  This evidence does not show any potential future harm caused by sale of the MAGA Poster, either, as it refers to "[t]he hate symbol thing," specifically, not Pepe the Frog's affiliation with political conservatives or Donald Trump, and certainly not the use of Pepe the Frog in a graphic representation of an historical event.  To get around this problem, Mr. Furie asserts that "unrestricted and widespread" association of Pepe the Frog with "widely despised" figures like Alex Jones and Roger Stone *would* harm his licensing market, without providing any evidence or authority.[13]  But even if

---

[12] Mr. Furie also claims his own market for creating posters would be potentially harmed by widespread unauthorized use of Pepe the Frog in posters.  He does not distinguish how use of the character in a poster would be any different than use of the character in internet memes, which he condoned for close to a decade.  He also does not allege or show that any such posters feature Pepe the Frog, the only character he has ever licensed.  But in any event, there is no potential for Mr. Furie to enter into the market for politically conservative posters featuring Pepe the Frog, as he claims to despise such associations and disapproves of any such depictions of the character.  For the same reasons, there is no potential derivative market for such works, either.

[13] Again, the level of table-pounding in the opposition says more about Furie than it does about Alex Jones.  Alex Jones has had up to 80 million listeners and viewers per day.  Mr. Furie and his counsel may "despise" Jones, but this has nothing to do with copyright law.  Even if Pepe were associated with Osama Bin Laden or Roger Goodell, what difference would that make in the analysis of whether or not the use is fair?

RANDAZZA | LEGAL GROUP

1   this were true, it would not matter, because Mr. Furie is transparently using copyright

2   law here as some kind of attempt to bring a trademark tarnishment claim in disguise.

3   This is not a proper use of Title 17.  *See Sun Trust Bank*, 268 F.3d at 1280-81; *see also*

4   *Zacchini*, 433 U.S. at 573.  There is no evidence to suggest Mr. Furie has or is likely to

5   lose any licensing revenue, in the form of market substitution, as a result of the sale of

6   the MAGA Poster.  All available evidence shows that the exact opposite is true.

7           All of the fair use factors thus weigh in Defendants' favor, and FSS's sale of the

8   MAGA Poster is a fair use under copyright law.  The Court should grant summary

9   judgment in Defendants' favor.

### 3.4.5   Defendants Did Not Act in Bad Faith – Whatever that Means

11          Mr. Furie argues that Defendants are foreclosed from asserting the fair use

12  defense because they "acted in bad faith."  He does not provide any legal basis for this

13  argument aside from the general principle that failing to "act in a manner generally

14  compatible with principles of good faith and fair dealing" can bar this defense.  *Monge*,

15  688 F.3d at 1173 n.6.  Instead, he argues that FSS acted in bad faith by re-promoting

16  the MAGA Poster after Mr. Furie filed this suit and increasing the poster's prices,

17  without any explanation as to how this is legally significant.  The closest he comes to

18  explaining the significance of these facts is that the FSS's web site stated "**we'll be**

19  **forced to take it down forever when we run out, so make sure you get this**

20  **collectable poster today**!", which Furie expects this Court to believe constituted an

21  admission of infringement. (Doc. No. 96-17) (emphasis original).  Mr. Furie's argument

22  makes no sense, and FSS never admitted to any form of infringement.  It was, and

23  always has been, FSS's position that its sale of the MAGA Poster is a fair use of Pepe

24  the Frog.  There is ample sworn testimony and contemporaneous statements to this

25  fact. (*See* transcript of deposition of Alex Jones, attached as **Exhibit 5**, at 14:9-14, 16:3-

26  20; Alex Jones deposition, Plaintiff's Exhibit 24, attached as **Exhibit 6**, at 2:2-19; Alex

RANDAZZA | LEGAL GROUP

1  Jones deposition, Plaintiff's Exhibit 26, attached as **Exhibit 7**, at 3:1-21.)   Mr. Furie

2  provides nothing to the contrary, and FSS acted in good faith.

### 3.5   Furie Abandoned His Copyright in Pepe the Frog and/or Granted an Implied License to the General Public to Use this Character

5  A creator can abandon copyright in his works.   Copyright abandonment "must

6  be manifested by some overt act indicative of a purpose to surrender the rights and

7  allow the public to copy."   *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th

8  Cir. 1960).   How much more of an overt act could there be other than clear statements

9  to multiple press outlets?

10  Mr. Furie does not address the most directly on-point case on this issue, *Marya

11  v. Warner/Chappell Music, Inc.*, 131 F. Supp. 3d 975, 992-93 (C.D. Cal. 2015).   There, the

12  lyricist of the popular song "happy birthday" stated in an interview with *TIME Magazine*

13  that she "had no complaint to make on the use of the words because she long ago

14  resigned herself to the fact that her ditty had become common property of the nation."

15  The court found that the "clear implication from the article is that Patty told the *TIME*

16  journalist that she had surrendered any claim she may have had to the *Happy Birthday*

17  lyrics," which could constitute an overt act expressing an intent to abandon her

18  copyright.   *Id.* at 993 (emphasis original).[14]   There is no part of this decision requiring

19  specific wording for abandonment, such as "I hereby formally abandon my copyright."

20  Mr. Furie claims that the specific wording of his public statements shows a lack of

21  abandonment, but they continue to show that he has recognized for years that

22  thousands of individuals use Pepe the Frog, that he made no attempt to stop this use,

23  that he was inspired by it, and that he had lost all control of how the character was

---

25  [14] The court did not grant a motion for a directed verdict on this defense because there were
26  outstanding questions as to what the lyricist actually told the reporter and whether *TIME* was
    paraphrasing her.  *See id.*  That is not the case here, as the record shows what Mr. Furie's specific words
27  were and what he meant by them.

being used.  This is the equivalent of the statements at issue in *Marya*, and thus constitute abandonment of Mr. Furie's copyright in Pepe the Frog.

### 3.6  Furie Cannot Seek Statutory Damages or Attorneys' Fees

Defendants' Motion explains that FSS's sale of the MAGA Poster started before any Mr. Furie attempted to register any of his copyrights, and thus statutory damages and attorneys' fees are unavailable are unavailable unless there is any "legally significant difference between [the infringer's] pre and post-registration infringement." *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 701 (9th Cir. 2008).  Mr. Furie argues that there is such a distinction here because FSS sold what Furie characterizes as a "Limited edition MAGA poster" and increasing the sale price of the poster after learning of this suit.[15]  But this does not change the fact that FSS has only ever sold a single version of the poster.  There is no difference at all in the poster before and after Mr. Furie's registrations; it is the same piece of art.  (*Compare* Doc. No. 85-59 at 2 and Doc. No. 96-17 at 2.)  Mr. Furie tries to claim this is equivalent to a new edition of a book by citing *Fodor v. L.A. Unified Sch. Dist.*, but that case dealt with **a new version** of a book that added "revisions and additions to update material." 2014 U.S. Dist. LEXIS 188398, *3 (C.D. Cal. June 3, 2014).  Here, there are no such changes or additions.  And finally, Mr. Furie claims that an off-handed mention by Alex Jones of signing the last 100 copies of the poster is a "legally significant difference" without explaining the contention.[16]

---

[15] Mr. Furie claims that the subsequent listing of the poster at this increased price is a "New Limited Edition . . . MAGA Poster," but that is the same description used for the initial, pre-registration listing.  (*Compare* Doc. No. 85-59 at 2 and Doc. No. 96-17 at 2.)

[16] There is also no evidence Alex Jones ever signed any copies of the poster.  FSS has over 100 unsold posters in storage, and FSS's corporate representative witness testified that he did not believe Alex Jones ever signed any copies.  (*See* Defendants' Second Supplemental Responses to Requests for Production of Documents, attached as **Exhibit 8**, at Supplemental Response No. 15; *see also* **Exhibit 4** at 103:7-104:16.)

RANDAZZA | LEGAL GROUP

Mr. Furie also contends that there is a legally significant difference in FSS's alleged infringement because it continued to sell copies of the poster after being notified of Mr. Furie's claims. He provides no evidence to support this contention, and it makes little sense. Under Mr. Furie's reasoning, if the defense of innocent infringement was ever available to a defendant, then statutory damages are always available, regardless of delay in copyright registration, so long as a single infringing copy is sold after a demand letter is sent. This is completely inconsistent with the purpose of limiting statutory damages and fees, which is to encourage the prompt registration of copyrights.

Mr. Furie is precluded from seeking statutory damages or attorneys' fees under 17 U.S.C. § 412.

## 4.0   CONCLUSION

The Court should grant summary judgment in Defendants' favor.

Dated: April 22, 2019           Respectfully submitted,


RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza

Marc J. Randazza, CA Bar No. 269535
Alex J. Shepard, CA Bar No. 295058
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

*Attorneys for Defendants,*
*Infowars, LLC and*
*Free Speech Systems, LLC*

Case No. 2:18-cv-01830-MWF-JPR

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 22, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that a true and correct copy of the foregoing document is being served via transmission of Notice of Electronic Filing generated by CM/ECF.

Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza