1                      UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5

MATT FURIE,                        )
6                                  )
         Plaintiff,                )
7                                  )
              vs.                  )
8                                  )   2:18-CV-1830-MWF
INFOWARS, LLC, et al.,             )
9                                  )
         Defendants.               )
10    _____)

11

12

13                  REPORTER'S TRANSCRIPT OF HEARING

14

                         Los Angeles, California
15
                         Monday, May 6, 2019
16

17

18

19

20

21

22                       AMY DIAZ, RPR, CRR, FCRR
                         Federal Official Reporter
23                       350 West 1st Street, #4455
                         Los Angeles, CA 90012
24

25      *Please order court transcripts here:  www.amydiazfedreporter.com*

                AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1        APPEARANCES OF COUNSEL:

 2

          For the Plaintiff:
 3

 4                    WILMER CUTLER PICKERING HALE & DORR LLP
                      By:  Louis Tompros, Attorney at Law
 5                         Stephanie Lin, Attorney at Law
                      60 State Street
 6                    Boston, Massachusetts 02109

 7                    WILMER CUTLER PICKERING HALE & DORR LLP
                      By: William Kinder, Attorney at Law
 8                    250 Greenwich Street
                      New York, New York 10007
 9
                      WILMER CUTLER PICKERING HALE & DORR LLP
10                    By:  Nancy Schroeder, Attorney at Law
                      350 South Grand Avenue, Suite 2100
11                    Los Angeles, California 90071

12

13        For Defendants:

14                    RANDAZZA LEGAL GROUP, PLLC
                      By:  Marc Randazza, Attorney at Law
15                    2764 Lake Sahara Drive, Suite 109
                      Las Vegas, Nevada 89117
16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE CLERK:  Calling item number one, case number
 2          CV-18-1830-MWF, Matt Furie vs. Infowars, LLC, et al.
 3                    Counsel, please rise and state your appearance for
 4          the record.
 5                    MR. TOMPROS: Good morning, Your Honor.  Louis
 6          Tompros from Wilmer Hale on behalf of the plaintiff, and
 7          along with me are my colleagues, William Kinder, Stephanie
 8          Lin, and Nancy Schroeder.
 9                    MR. RANDAZZA: Marc Randazza from the Randazza Legal
10          Group on behalf of the defense.  To my left is my associate,
11          Lateiga Cahill.  She is not admitted in this case, and is
12          assisting me as a paralegal.
13                    THE COURT:  That is fine.
14                    Good morning.  We are here on the motions for
15          summary judgment.  Before we get started, I just want to say
16          to counsel, it's very rare for a case to get this far along
17          and for the lawyers not to have appeared in front of me
18          before for some reason or another.  But here, I very much
19          mean that as a compliment, you know, given the subject matter
20          and the fact that your clients are in the public eye, it
21          certainly would have been conceivable, and forgivable, but
22          not ideal, if there had been a lot of posturing and a lot of
23          back and forth, and a lot of getting -- a lot of briefs about
24          how, you know, progressive values are being defended or the
25          First Amendment protects free speech; but instead, what we've
```

1    had is a lawsuit which is basically a very -- it's a

2    complicated copyright lawsuit because of some of the legal

3    and factual issues, but it's a basic copyright dispute, the

4    way many other disputes are in Federal Court.  And I'm glad

5    that counsel have been able to, at least so it seems to me,

6    treat it in that fashion.  And I hope that will carry over to

7    later this week, as well.

8          And I -- like I said, I think what I mean to say,

9    and I very much mean this as a compliment, is that it seems

10   that the lawyers here have been, while of course having

11   disputes, including the dispute that was brought to my

12   attention on the length of a continuance, have been behaving

13   very civilly and very professionally.  And I hope that

14   despite the passions that the clients might bring to the

15   matter, that will continue.

16         So here let me summarize the tentative, because it's

17   not going to be on the record, as I said.

18         First, there is this issue about the documents, and

19   on whether they were properly disclosed.  And that is of real

20   concern to me because I do think potentially the amendments

21   to the Federal Rules that the Supreme Court has adopted and

22   Congress has chosen to allow to stand are potentially very

23   important on just cutting down on the amount of discovery

24   disputes and the cost of civil litigation pretrial.  But that

25   won't happen if they are not enforced.  But at the same time,

1     they have to be enforced reasonably.  And the real issue here

2     is not whether these documents were ever disclosed, you know,

3     I'm told that they weren't, that doesn't seem to really be

4     disputed; the question is, is when did they come into the

5     custody of or possession of a party and when did that party

6     form the intention to use them in trial?

7          And some of the documents here, to the extent they

8     were public, you know, there is nothing wrong with a party

9     receiving a motion for summary judgment thinking, wow, I -- I

10    really need to get evidence on that point, and going out and

11    finding it, as long as the evidence is then promptly

12    disclosed.

13         What is not allowable is to have a document in one's

14    possession and recognize that it was going to be, or very

15    likely was going to be, used as an exhibit at trial from the

16    beginning of the case, and then sit on it as a way of

17    sandbagging.

18         So certainly some of the documents here clearly seem

19    to be more on the proper end of things than the other.  For

20    the other documents, it might be sufficient if the defense

21    just submits a statement saying when the document was

22    obtained and when the decision was made to use it.  And

23    happily, we are at summary judgment here; we aren't at trial.

24    We aren't in the middle of trial when a witness is on the

25    stand and the objection is raised that Rule 26 prevents use

 1      of the document, which is one of my least happy things to

 2      occur as a district judge.

 3              So here, I think -- what I'm saying is we have to

 4      work it out, and I'll insist that it be worked out, but it

 5      probably will be worked out.  So one way of approaching the

 6      arguments on the issues here on summary judgment is to just

 7      assume that these documents are going to come in, and if the

 8      plaintiff feels that there is a very good argument on some of

 9      them, that they shouldn't come in, or that the lack of

10      certain documents is dispositive on certain issues, then

11      please feel free to raise that.

12              For similar reasons, it does seem that the meet and

13      confer could have been more robust, but especially when

14      certain lawyers are not practicing in this district

15      routinely, then it does act sometimes as a trap for the

16      unweary.  It doesn't seem like there was a lot of prejudice

17      here, so on this occasion I'll choose to overlook that.

18              Let's get to the merits of the motions, which raise

19      some interesting issues.  It seems to me that the Furie

20      motion, it's a strong motion, it was a well-written motion.

21      It was, more importantly for my purposes, a well-supported

22      motion.  But nonetheless, it seems that it should be denied

23      for -- in at least a couple of areas, and that would be on

24      the defenses of abandonment and de minimis use.  While it

25      seems to me that a rational jury could go both ways on that,

1    and in part it's -- it's for disputes in the evidence, but

2    it's also broader than that.  It's who -- even if the facts

3    were virtually undisputed, who ultimately gets to draw the

4    right reasonable inference from those facts?  Now, on a

5    contract case, it would probably be the Court because it's a

6    written document and that is the law, but here, it seems to

7    me that it really ought to be a jury who is doing that.

8           The invalid certificate of registration and implied

9    license, I think that the defendant just simply hasn't met

10   the burden of showing some reason for those not to be removed

11   from the case in favor of the plaintiff.

12          It could well be that the lack of a copyright is in

13   the same position, but that it's -- what we've got here is,

14   as I read the facts -- and if I'm reading them wrong, then

15   please let me know -- we've got this trip to Mexico combined,

16   of course, with Mr. Furie's denial that El Sapo had anything

17   to do with Pepe.  If a plaintiff could just deny things and

18   that was that, then there would seldom be the need for any

19   sort of trial.  Nonetheless, there has to be some sort of

20   evidence to suggest otherwise.

21          Here, while there is similarity between the images,

22   it seems to me, and this is a legal conclusion, that they

23   are -- while they might be substantially similar, they are

24   not strikingly similar.  And if they were strikingly similar

25   under Ninth Circuit law, then the access would be presumed.

1    If someone comes out with *Hamlet*, and it was under

2    Shakespeare's copyright and the play was the same except for

3    five words, then of course you would say it was copy

4    regardless of whether access was shown or not.  That is not

5    the case between Sapo and Pepe.  There has to be some access.

6    And is what is shown here sufficient for it to be a jury

7    question?  It seems a close call.

8           On the Infowars' motion, on some issues, it does

9    seem that the motion should be denied; in particular, whether

10   Infowars should be a defendant.  I mean, it was there on the

11   website, and apparently Infowars takes the position that that

12   was a mistake, and that the intention of Infowars is -- and

13   I'm sure there is good business reasons for this -- is to

14   have a pretty clear distinction between the operating company

15   and Infowars itself.  As that may be, that might be the

16   intention, and it might have been a mistake, but again, that

17   seems like something for a jury to decide.

18          And again, the fair use, it seems to me fair use

19   should be for the jury for two reasons:  One is the facts

20   themselves are disputed by the parties about who was doing

21   what and when and how and with what intention.  But even if

22   the facts were far less disputed than they appear to be, at

23   some point, again, it's -- who decides this?  If you had even

24   largely undisputed facts, who gets to draw the proper

25   inference from those facts?  And in this area of the law, it

1    seems to me that it should be a jury and not myself for many

2    reasons, in part just what the case law says, in part the

3    structure and purpose of the copyright acts and how it

4    divides things between the Court and the jury.  And finally,

5    just overarchingly, just consistent with the Seventh

6    Amendment itself.

7           However, that is not to say that there aren't legal

8    decisions to be made here.  And one legal decision is whether

9    the pre and post-registration is different.  And if it isn't

10   different, then the statutory timelines would seem to me to

11   cut off the right to statutory damages and attorney's fees.

12   And that seems to me what is going on here, that there is --

13   that, yes, the plaintiff can point to these -- to I guess to

14   some -- to distinctions, but I don't think that -- they

15   aren't legal differences, they aren't differences that really

16   matter.  So if that tentative view of the Court is correct,

17   then summary judgment should be granted in favor of Infowars

18   on that significant point.

19          So having expressed to you some thoughts that I've

20   had, having read the briefs and the evidence that you've

21   submitted to me, let's try to go in the same order.  And let

22   me hear first from the plaintiff on his motion, and of course

23   the defendants will then be heard on that motion.  And then

24   we'll switch and talk about the Infowars' motion, and I'll

25   hear from counsel for the defendants first, and then I'll

1    hear from counsel for the plaintiff.

2           All right.  Thank you, counsel.

3           MR. TOMPROS: Thank you, Your Honor.  With your

4    permission, what we would like to do is go roughly in the

5    order of your tentative.  And my colleague Mr. Kinder was

6    going to handle the abandonment part of that.  My colleague

7    Ms. Lin was going to handle the de minimis use part of that.

8           THE COURT:  Let me say one other thing I thought was

9    very interesting, at this point it doesn't matter, if we get

10   to the point of drafting jury instructions, it might matter

11   quite a bit, that is the very interesting argument that the

12   defendants raised about memeification, which is not a -- it's

13   not a concept that seems to be in the case law, or at least I

14   couldn't find it.  But it seems to be kind of a commonsense

15   thing following from the *Happy Birthday To You* case, where at

16   some point if Mr. Furie was content or acquiesced or perhaps

17   even took a certain amount of pride in Pepe taking on a life

18   of his own, what effect does that have on fair use?

19          Now, in the briefs, the plaintiffs kind of said,

20   well, really as such, sort of this new or separate doctrine,

21   it's not supported in the law, it should have no effect.

22   And, you know, you are probably, as just a strict matter of

23   where the law stands right now, you might well be right.  But

24   where the law is going to be five years from now, or

25   whether -- this isn't anything new, it's just applying the,

1    kind of the reasoning, and just the sense of fairness,

2    really, that is if the *Happy Birthday* case to something which

3    is kind of new, or at least new to someone who is my age on

4    that, I'm sure to many younger people, the idea that memes

5    are something new would seem ludicrous.  But all of that, I

6    just think that that just struck me as being a fairly

7    interesting issue.

8            The fact is, though, I haven't really made a big

9    deal of it in the tentative, and I may or may not even in the

10   final order, because simply I don't think that a decision on

11   that point ultimately determines whether fair use is for the

12   jury here or not.

13           So anyway, with that further guidance, counsel, then

14   feel free to start arguing.

15           MR. TOMPROS: We have a few slides.  Would I be

16   permitted to us the --

17           THE COURT:  You may.  Have they been shared with the

18   defense?

19           MR. TOMPROS: We have a set if you want to pass those

20   over.

21           THE CLERK:  Please do not walk through the well.

22           MR. TOMPROS: Of course.

23           THE COURT:  Counsel, you may proceed.

24           MR. KINDER: Good morning, Your Honor.

25           As Mr. Tompros said, my name is Will Kinder on

1    behalf of Plaintiff Matt Furie, and I'll be addressing the

2    issues of abandonment and implied license.  I'll give

3    Mr. Tompros a moment to pull up the slides here.

4           Okay.  So I would like to start with abandonment and

5    spend most of my time on that issue.

6           First, the standard, the legal standard for

7    abandonment is exacting.  It requires an overt act indicating

8    a purpose to surrender the copyrights.  And that act must be

9    taken with respect to a particular copyrighted work, and the

10   conduct must be clear, decisive and unequivocal.

11          Infowars has cited only a single case in which an

12   abandonment defense -- sorry, Your Honor, one moment --

13   Infowars has cited a single case in which an abandonment

14   defense survived summary judgment, and the statements at

15   issue in that case are on the screen.  You can see that they

16   clearly are made in the context of the copyright holder's

17   ownership of copyrights.  The plaintiff said, I have never

18   cared about the copyrights.  I don't care about copyrights.

19   Some people don't understand that there are more important

20   issues than copyrights.

21          None of the statements that Infowars points to in

22   this case approach this level of overt intent to abandon

23   legal rights in Mr. Furie's works.  Infowars also relies, as

24   Your Honor mentioned, on the *Happy Birthday* case.  Infowars

25   says this case is the most on case point for its purposes.

1        But in that case the Court denied summary judgment on

2        abandonment, precisely because the words and intent that the

3        copyright holder had said and had were unclear.  If anything,

4        this Court, Your Honor, should support the notion that

5        Infowars' cross motion for summary judgment on these issues

6        should be denied if the Court has any doubt about Infowars'

7        characterizations of Mr. Furie's statements, and we submit

8        that it should have many such doubts.

9             There is only one party here who has presented

10       verbatim each of Mr. Furie's statements, and that is

11       Mr. Furie.  And that is because when viewed verbatim and in

12       their proper context, Mr. Furie's statements show exactly the

13       opposite of what Infowars suggests, which is a lack of

14       sufficient intent to abandon his copyrights.

15            One other issue on the *Happy Birthday* case, Your

16       Honor.  The Court observed that, if credited, the reporter's

17       paraphrase of the copyright holder's statement might be an

18       overt act of abandonment, but it was clear in that case that

19       the statement was made in a discussion about a lawsuit that

20       was adjudicating the copyrights at issue.

21            None of the statements that Mr. Furie have made were

22       made in the context of his copyrights.  And so I would like

23       to review just a couple of those, and I'll also refer to the

24       tentative order, Your Honor.  But we would submit that there

25       are two overarching reasons why Mr. Furie's statements do not

1          give rise to the overt intent to abandon that is required.

2                    First, the statements on their face, the statements

3          themselves are not about copyrights, and they do not indicate

4          an intent to relinquish any legal rights.

5                    And second, viewed in the course of Mr. Furie's

6          entire course of conduct throughout that time period, it was

7          clear that he was enforcing and seeking to benefit from his

8          ownership of the copyrights to Pepe the Frog.

9                    The first statement I would like to look at, Your

10         Honor -- and in the interests of time, I just want to look at

11         two statements -- this first one I think is indicative of all

12         of Mr. Furie's statements except for one, and we'll look at

13         that one in a moment.  But this is the August 2010 *Know Your*

14         *Meme* article.  This is Furie Exhibit 47.  And Mr. Furie is

15         asked a question about Pepe's use as a meme, as he was in

16         many of the articles that Infowars relies on.  And in fact,

17         Your Honor's tentative quotes Mr. Furie's answer where he

18         says about the use of Pepe as a meme, "I don't really mind.

19         I was like, it doesn't look the greatest, but I don't care."

20                   As an initial matter, these statements do not

21         reference his copyrights.  They don't reference his

22         copyrights in *Boy's Club* or *Play Time* or Pepe in the Blue

23         Shirt.  And if you look more closely at the entire language,

24         he's talking about a particular use of Pepe the Frog that he

25         thought did not look the greatest.  He's talking about how

1    somebody took that out and vectorized it and made it look

2    something kind of different than mine.  At most, this is an

3    artistic critique by the artist about somebody else's use of

4    Pepe the Frog.

5         And this is legally significant, Your Honor, because

6    Mr. Furie's choice to not -- to be okay with this particular

7    use cannot give rise to abandonment.  Selective enforcement

8    does not jeopardize -- does not jeopardize Mr. Furie's

9    copyrights.  There is a reason why Disney is not required to

10   send a cease and desist letter to every child who traces or

11   draws Mickey Mouse in their notebook.  That is selective

12   enforcement, or even lack of enforcement, as the *Hampton* case

13   concluded does not give rise to abandonment.

14        Mr. Tompros, can you jump to slide 10?

15        The other statement by Mr. Furie that I wanted to

16   directly address is the April 2015 *Daily Dot* article.  This

17   is Furie Exhibit 64.  This is the closest Infowars can come

18   to abandonment, but it still fails.  Here, Mr. Furie is asked

19   about people profiting off of Pepe.  And in response, he

20   says, "I believe in supporting people's decisions to profit

21   off of Pepe."

22        As an initial matter, again this statement and the

23   question and the answer say nothing about copyrights.  But as

24   we have argued in our briefs, and as Your Honor's tentative

25   mentions, this article is clearly a sarcastic joke.  That is

1    evident.

2              THE COURT:  I believe what I said was that Mr. Furie

3    has said that it should be viewed as a sarcastic joke.  That

4    is not to say that a rational jury couldn't disagree with

5    that post hoc description of what he meant in the article.

6              MR. KINDER: Sure, Your Honor.  What I meant to say,

7    as we have said in our briefs, that this is a sarcastic joke.

8              And there -- and I take Your Honor's point, but I

9    think in looking at the entire context, which is key here, a

10   rational juror could not find that this was a serious

11   statement intended to abandon his copyrights.

12             And the first indication of that is this other

13   question and answer in the same article where Mr. Furie

14   nonsensically answers a question about Pepe's use as the

15   4Chan mascot, and he says, "As your God, my hope is to

16   enhance your Pepe birthing experience by empowering you

17   through it.  Obey Pepe, obey me, bow down to your leader,

18   worship me."

19             The context here matters, and no reasonable juror or

20   fact finder, or any reasonable person, we think, could

21   find -- could conclude that this was a serious interview

22   evidencing his intent to abandon his legal rights to Pepe the

23   Frog.

24             Judge Learned Hand has said, in a slightly different

25   but analogous context, which was in the context of a

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    unilateral offer to contract, the circumstances in which the

2    words are used is always relevant and usually indispensable.

3    In the Eleventh Circuit case, quoting Learned Hand here, the

4    Court found that, "There were indicia of gest around the

5    alleged offer that made it clear that no reasonable person

6    could find a serious intent."

7         THE COURT:  Well, certainly no reasonable person

8    could think that Mr. Furie actually intended people to obey

9    him or gratuitously offer him nongenital or genital love, but

10   it's something else to say that it wasn't indicative of a

11   deeper intent to take pride in or acquiesce in the fact that

12   others were using Pepe for their own purposes, to put it in a

13   phrase that favors you, or that Pepe had taken on a life of

14   his own, for better or worse, to put it in a phrase which is

15   more helpful to the defendants.

16        MR. KINDER: Sure.  I think if you look -- again, if

17   you look at the words -- if you look at the words on their

18   own, at the top here, there is -- there may be some question

19   on their own about what is the intent.  But in light of not

20   only the other statements, the other evidence around this

21   article about the article, and the evidence about

22   Mr. Furie -- this is the second point I wanted to get to --

23   the evidence about Mr. Furie's entire course of conduct

24   throughout this time period, he never -- a reasonable juror

25   would not find, could not find, that he -- that the statement

1    that Infowars, the narrow statement Infowars points to, could

2    amount to abandonment.

3         For example, in the other articles that Infowars

4    relies on, there are multiple statements by Mr. Furie where

5    he makes clear an intent to benefit from his rights to Pepe

6    the Frog.  This is the September 2016 *Atlantic* article where

7    Mr. Furie is asked about making money off of Pepe.  And he

8    says, "I just did a Pepe official clothing line.  I'm doing

9    little enterprising things like that."

10        In this July 2015 *Vice* article, he's asked about

11   potentially doing a book deal, and he says, "If the right

12   situation came along, I would do it.  I mean, I guess it

13   would be worth it."  And in fact, he did do that book deal.

14   That is the *Boy's Club Collective Edition*, which is a

15   registered copyright in this case.

16        And when Mr. Furie spoke about copyrights, he did so

17   unequivocally and directly.  In this September 2016 *Esquire*

18   article, he said, "Pepe the Frog is copyrighted by me."  He

19   goes on to explain how it's difficult in the era of the

20   Internet to enforce his copyrights, but there is no doubt

21   about what Mr. Furie thought of his copyright in Pepe the

22   Frog, and that was that he owned it.

23        Juxtapose to the *Melchizedek* case that Infowars

24   relies on.  There could not be a starker difference.  There

25   the copyright holder said, I don't care about copyrights.

1     That is not what Mr. Furie has said, and that's not what he's

2     believed, and that's not what he's done.

3           Just a couple more slides.  Mr. Furie has

4     consistently licensed Pepe the Frog throughout this time

5     period.  That is not the conduct of someone who intended to

6     abandon or thought he had abandoned his rights to Pepe the

7     Frog, and he has taken enforcement action throughout that

8     time period, as well.

9           So, Your Honor, we'll submit that the statements

10    Infowars points to either do not talk about copyright, or at

11    most, evidence an ambivalence that is not the clear and

12    decisive conduct that is required under the law for

13    abandonment.

14          Unless Your Honor has questions, I'll just very

15    briefly touch on implied license.

16          THE COURT:  You may.

17          MR. KINDER: The standard for an implied license is

18    governed by state contract law.  That is true for implied

19    copyright licenses, and that standard thus requires the same

20    elements as an express contract, which include mutual assent

21    or offer and acceptance and consideration.  Infowars does not

22    dispute that that is the standard, but Infowars has not

23    offered any explanation as to how mutual assent or

24    consideration have been offered.  And in fact, all parties

25    agree that there have been no negotiations and they have

1    never spoken with one another.  Infowars offers no

2    explanation how that factual circumstance could give rise to

3    implied license, and I think Your Honor's instincts in the

4    tentative on that point are exactly correct.

5             THE COURT:  Thank you, counsel.

6             What else on the -- oh, do you want to finish on

7    the -- why don't you finish on the Infowars -- I mean, on

8    Mr. Furie's motion, and then I'll hear from the defense.

9             MR. TOMPROS: Yes, Your Honor.  My colleague, Ms.

10   Lin, will address the remaining issues.

11            THE COURT:  Thank you.

12            MR. TOMPROS: Thank you, Your Honor.

13            MS. LIN: Good morning, Your Honor.  I'm Stephanie

14   Lin on behalf of Matt Furie, the plaintiff.

15            If it's all right, I'll start with the de minimis

16   use issue, and then also briefly touch on the lack of

17   copyright and invalid registration issues.

18            THE COURT:  You may.

19            MS. LIN: Thank you.

20            So Infowars' eighth affirmative defense is that its

21   infringing use is de minimis, and their theory is that

22   because Mr. Furie's copyrighted works are only comic books,

23   not the character and image of Pepe the Frog, that their use

24   of Pepe's head in their poster, in their posters is de

25   minimis and does not constitute copyright infringement.  But

1       that is incorrect.

2              The de minimis standard is that the taking is so

3       meager and fragmentary that the average audience would not

4       recognize the appropriation.

5              But if we could go to the next slide.  As you can

6       see here, this is the infringing image next to Mr. Furie's

7       copyrighted image.  No reasonable jury could find that Pepe

8       is not recognizable in this image.  And you can see that a

9       significant portion of Pepe is taken here.  It's his entire

10      head and face and all of his distinctive characteristics, the

11      large eyeballs, the puffy upper and lower eyelids, the

12      rounded lips, the shape of the head, everything.

13             But even if we only consider Mr. Furie's copyrights

14      from the comic books, the taking is still significant and not

15      meager and fragmentary, because he owns copyrights in the

16      character of Pepe, as well as the image of Pepe.  Pepe is one

17      of four main characters.  That is a significant portion to

18      steal one of those characters out of four, and the books are

19      all about them.

20             But I think that significantly is the -- the most

21      significant point is the recognizability of Pepe and the

22      taking.  The whole point of using Pepe's image in these

23      posters was because it was recognizable.  That is what sells

24      posters.  That -- the artist who created the original MAGA

25      poster, John Allen, testified under oath that it was

1    important that Pepe was actually recognizable in the posters,

2    and Infowars' corporate witnesses agreed with that.

3          Alex Jones testified that he recognized Pepe as that

4    stupid frog, and that people like it.  That was when he was

5    looking at the poster -- the original poster to decide

6    whether or not he wanted to sell it.  And the corporate

7    representative for Free Speech Systems, David Jones, also

8    said he recognized Pepe when he saw it.

9          So I think that that is the most important point on

10   the de minimis issue is that it's not meager and fragmentary,

11   but also it is recognizable, and that is the whole reason

12   that they used it.

13         You know, this article from *New York Magazine*

14   explains, you know, Pepe, he's that green, anthropomorphic

15   frog, the one from all the memes.

16         And to Your Honor's point about memes, you know,

17   Infowars argues somehow that the Pepe character is not

18   protectable because it has become such a popular meme.  I

19   think in addition to the selective enforcement point that my

20   colleague, Will Kinder, made earlier, this argument really

21   only goes to show that Pepe is, in fact, distinct enough of a

22   character to be recognizable in all of his different forms.

23         So again, this goes to our point that the character

24   himself is copyrighted; and therefore, the taking is

25   significant.

1          Further, the idea that Pepe cannot be protectable

2     just because he has gone viral is not supported by the law.

3     You know, rights and memes can be adjudicated, as the *Grumpy*

4     *Cat* case shows, and as the *Garfield* case shows.  The fact

5     that a character is extremely popular and well-recognized

6     does not change whether or not it can be protected by

7     copyright.

8          So that is why we think summary judgment actually

9     should be granted for Mr. Furie on Infowars' eighth defense

10    of de minimis use.

11         THE COURT:  Thank you.  And what about the lack of a

12    copyright?

13         MS. LIN: So regarding the lack of copyright, um, if

14    we could go to slide 2.

15         You know, to focus on the access point first, I

16    think that Mr. Furie's statement that he had no access to El

17    Sapo, had not seen El Sapo before, is enough to find as a

18    matter of law that he did not have access.  And the reason

19    for that is because the burden is on Infowars to prove its

20    affirmative defense.  And they have put forward no actual

21    evidence that Mr. Furie did El Sapo at any point.

22         I will note that they did not produce any evidence

23    in a timely manner about when El Sapo was created, which

24    version of El Sapo Mr. Furie allegedly saw or when, and

25    really the timing of any of the versions of El Sapo that they

1      have used in any of their briefs.  They did provide

2      Exhibit 18 with their opposition, again, not produced but in

3      their opposition, and that shows a 2003 version of El Sapo.

4      That is the only version of El Sapo that actually has a date

5      associated with it.

6              And they produced -- and they provided an article,

7      Infowars' Exhibit 43, that purports to explain the history of

8      El Sapo.  But nowhere in there does it say that El Sapo has

9      ever left Argentina.

10             Throughout their brief, they say that El Sapo was

11     ubiquitous in Latin American.  Their statement of facts say

12     it was throughout Central America.  That is supported by

13     absolutely no record evidence whatsoever.  The article they

14     provided only says that El Sapo tours Argentina.

15             And furthermore, they do not explain why or how a

16     childless, 24-year-old artist on a summer vacation in Tijuana

17     would be watching children's programming in Argentina.

18     Absolutely no evidence.  This is pure speculation and totally

19     made up.

20             So that is why we think as a matter of law you can

21     decide in Mr. Furie's favor on the lack of copyright defense.

22             THE COURT:  Thank you.

23             Let me hear from the defense in regard to

24     Mr. Furie's summary judgment motion.

25             MR. RANDAZZA: Give me one moment, Your Honor.

1          Your Honor, the first issue here I would like to

2     discuss is this issue of access.  Now, when we talk about

3     Pepe, we are talking about -- remember they are being very

4     careful to call it El Sapo.  It's Pepe the Toad.  That is

5     what it means in Spanish.  If we are going to use English in

6     this proceeding, let's do that.  If we are going to use

7     Spanish, let's use Spanish.  My Spanish is rusty, but I can

8     get along.  We've got Pepe the Toad and Pepe the Frog.  I

9     can appreciate Your Honor does not find them strikingly

10    similar.

11          I think a jury would find it coincidental that a

12    similar looking animal, a similar character with the exact

13    same name -- I'm not a biologist, but at least the exact same

14    genous -- would miraculously spring from the mind of an

15    artist.

16          I want to look at that in context.  If we look at

17    that in context of Mr. Furie's greater body of work -- I have

18    here an exhibit to his deposition.

19          May Ms. Cahill approach?

20          THE COURT:  She may.

21          MR. RANDAZZA: You want to bring that over to them?

22          So while we ask Ms. Lin's question of what interests

23    would a childless 24-year-old have in cartoon characters?

24    Well, it seems that this is the actual -- this is his genre,

25    children's cartoon characters.  And if we look at this, I

1    can -- I have a number of pullouts from this, Your Honor --

2    if you look at that one complete work here, we have squares

3    drawn around a number of these characters.

4         For example, you might see, if Your Honor is not

5    familiar, and I may misidentify some of these, in the top,

6    left-hand corner we have, is that from the old cartoon

7    He-Man.  We've got characters -- we've got Elf.  We've got a

8    character from *The Neverending Story*.  If you look down in

9    the middle at the bottom, there is Big Bird, which, you know,

10   he testified, Mr. Furie testified that he created that not as

11   inspired by Big Bird, but rather inspired by a knockoff of

12   Big Bird.

13        We look at the bottom to the right-hand corner, you

14   will see Animal from the Muppets.  Above that you see Groot

15   from *Guardians of the Galaxy*.  So this collage of well-known

16   cartoon figures is his own work.

17        So I think it's more likely than not that this

18   striking similarity will become more and more striking as the

19   jury looks at each one of these.  I don't want to burden the

20   Court with -- with exhibit after exhibit of these but, you

21   know, for -- we have here -- my associate will approach you

22   with one example.  I haven't seen the material -- I haven't

23   seen the movie myself, but the character here is from *The*

24   *Neverending Story*, with apparently a red-shirted frog, which

25   is coincidently how Pepe the Toad is shown, spray painting

1        something in Spanish on the side of him meaning escape.

2                Now, another example of his work -- bring that over

3        to him.   I actually find this quite creative and

4        interesting, where he's taken a previously horrifying

5        character of Freddie Krueger, and recasts him as a loving

6        father carrying a child.   I think it's kind of funny.   But

7        this would be consistent with taking perhaps the wholesome

8        Pepe and moving him into a little more, I would say teenage

9        existence, or more of a college existence.   He has this style

10       of juxtaposing previously-existing characters and putting

11       them in situations that you wouldn't normally find them.

12               And during his deposition, he either admitted or,

13       you know, upon hearing that there were a number of

14       admissions, he started to change his story and say that these

15       were just coincidences, that it just coincidentally looked

16       like one character or another.

17               Now, if we think about this access issue from the

18       standpoint of Pepe the Toad has never left Argentina, well,

19       that might have worked in 1975, but Mr. Furie testified that

20       he has had access to the Internet since at least as early as

21       2000, if I'm not mistaken.   If I'm mistaken, correct me.

22               But that would seem consistent with most of our

23       experiences.   You know, I myself have never been to Japan,

24       but I am familiar with Japanese comics.   And I think that you

25       don't need to travel to Argentina, you don't even need to go

1      to Tijuana.  I think the visit to Tijuana is probably

2      irrelevant as long as he had access to the Internet.

3              So I think frankly it looks to me that this is very

4      much an issue that a jury could look at and say, these are

5      strikingly similar, the characteristics of them are

6      strikingly similar, and the context of his greater work, they

7      are strikingly similar.  And given that striking similarity

8      and the context of his greater body of work, I think it's

9      more likely than not the toad was the inspiration for the

10     frog.

11             With respect -- if you have any questions on that

12     issue, Your Honor, if not --

13             THE COURT:  I understand your argument.

14             MR. RANDAZZA: Okay.  Now, if we move on to the

15     certificate, the registration, we are not claiming that none

16     of his registrations are valid, we are claiming that the 2017

17     registration is invalid.

18             And that is because if you look at the amount of

19     originality added to it, let's presume that the frog was an

20     original creation.  If we presume that the frog was an

21     original creation and it was not Pepe the Toad, we are going

22     to look first -- I'm going to give you these in order.

23             Now, of course the first one is a rendition of the

24     toad shown in a red shirt, just like in the one where he is

25     spray painting the side of that animal.

1            Let's set that one aside for a moment and go to the

2      next one, which is this one, Your Honor, which is the black

3      and white version.  So that is one that we do not dispute

4      Mr. Furie drew.

5            The next one that says, "Not good man," that one is

6      not one that Mr. Furie drew.  In fact, he admitted that, and

7      we've shown that.  And this is one of the exhibits that we

8      found while drafting our reply brief.  So that will answer

9      Your Honor's question as to when we found it.  We did not

10     have that from the Body Building website at the time of

11     discovery, but it was found on the Internet and equally

12     available to them.  It simply shows that this was drawn well

13     before this 2017 version.

14            So what happens from this black and white version to

15     the version that Mr. Furie did not draw to the version that

16     Mr. Furie registered with the copyright office?  We look at

17     this trifecta here, or triptych, we see that somebody else

18     has colorized it with red lips and a blue shirt.  And then we

19     go to what Mr. Furie added when filing for registration in

20     2017.

21            And I'm looking at the details here of what he's

22     changed.  He's changed -- you can see the -- there is a roll

23     of his neck underneath his chin that is green.  And the one

24     that some mystery person did, and then you will see on his

25     registered version, he's actually changed that to the collar

1    of the shirt, not really changing the line, just changing the

2    color to blue.  And then he has added these few lines to add

3    arms to it.

4        We are not saying that Pepe himself is not

5    copyrightable, what we are saying is if that is the amount of

6    creativity that he added to another derivative work without

7    disclosing that in the copyright application, we would say

8    that these are similar to the case that Your Honor handled

9    involving Taylor Swift where the elements that he's claiming

10   are copyrightable are simply these banal elements, much like

11   when Taylor Swift used the term, "Players gonna play" in the

12   lyrics.  Is really changing the color of this collar or neck

13   to blue and then adding arms enough to render this a new work

14   worthy of registration? And should he not have disclosed this

15   fact that it was derived from itself another derivative work?

16       So we think based on that, the 2017 registration

17   should be invalidated.

18       And if Your Honor has no more questions on that.

19       THE COURT:  All right.  And what about abandonment

20   and de minimis?

21       MR. RANDAZZA: Yes, Your Honor.  The abandonment

22   issue, the implied license issue I think are, of course,

23   rolled into one.

24       And if we look at the exhibits that my friends just

25   showed us, starting in August 2010, Mr. Furie makes very

1     clear statements to the world that he doesn't mind.  2010, he

2     says he doesn't mind.  Then he says again in a *Vice* article,

3     2015, it's a post-capitalist kind of success.  Its become its

4     own thing in Internet culture.  He says, "I'm flattered by

5     it.  I don't really care.  I think it's cool.  I'm getting

6     inspired by all the weird interpretations of it."  He goes on

7     and on and on for years saying that this is just fine.

8          Now, the license itself need not be in the form of

9     some kind of implication while sitting in a -- in a meeting

10    room implying to somebody that they have a license to use it.

11    There is such a thing as a creative commons license.  This is

12    something that a lot of artists choose to employ.  They want

13    to see their work shared.  They enjoy seeing it shared.  They

14    think it benefits them, and often it does.  The fame of this

15    character only existed because other people did this.

16         Mr. Furie's success went from, you know, earning

17    approximately $20,000 a year in complete obscurity to fame

18    and six-figure income because of this memeification.  So when

19    you look at all those, it is certainly foreseeable.  You

20    know, it's not the question of what he intended in doing

21    that.  I don't think what is important is to say, did

22    Mr. Furie sit down and say, I want to inspire everybody to do

23    this, although I think there is no other interpretation of

24    all of those statements, but it is, how would the reasonable

25    next artist interpret all that?  And I don't think any next

1    artist would interpret all that, except for, Mr. Furie has

2    implied, or at least almost explicitly said, this is under a

3    creative commons license.  He didn't use those magic words,

4    but that is what he did.  He dedicated it to the public for

5    this use.

6         Now, it is true that he later thought better of it.

7    But I don't know how you can task the artist who, you know,

8    is not a party here, how can you task that artist with

9    following up on Mr. Furie's press release?  This artist may

10   have been exposed to this for years.  Everybody kind of knew

11   at the time, if you followed memes, you knew that Mr. Furie

12   had given all these interviews that say, I want everybody to

13   have it.

14        Now, in anticipation of litigation, or after

15   litigation, he started saying other things.  That's

16   understandable.  You are going to change your position once

17   you realize that this might hurt your case.

18        But if we look at the deposition of Mr. Jones.

19        MS. CAHILL: May I approach?

20        MR. RANDAZZA: Remember there are two people here,

21   one being Mr. Allen, who created this one-page graphic novel

22   discussion of the 2016 election, but then you also have the

23   party who decided -- the decisionmaker who decided to sell

24   it.

25        Now, if this had had, you know, an example was made

1        during my friend's argument that this isn't like Mickey Mouse

2        where just because Disney doesn't go after everybody who

3        draws a copy of Mickey Mouse on their notebook, that somehow

4        says that Mickey Mouse has been memed into the public domain.

5        I agree with that argument.

6                However, nobody from Disney has ever come to an

7        interview and said, you know, we've just decided that we are

8        going to protect everything here, but Goofy, Goofy can go out

9        and be drawn by anybody, because we would like to see what he

10       becomes.  We would like to see him take on a life of his own.

11               So Mr. Jones testifies here, if you look at page 14,

12       line 18, he says he saw it.  "Oh, it's just a funny thing.

13       The liberals don't like it.  I just didn't get it."  He

14       looked into it briefly because he kept seeing it pop up.  And

15       he read articles with Mr. Furie saying this Pepe belongs to

16       everybody, and he's free to air, basically.  And, "That is

17       why I had that in the back of my mind when later we got

18       pitched the poster," because he has a basic understanding of

19       selling something, sometimes you can have issues.

20               So if the artist and the seller were both well aware

21       of Mr. Furie's statements that this is, you know, I realize

22       it doesn't fit very neatly into 1960s cases, it doesn't fit

23       very neatly into pre-creative commons cases, and it certainly

24       doesn't fit neatly into pre-Internet cases, but Your Honor

25       has the great privilege of writing the meme opinion here, and

1     I think that is going to be part of it.  And I presume you

2     will have some fun with that.

3          THE COURT:  As a district judge, I don't look on

4     that as an opportunity so much as the chance to make

5     mistakes, and the default should be that the jury can just

6     mix things up.

7          Counsel, I have a 10:00 calendar, it's not going to

8     be that long, but there are some people calling in.  What I'm

9     going to do is briefly leave the bench, let the three cases

10    that are on at 10:00 check in, we will have argument in those

11    cases, and then we will recommence on this case.

12         So just -- I'll allow you to finish, counsel, and

13    then we can have a brief rebuttal on the Furie motion, and

14    then I'll hear argument on the Infowars' motion.

15         Now, one thing where you can probably use the time,

16    ordinarily I would get the final order out in the ordinary

17    course, and that would probably be maybe tomorrow, but I'm in

18    trial tomorrow, so I'm not entirely clear when the final

19    order would come out if I'm just doing it as it comes up on

20    my plate.

21         If both of you agree that you would like it to come

22    out before Wednesday, I don't promise it, but I'll do my

23    best.  If both of you would like me to hold off, then I will

24    hold off.  And I've got plenty of other things to do.  If the

25    two of you can't agree on it, then you will get it in the

```
1    ordinary course, and that may or may not be before Wednesday,

2    it will be a chance when I get it done.  And you don't need

3    to tell me, it's just talk to each other.  If you both agree,

4    then you can let Ms. Sanchez know one way or the other.  And

5    if you both can't agree, I don't want to know who is taking

6    what position or anything about it.  I'll just work as I

7    would ordinarily do it, and it will come -- it will get off

8    my desk as it gets off my desk.

9              MR. TOMPROS: Is Your Honor thinking about that

10   because of the settlement --

11             THE COURT:  Correct.

12             MR. TOMPROS: That is scheduled for tomorrow,

13   Tuesday.  It ultimately may not make a difference.

14             THE COURT:  It may or may not get -- it's much less

15   likely I would get it done before then.  But I might, or at

16   least I could, issue a brief thing saying what my final

17   rulings are, and then just follow it up with something more

18   elaborate later on.  Again, if that would be helpful, just if

19   you can agree, that is fine; if not, then ignore it and I'll

20   just get things done as I get things done.

21             All right.  Thank you, counsel.

22             (Thereupon, there was a brief recess.)

23             THE CLERK:  Recalling item one, Matt Furie vs.

24   Infowars, LLC, et al.

25             Counsel, please restate your appearance for the
```

1    record.

2            THE COURT:  All right.  Could somebody -- yes.

3    Could somebody go get all counsel, please?  Thank you.

4            MR. TOMPROS: Yes, Your Honor.  They are in the

5    counsel room.  May we have just a moment to --

6            THE COURT:  You do, counsel.  We were hearing

7    Mr. Randazza's argument against the Furie motion.

8            All right.  Counsel, you may proceed.

9            MR. RANDAZZA: Thank you, Your Honor.  Your Honor, I

10   believe we were discussing the copyrightability and the

11   copyright registration for the 2017 image.

12           And in that -- in that issue, we have claims by the

13   plaintiff that the distinctive elements of this work are

14   Pepe's bulging eyes, three dots in his -- on his eyes, which,

15   you know, when I look at that, and then I look at page 4 of

16   your tentative ruling has the -- has other images of Pepe

17   that don't have those.  And then I look at -- they claim that

18   his blue shirt is his -- is his typical costume, again, not

19   there, not until this third-party created it, the maroon

20   lips, again not until this third-party created it.

21           So I think what we really have here is a joint work

22   between Mr. Furie and some unknown author.  And I think, you

23   know, really as a -- you know, he is supposed to disclaim

24   those elements that he did not add; namely, the blue shirt

25   and the red lips.  And that failure to disclaim indicates

1          that that registration -- invalidates that registration.

2                  And if we go back to the -- the issue of the license

3          to the public, you know, I think it's -- it's very clear

4          that -- if we look at, there was a great quote that they

5          brought up that was that you need to look at it in the

6          context.  And I think I demonstrated that that context was

7          overwhelmingly in the form of a global creative commons

8          license.  He only changed his mind on that belatedly when he

9          decided that he didn't really like the political affiliation

10         of a lot of people who were using it.

11                 But, you know, there were other people that, you

12         know, Nicki Minage used it, for example.  Now, I wouldn't

13         know Nicki Minage's music if you started blaring it in my

14         house at 3 AM.  Some people may really like her; some people

15         may despise her, I'm sure somebody hates Nicki Minage, and

16         they would be horrified if their character was somehow

17         affiliated with that.  That is not where we go.  So the fact

18         that if you decide after that, man, I didn't mean everybody,

19         including Nicki Minage, well, that doesn't mean once you make

20         that announcement to the world, I didn't mean everybody, that

21         people who had already imported that knowledge into their

22         heads were tasked with then later reading an *Esquire* article

23         where you say otherwise, or tasked with knowing about the

24         press release where you say you've changed your mind.

25                 Now, let's set aside the fact that I don't know that

1    you can put it back in the box once you've abandoned it, once

2    you have said, this is creative commons license, once you

3    have told everybody, I like you doing this, please continue

4    doing it, I don't know how you put it back.

5            And then we get to that final article where they

6    said that this was just sarcasm.  And, you know, yeah, he's

7    talking about genital love and all this stuff, it was funny,

8    but to say that no reasonable person would look at that and

9    take that seriously, well, frequently, artists can be weird.

10   I mean, I think if we looked at anything that Andy Warhol

11   might have said, I don't know if anybody would know if they

12   were being serious.  I don't think it's very out of context

13   for an artist to have an ego of that size.  I am your God,

14   well, Pepe the Frog that is, it was -- it was actually used

15   in a very -- in kind of a funny context.  And I'm -- where

16   there were people who used it on the Internet who created

17   this myth that he's actually the ancient Egyptian God Kek,

18   and Kek was a frog-like creature, and they showed people

19   loved to find these images of ancient Egypt, and then show

20   Pepe next to this statute, and showing that he's really a

21   God, and then they created a fake country called Kekistan, I

22   mean, all of this is just a bizarre, overwhelming use by the

23   public.  I don't know how anybody could read that statement

24   by Mr. Furie and say, well, this is obviously sarcasm.  So

25   we've got to decide that we won't actually use him in this

```
 1    context.
 2              Now, that is all completely outside.  And I don't
 3    want to get into my fair use argument unless you would like
 4    me to just segue into it.
 5              THE COURT:  I want to give the chance for there to
 6    be a brief rebuttal.  So why don't you save that for when you
 7    are arguing your motion, and then we'll proceed in that
 8    fashion.
 9              MR. RANDAZZA: I'll just conclude by saying in the
10    context of somebody using it, you know, it might be different
11    if somebody simply took it, you know, threw it in a hat or
12    created a stuffed animal of it and said, well, he said
13    everybody could use it.  But I think contextually, that
14    context grows even greater when we look at the fact that, at
15    least on our -- of our view, this is very clearly fair use.
16              And I will address that after the rebuttal, Your
17    Honor.  Thank you.
18              THE COURT:  Thank you.
19              MR. KINDER: Good morning again, Your Honor.  Will
20    Kinder on behalf of plaintiff.
21              Just briefly regarding abandonment and implied
22    license.  Mr. Randazza's presentation omitted any mention of
23    the legal standard for both abandonment and implied license.
24              Mr. Furie's statements do not meet the standard for
25    either.  With respect to implied license, Infowars has still
```

1    not refuted that the standard requires the familiar elements

2    of offer, acceptance and consideration. They have offered no

3    explanation for how the evidence in this case meets those

4    elements.

5         As for abandonment -- Mr. Tompros, can we go to

6    slide 16?  As for abandonment, Mr. Randazza continues to wave

7    his hands around Mr. Furie's statements.  That was actually

8    not the slide I'm looking for.  Let me -- do we have the

9    clicker?  Apologies, Your Honor.  Mr. Randazza's presentation

10   omitted any discussion of the precise statements in the

11   context of the legal standard for abandonment.  That

12   abandonment standard is exacting, and the context of

13   Mr. Furie's statements, his conduct in licensing and

14   enforcement, show precisely the opposite of what Mr. Randazza

15   wishes they did.

16        I think in particular, this slide demonstrates

17   Mr. Furie's sustained and repeated efforts to license and

18   earn benefits from the copyrights that he owns. This is not

19   the conduct of someone who either intended to abandon or

20   thought he did abandon his copyrights.

21        Lastly, Mr. Randazza raises for the first time the

22   theory that Mr. Furie's statements amount to a creative

23   commons license.  A creative commons license is a specific

24   contractual arrangement that an artist enters into, and in

25   doing so, deliberately gives up certain -- a certain scope of

1    copyrights in a particular work.  There is no evidence in

2    this case that Mr. Furie entered into a creative commons

3    license.  Infowars cites no cases, and we are aware of none,

4    that would suggest that the statements Mr. Furie made can

5    give rise to a creative commons license.

6         And unless Your Honor has questions, I'll rest on

7    our briefs.

8         THE COURT:  I do not.  All right.  Thank you.

9         The Furie motion is taken under submission.

10        So now, Mr. Randazza, if you would please argue in

11   favor of your motion on behalf of the defendants, and then

12   I'll hear an opposition from -- argument from the plaintiff,

13   and then I'll give you a chance to respond.

14        MR. TOMPROS: Your Honor, may we have a brief

15   rebuttal on the other remaining issues in the Furie motion

16   that were not addressed?

17        THE COURT:  All right.  Go ahead.

18        MR. TOMPROS: Thank you.  We will be very quick.

19        MS. LIN: Thank you, Your Honor.  I just have two

20   points on the lack of copyright and two points on the invalid

21   registration point.

22        First of all, the reason plaintiff has moved for

23   summary judgment on these issues is because it's clear, as

24   Your Honor can see from today, that Mr. Randazza and Infowars

25   want to use those defenses as a way to bring confusing and

1    misleading information before the jury, information about

2    other artworks that are not at issue here, or the Nation of

3    Kek, and things like that.

4           As Your Honor mentioned at the beginning, I think

5    that this is and can be a straightforward copyright case, and

6    that is how we would like to keep it.

7           We respectfully submit that this is exactly why

8    summary judgment is procedurally appropriate.  There are no

9    genuine disputes of material facts here.

10          And, you know, we want to make two points on the

11    copying.  Mr. Randazza changed his theory.  The only argument

12    they moved on in their briefs was Mr. Furie's trip to Mexico

13    for access, and Mr. Randazza apparently now concedes that

14    that is irrelevant.

15          He argues for the first time today that Internet

16    access is the same thing as access for purposes of this legal

17    issue, and that just cannot be the case.  Otherwise, access

18    would not be the second prong of this test for the last

19    20 years.

20          Secondly, Mr. Randazza wants you to infer access

21    from his characterization of Mr. Furie's art, which by the

22    way, we do not agree with.  But the only inference allowed in

23    this context is when the images are identical.  If the images

24    are identical, then access can be inferred.  That is not what

25    is happening here.  It's very clear the images are not

1    identical; and in fact, we think they are objectively

2    substantially different enough:  Pepe is 3-D, El Sapo is 2-D.

3    Pepe has puffy eyelids, El Sapo has no eyelids.  Pepe has

4    round lips, El Sapo has no lips.  We think there is enough

5    objective similarity to find for the defendants here.

6            Two points on the invalid registration, the 2009

7    Bodybuilding.com image, which again was provided late in this

8    case, and is not just about the documents, but is actually an

9    entirely new theory that was not previously disclosed to the

10   plaintiffs, that intervening image does not change

11   Mr. Furie's legal rights one bit.  As the copyright owner, he

12   has the exclusive right to make derivative works.  That is a

13   derivative work.  Mr. Furie owns both the 2006 comicbook that

14   he registered, as well as the 2016 image of Pepe in the Blue

15   Shirt that he also created.  And just for the record,

16   Mr. Randazza keeps calling it a 2017 image, it is a 2016

17   image.

18           And then secondly, if you look very closely at the

19   2009 image next to the 2016 image, you can see that they are

20   not -- it is not a copy of the 2009 image.  He is wearing a

21   different shirt in the 2009 image, he's wearing a tank top,

22   more similar to the earlier 2006 image.  The colors are

23   actually different.  And his shirt has a collar, it is not --

24   it is clearly not a copy of this random image from the

25   Internet.

1              That is all.

2              THE COURT:  Thank you.  Then the matter is taken

3    under submission as to the first motion for summary judgment.

4              And now we'll hear argument on the second motion for

5    summary judgment.

6              Mr. Randazza?

7              MR. RANDAZZA: Thank you, Your Honor.

8              Your Honor, at its heart, this is a free speech

9    case.  All of these interesting arguments about whether it's

10   copyrightable, whether he abandoned it, I really -- I almost

11   hope we don't win on those, because establishment of when

12   something is fair use, that means that we have struck a

13   bargain between creative works and free expression.

14             And if that bargain goes out of balance, we have a

15   real problem.  We have a chilling effect.  Now, in this case,

16   I believe that we have sufficient record evidence to allow

17   you to decide as a matter of law that this is fair use with

18   respect to your tentative ruling, Your Honor.

19             And I think that if this Court is to divert this to

20   a jury, it should consider the chilling effect that that will

21   create.  Here, for some reason, we do not have Mr. Allen, the

22   creator, as a defendant.  If we did, I believe he probably

23   would not have been able to sustain this case this long.

24   Fortunately, Mr. -- fortunately Infowars at least can stand

25   up for the principle of freedom of expression, but not

1        everybody has that luxury, and most of the time political

2        artists don't have that luxury.

3               So the chill that it can create when we say that you

4        not only need to -- not only can you be sued for this, but

5        you will have to go through the entire expense and length of

6        time that a jury trial will take, is really a palpable strike

7        against one of our most cherished freedoms.

8               And when we look at this case, it's not simply mere

9        commentary, it's not simply mere discussion, it is political

10       speech.  When we look at this poster, you know, this is not

11       itself an aesthetic piece of art.  This is not, you know, for

12       example, this is not this, this that Mr. Furie licensed.

13       It's not this.

14              If you look at that, and you turn to your tentative

15       ruling on page 8, the political nature of this speech is

16       undeniable.  These are very clearly the figures, and Mr.

17       Allen testified to this as how he included them.  He included

18       the key figures that were influential in the 2016 election.

19       It's unusual that a cartoon character will become influential

20       in an election, or in any other political event.  Doesn't

21       happen that often.

22              You know, I racked my brain for some examples, and

23       it was like maybe the original creator of the Kilroy graphic

24       in World War II, if he were to show up one day and say these

25       later uses discussing how Kilroy was here was written on

1     boxes of ammunition dropped on Normandy, that that would

2     somehow be not the drawings on the box themselves, but if you

3     were to show who were the key figures in World War II, sure,

4     you would probably put, you know, you would put FDR, you

5     would put Stalin, you might put Kilroy, but that would not

6     only not happen if fair use is not found here, but perhaps a

7     historian would even be afraid to do so if they knew they

8     would have to face the length and expense of a jury trial

9     because of it.

10         We don't need to find beyond a shadow of a doubt

11    that this was fair use, but I don't know how a reasonable

12    juror could find otherwise.

13         So if we look at the elements of it, at the very

14    least I would imagine there must be some of these elements

15    that we would not trust to a jury or that we would not -- we

16    could at least narrow the issues.

17         So if we look at factor one, the purpose and

18    character of this use, I think I've explained that, and I

19    think it shows here.  This is a one-page graphic novel of the

20    election.  You know, what we really have here, you know, it

21    seems, is the same kind of complaint one might have if,

22    say -- I mean, pick anybody from this gallery of right wing

23    figures who ushered in the election of Donald Trump.  Let's

24    say that Roger Stone decided, you know -- and Roger Stone

25    probably is the best example to pick -- if he mercurially

1    decides, I don't want to be associated with these people

2    anymore, and then he were to sue under right of publicity

3    under Section 3344, that is what this really is.  We can't

4    say Pepe the Frog without showing who he is.  I mean, were we

5    to draw a circle and say, you know, with an asterisk that

6    goes down below that says Pepe the Frog would be here, but we

7    don't have a license to display him.

8         This artist decided that he was an instrumental

9    player in the election.  That it wasn't his invention.  You

10   know, even in a campaign speech Hillary Clinton said so.  In

11   their own Complaint they show Pepe the Frog on a movie poster

12   called the -- for showing The Deplorables, and showing all of

13   these people that would be considered deplorable by the

14   Clinton campaign.  And there Pepe is in military uniform

15   behind Donald Trump. That, itself, fair use.

16        So this is highly transformative.  And the

17   transformative nature of its use is also evident when we look

18   at how does this affect -- is this really something that

19   supplants the original, or is it complementary to the

20   original?  That is how the law looks at it.  This is not

21   supplanting his use.  This is not a comicbook about a

22   peaceful frog dude who likes talking on his cell and smoking

23   marijuana.  This is somebody who was part of a successful

24   campaign to get his candidate elected.

25        I mean, unfortunately for Mr. Furie, Pepe the Frog's

1    personality, as it were, is not something he gets to control.

2    Once he became memefied, once he became part of a wave of

3    political speech, this is who he is in this picture.

4    Unfortunately for Mr. Furie, you know, his baby grew up to

5    embarrass its father.

6         Now, if we look at the next factor, and this is

7    where -- this is where it really gets interesting is the

8    nature of the copyrighted work.  Now, I don't know how we are

9    going to create a jury instruction that would say, does the

10   jury understand what memeification means?  I mean, that is

11   something -- that is the beauty of the common law.  This is

12   what I love about common law versus civil law.  We don't just

13   look at the code and check off the box.  You know, we have

14   got a judge here who has to look at this and say, what does

15   this law mean?  The context of today, in the context of the

16   fluidity of our culture, and I think once the nature of the

17   work becomes memeified, where there are really so many

18   third-parties using it, so many people using it in a fair use

19   way, I think that changes the nature and character of the

20   work.  And this is something which has previously not been

21   such an important factor in the fair use analysis.  Usually

22   it's, you know, you do number 1 and you do number 4 and you

23   skip through 2 and 3.  Well, I think you have to stop at the

24   tollbooth to number 2 here.  And I think you need to --

25         THE COURT:  Mr. Randazza, let's say I ultimately

1    agreed with you that the factors are more designed for the

2    use of a judge than the use of a jury.  But aren't there just

3    specific facts within that evidence where -- I mean, the

4    parties just seem to disagree in how Pepe was being used or

5    had been used in the past, or with one intent and all of

6    this.  Shouldn't I maybe propound, especially if there was

7    going to be a jury trial anyway, shouldn't I sort of then

8    propound a special verdict form and have the jurors resolve

9    some of these facts? And when I know what it is they think of

10   it, I could enter for or against on fair use, but doing so on

11   a factual record that the jury had resolved instead of me,

12   which is obviously very difficult to do, just based on

13   declarations.

14          MR. RANDAZZA: Well, I don't know if you need to do

15   it based on the declarations.  You can do it on the face of

16   the thing itself.  You know, in -- I mean, it's not that --

17   it's not like fair use can't be decided on even on a 12(b)(6)

18   motion, it certainly can, and especially in the context of

19   political speech.

20          You know, if we look at, there is a Northern

21   District of California case that we cited, *Dhillon vs. Does*.

22   There was no attempt to change the expression of Ms. Dhillon,

23   which they used in a political context.  There was no attempt

24   to change anything.  They just took her picture from her

25   website and threw it on their flyer, and then engaged in

1    political speech about her.  Well, here it doesn't take a

2    factual determination to look at this and see the

3    differences.  We don't dispute, Ms. Lin made a very good

4    argument that this is clearly Pepe the Frog.  It is.  I'm

5    conceding that.  Nobody is saying that is not really him.

6    Nobody is saying this just coincidentally looked like him,

7    darn it, it's him, because he's a figure in the election.

8    That is something that you can find based on the record that

9    is already before you.  You can find that -- you know,

10   frankly, we weren't involved when an answer was filed.  You

11   know, I would have moved for that as a 12(b)(6) issue had I

12   been counsel at the time.

13          You can find that by simply looking at this.  This

14   is clearly transformative use.  As far as, you know, whether

15   or not the jury should be asked about facts, about is

16   something a meme, what is a meme?  I mean, we are going to

17   have to instruct them about what a meme is, not ask them.

18   And then we ask them, has this been memeified? I don't know

19   how any reasonable juror could ever find that it hadn't been.

20   It's probably the most famous meme ever to exist at this

21   point.  So I don't know what juror would be so -- would be

22   able to do that.

23          And that is the standard at summary judgment.  Not

24   just is there a hypothetical argument that we could pull out

25   of somewhere and make it.  Sure, they can make it.  They are

```
 1    going to make it, but what reasonable juror would say this
 2    hasn't been memeified?  And then as a matter of law, how does
 3    that affect its ability to fend off later fair use?  I
 4    believe that the more something is memeified, the more likely
 5    it is to be fair use.  You know, and where is that line?  I
 6    do not know.  But with apologies to Potter Stewart, I know it
 7    when I see it and I see it here.  If you had a less famous
 8    meme, I mean, I could rattle them off, but this has been
 9    something that -- I've worked on meme cases since this was
10    first a thing.  You know, some of them are probably not so
11    famous anymore; some of them were probably very limited in
12    use.  This was everywhere, to the point that a presidential
13    candidate made it a campaign issue.  They put out an
14    explainer on what this meme means.  You have everything
15    before you that you need to do to make that decision.
16            Now, the effect on the market, well, that I don't
17    know what we are going to talk about as far as how a juror
18    could say that this poster, this one-page graphic novel, this
19    one-page Mount Rushmore of conservative speakers, how could
20    this have had an effect on his market?  Well, he's shown us
21    nothing.  He's had plenty of time to bring that to us.  We
22    have nothing.  Nothing at all.  We have that nice timeline
23    they showed us about when he signed licensing deals and all
24    that.  And frankly, even if he abandoned the copyright to
25    this, even if it's fair use for everybody to use, even if
```

1     it's creative commons, nothing stops him from exploiting it,

2     and indeed nothing did.  You have before you in the

3     unredacted versions of our motion for summary judgment just

4     how substantially his income went up after this, and

5     including even after the lawsuit was filed.

6              So how does somebody say, his income is here, and

7     then it's here, how do they say that this, even if this use,

8     I'm going to say this use by everybody, that he didn't want

9     to use it?  Remember, he doesn't mind Nicki Minage using it,

10    he doesn't mind, you know, other celebrities using it, he

11    minds when people that he politically disagrees with use it.

12             So I don't know how we are going to parse out --

13    first we are going to take off the people he likes and we are

14    going to put those aside, and then take the people he doesn't

15    like.  Let's say the case could be decided only on those

16    grounds, even there, you have record evidence that shows his

17    income went like this.  So where is the market harm?  They

18    have shown nothing.

19             They have not shown anything that they have lost as

20    a result.  Now, how -- even if you were to do that, how were

21    we to parse out this one discussion of the election, how did

22    this cause any market harm?  Now, he says, his argument, his

23    only argument is, the market harm is that I don't want him

24    associated with people who wouldn't vote the way I would

25    vote.  That is not market harm.  That is not copyright market

1   harm.  That is maybe reputational harm, that might be, if he

2   were a person, a 3344 violation, might be.  I'm not conceding

3   that it is, but it might be.  It might be -- if this were a

4   registered trademark, it might be a trademark question.  That

5   is not what copyright is for.  Copyright is not supposed to

6   be used as the tool of political censorship, and that is what

7   this is.  That is what this case is about.  This case isn't

8   about, he didn't make money because of this.  This case isn't

9   about the fact that he doesn't want it reproduced by other

10  people.  He made that clear.  He told everybody that.  What

11  this case is about, heck, I don't like the politics of some

12  of the people in this, but it doesn't change the fact that

13  you have the right to make that expression.  And if you

14  don't, if you must face the crucible of a jury, and I'm

15  talking about the cost of it and the time of it, because of

16  that, it's going to be very cold outside as Your Honor issues

17  that order.  And I don't think that you should.  I think you

18  have the capacity and you have the evidence in front of you

19  to rule on fair use.

20          So, you know, I don't really want to -- it is on our

21  motion.  We also raised abandonment in our motion, but I

22  think we've already discussed that.  We've already talked

23  about statutory damages and attorney's fees to some extent.

24  I would rather, since it doesn't really seem this argument is

25  about that, but I will address those if Your Honor would like

1    to hear it.

2            THE COURT:  Well, especially before tomorrow,

3    it's -- why don't you go ahead and do that, because it's --

4    and that way it also sets it up if the counsel want to

5    address that in opposition.

6            MR. RANDAZZA: The abandonment, you know, we really

7    made --

8            THE COURT:  Not the abandonment, I meant the

9    statutory damages and the attorney's fees.  The abandonment I

10   think we've dealt with.

11           MR. RANDAZZA: I think I have beaten that to death,

12   Your Honor.

13           Statutory damages and attorney's fees, you know,

14   there is a -- when it comes to copyright, you have a

15   copyright in your work the moment you create it.  I can draw

16   a picture right now and it is all of a sudden a knowable

17   under international agreements, under the Berne Convention

18   with copyright protection.  However, the Berne Convention

19   allows discrimination against your own citizens.  If

20   Mr. Furie were a foreign citizen, he would be able to come

21   into this courtroom with or without a registration.  But in

22   the United States, we have decided, Congress has decided,

23   that you get certain benefits for preregistration.  What went

24   into that wisdom, I don't know, but this is where we are.

25   And you register your works either within 90 days of its

1        creation or before the infringement, and if you do that, you

2        get a prize:  You get the availability of statutory damages,

3        and you get the availability of attorney's fees under Section

4        505.

5                However, if you don't do that, Congress will still

6        allow you to bring a claim for injunctive relief, still allow

7        you to bring a claim for your actual damages, still allow you

8        to bring a claim for lost profits, but it does not allow you

9        to get statutories or attorney's fees.

10               And I think it's very clear here if you look at the

11       timeline, even if this Pepe in the Blue Shirt registration is

12       valid, which we don't think it is, all of these were created,

13       you know, all of his images were created outside of the zone.

14       So I don't think this requires a lot of argument.  I think

15       it's just a very simple matter of looking at the calendar,

16       bang, bang, bang, you are done.

17               I do think Your Honor's comments were exactly on

18       point when Alex Jones comes on the air and says, We've got a

19       special limited edition, but there is no evidence that that

20       edition changed, nothing about it changed.  He's just --

21               THE COURT:  I think what really changed is the

22       price, and I think the price is immaterial as a matter of

23       law.

24               MR. RANDAZZA: Yes.  I agree, Your Honor.  I mean, if

25       it were just a matter of price, well, if it went up or went

1    down, that makes it a new infringement because you changed

2    the price?  It's not even a new infringement if you sell more

3    of them.  It's got to be the first infringement.

4         So I think your tentative is accurate on attorney's

5    fees and statutory damages.

6         THE COURT:  All right.  Thank you.  Let me hear

7    from --

8         MR. RANDAZZA: Thank you, Your Honor.

9         THE COURT:  -- from the plaintiff.

10        MR. TOMPROS: Thank you, Your Honor.

11        Let me start on fair use, and this is not a case

12   about the First Amendment.  This is not a case about free

13   speech.  This is a case about copyright infringement.  And

14   copyright infringement restricts what people are allowed to

15   make money off of in their -- by way of expression.  You

16   cannot make money off of someone else's

17   previously-copyrighted works.  That is what this case is

18   about.  It's not about free speech.  If Infowars had, Mr.

19   Jones had simply picked a different mascot, had picked

20   anybody else, they could do whatever else they wanted to with

21   it and Mr. Furie wouldn't have a claim.  No one wants to

22   restrict -- this case is not about restricting anything that

23   Infowars says.  This is not a free speech case, it is a

24   straightforward copyright case.

25        And so let's talk about the fair use factors that

1    Mr. Randazza went through.  I think Your Honor is correct,

2    there are significant factual disputes.  That is exactly why

3    we did not move for summary judgment on fair use, because we

4    understand that they have different views about their own

5    intent, and different views about the nature of the product

6    as to whether it is a commercial product or not.  We

7    understand that.  It's disputed.  And that is exactly why we

8    didn't move.  But as we go through each of the four factors,

9    I think in the -- what the Ninth Circuit has continually

10   called a highly fact-specific affirmative defense, you will

11   see that there are disputed issues of fact and Infowars has

12   the burden on them.

13         So let's start with the first factor, and that is

14   the purpose and character of the use.  The Ninth Circuit here

15   has a rule that is somewhat unique in application of the

16   first factor, and it comes from a variety of different cases,

17   but is most appropriately stated in the *Monge* case, and the

18   *Fisher* case, and that is that fair use requires good faith.

19   Conversely, the bad faith bars the fair use defense.

20         And we think here under that -- under application of

21   that law, there was bad faith, and that bad faith bars the

22   application of the fair use defense.

23         What was the bad faith?  The bad faith here was that

24   the day after Infowars received a notice that its poster was

25   infringing, it admitted infringement on its website, and it

1    tried to profit off of that infringement.

2          So here is what they said.  The day after they

3    received notice of their infringement, they wrote -- they

4    changed the description of the poster on the website, and it

5    now said, "We'll be forced to take it down forever." So they

6    admitted immediately after receiving notice of infringement

7    that they were going to be forced to take down the poster

8    forever.

9          They didn't just say that once, they went further to

10   trade on their infringement.  They said the establishment

11   wants this taken down.  And then they said, we won't be able

12   to print anymore after they are done.  And they called it

13   this limited edition poster.

14         So they specifically referenced Pepe the Frog in

15   their exact same description.  Had they gone on doing what

16   they were doing, we might not have a bad faith argument, but

17   when you receive notice of infringement, and you admit to the

18   public that you are infringing and will be forced to stop,

19   and then try to trade on that fact to make more money, that

20   is classic bad faith copyright infringement that bars a fair

21   use determination.

22         And that was not all they did.  They, as Your Honor

23   recognized, changed the price.  So that the new poster, which

24   they, as we highlighted in the bottom left, was advertised

25   for the first time as having limited availability, get yours

1    today.  The new poster was 29.95.  So they get notice that

2    they are infringing, they advertise the fact of that

3    infringement, and then they sell the new version of the

4    poster, this new admittedly infringing poster at a higher

5    price to try to trade off of that infringement.  That

6    absolutely bars the fair use defense in this circuit,

7    specifically where bad faith precludes fair use under *Monge*

8    and *Fisher.*

9         But there is more that goes into this first factor

10   that is in dispute.  And I think the fundamental factual

11   dispute between the parties is whether the inclusion of Pepe

12   the Frog on this poster was, as Mr. Randazza would have it,

13   some kind of a political statement, or was, as we contend, a

14   purely commercial determination.

15        The *Campbell* case from the Supreme Court is very

16   clear on this.  And it says the fact that a publication was

17   commercial as opposed to nonprofit is a separate factor that

18   tends to weigh against a finding of fair use.  Infowars wants

19   you to think that this poster is some kind of a political

20   statement piece.  But that is not what they were.  They were

21   pure commercial merchandise.  The testimony from Infowars'

22   own representatives will show that the decision to sell the

23   poster was purely driven by profit.  Full stop.  They will

24   also tell you that the decision to stop selling the poster

25   was purely driven by profitability.  Full stop.

1          THE COURT:  Counsel, to what degree is that

2     distinction determined by the motivation of the actor?

3     Maybe -- you know, I'm not asking that question rhetorically,

4     maybe it's entirely done by that, but the idea that anyone

5     who was aware of the results of the election or reads a

6     newspaper or looks at political websites on the Internet

7     would look at that poster and say that it wasn't political

8     speech, it just -- it just seems a bit of a stretch.

9          MR. TOMPROS: No.  To be clear, the Infowars' site is

10     a political site and they sell political merchandise.  The

11     question is whether the inclusion of Pepe the Frog on this

12     poster was a commercial decision or not.  And the answer is

13     it was a pure commercial decision.  That is exactly what Mr.

14     Jones himself, Alex Jones, who heads Infowars, testified.  We

15     asked him, "Did you notice Pepe the Frog when he reviewed the

16     poster?" And he said, "I did.  I just had a flash of that,

17     and it kind of brought up the data information in my head

18     about, Oh, that is that stupid frog, but I guess people like

19     it."  That is what he said.  So why is Pepe on the poster?

20     Because people like Pepe.  Why is Pepe on the poster?

21     Because Pepe sells posters.

22          The inclusion of Pepe was to make money.  At

23     minimum, there is -- that testimony creates a disputed issue

24     of fact as to whether the poster was commercial and the

25     inclusion of Pepe was commercial or not.

1           Now, let me just sort of --

2           THE COURT:  I guess this is what my question is:

3    I'm not thinking of an example and it probably would have

4    holes poked in it anyway, but let's say that there was an

5    inclusion of something which just on the face of it was as

6    uncommercial as commercial could ever be, or it was clearly

7    just purely a political speech, but the interior motivation

8    was entirely commercial.  I mean, is that what matters, then?

9    I mean, are we not to pay any attention?

10          You know, I think, you know, Mr. Randazza's pointed

11   out, and there is plenty of evidence in the record, that Pepe

12   the Frog had taken on this -- was seen -- I mean, it's not

13   like they -- you know, that Mr. Allen or Mr. Jones just

14   decided, let's put Mother Goose on here.  I mean, it's just

15   because people like it or it will sell more things.  I mean,

16   it wasn't just picked out of a hat.  It wasn't picked at

17   random.  There was a basis for including, you know, Pepe with

18   Kellyanne Conway.

19          It just seems to me that -- I'm trying to get at

20   what the case law is saying about the standard, because it

21   seems to me you are saying it's very much this subjective

22   standard, and I'm questioning whether that really -- it

23   really is -- really is all that where the motivation trumps

24   everything else, even what reasonably-informed viewer would

25   see with his or her own eyes.

1          MR. TOMPROS: You know, I think, Your Honor, there is

2     a lot of different ways to look at the poster from the

3     perspective of a reasonably-informed viewer.  And we don't

4     think that a person would look at Pepe and that and say, oh,

5     Pepe is included, for whatever reason, you know, because he

6     was some important figure in the election.  He's the only

7     cartoon character on here.  There is customer comments that

8     say, Hey, I like the poster because Pepe the Frog is in it.

9     So there are -- without conceding that point, to Your Honor's

10    question, I do think intent matters to the fair use test.

11    That is the -- in part the point, right, of the first factor.

12    It's the purpose and character of the use.  It's both the

13    purpose and the character.

14          What was -- when we want to construct a test, as

15    Congress did, that puts some reasonable restrictions on the

16    bounds of copyright and says, you know, in some instances you

17    can use this for a purpose that is permissible and other

18    instances you can't, the intent does indeed, I think, matter.

19          So I cannot cite you a case standing here today that

20    says intent offhand, but I think that it is implicit in the

21    word purpose.  And it certainly -- the heart of the way that

22    the cases deal with this factor, particularly where, for

23    example, bad faith in this circuit can itself bar fair use

24    under this factor, and where there is always a focus on a

25    commercial as opposed to -- a nonprofit or a commercial

1        purpose, as opposed to a noncommercial purpose, I think those

2        things are, in fact, going to intent.  And intent does

3        matter; and therefore, the concession of Mr. Jones, both as

4        the head of Infowars and as the 30(b)(6) on behalf of one of

5        the two defendants is, at minimum, sufficient to create a

6        disputed issue of fact.

7               And I think, just let me add one more point on that.

8        I know this goes to the same intent issue, but as to the

9        specific inclusion of Pepe, I don't think it's at all a

10       coincidence that Pepe features heavily in the advertising for

11       the poster.

12              So what we've got now on the screen is our

13       Exhibit 17, which was the banner ad that showed up on

14       Infowars.com.  It is one of the banner ads that showed up

15       throughout Infowars.com and Prisonplanet.com.  And if you

16       look at this banner ad, this is what they wanted, you to

17       click on their news site, to then be redirected to their

18       store so you could buy the poster.  There is only one face

19       that is visible in this banner ad, and it's Pepe.  And that

20       is because Pepe sells stuff.  Pepe sells posters.  And that,

21       I think you can infer, it's certainly a reasonable inference,

22       at minimum a reasonable inference for a jury to be allowed to

23       make from Mr. Jones' testimony about why Pepe was on the

24       poster, from the banner ads, and from the other

25       circumstantial evidence that the point of putting Pepe on the

1    poster was to sell more posters.  The only point of selling

2    the poster was to make money.

3            So on the question of whether this is a

4    transformative use or not, respectfully, there are disputed

5    questions of fact there, too. What Infowars says is that it

6    is transformative because it doesn't -- because the character

7    doesn't look exactly like one of the registered copyrights.

8    And because it has a -- it has been colorized red to match

9    the poster.  That is simply insufficient to be a sufficiently

10   physically transformative change to make -- to satisfy that

11   standard, which I think is why Infowars focuses on this idea

12   of contextual transformation.

13           And here the law is clear here, too, and Infowars is

14   getting it wrong, the standard for contextual transformation

15   is strict.  And it is set out by this Court in *Monge*,

16   describing and quoting the U.S. Supreme Court's case in

17   *Campbell*.  This is -- *Campbell* and *Monge* are really the

18   critical cases here.  *Campbell* was the case in which the

19   *Pretty Woman* song was changed into a rap version, and *Monge*

20   was the case in which someone's photos from their wedding

21   were published without their agreement.

22           And *Campbell* -- *Monge* citing *Campbell* says,

23   "Campbell makes clear that the heart of a claim for

24   transformative use is the use of some elements of a prior

25   author's composition to create a new one that at least in

1    part comments on that author's work."

2          So to be able to count as a transformative use, the

3    poster would have to somehow comment on Pepe.  It must be a

4    comment on the works.  It's not sufficient that it be a

5    comment on politics generally.  That is why we have all those

6    cases like, for example, Bruce Springsteen stopping the

7    playing of his music at political rallies doesn't matter.

8    You can't -- just saying it's being used for political

9    purpose doesn't insulate you, it has to be a comment -- to be

10   transformative, it must be a comment on the work, and that is

11   what is missing here.  And at minimum, there is a disputed

12   question of fact as to whether this was a comment on Pepe or

13   not.

14         We have Infowars' other 30(b)(6) witness, the

15   30(b)(6) witness that they chose to put up on the question of

16   the design of the MAGA poster and the creation of the MAGA

17   poster, and the knowledge and awareness of Pepe the Frog,

18   that 30(b)(6) witness conceded, Is this poster about Pepe the

19   Frog?  No.  If the poster is not commenting on the thing that

20   is being transformed, *Campbell* says, and *Monge* says, it is

21   not transformative use. At minimum, this creates a disputed

22   issue of fact.

23         If I could turn to the second factor -- and this is

24   why -- you know, I would love it if this were a really

25   interesting case in which we were going to make new law about

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    memeification and memes and all of the rest of it.  I think

2    quite candidly that is just not the scenario.  That

3    memeification is just a fancy word for what has been going on

4    for decades, and that is someone draws or creates something

5    interesting and other people copy it and send it around.  The

6    Internet has certainly made this easier and faster.  But the

7    idea that an image loses its copyright just because a lot of

8    people have copied it has been rejected squarely in the law

9    for decades, and has been squarely rejected even in the

10   context of modern Internet memes.

11         So there is the great -- I mean, I think the best

12   case is the one that my colleague, Ms. Lin, described to you,

13   where Odie is a famous character from Garfield, right? And

14   people copy Odie left and right, and Odie is all over the

15   place, but that doesn't mean you lose your rights in Odie.

16   That doesn't mean that the creator of Garfield lost its

17   rights.  That case said it beautifully, "No matter how

18   popular a character may become, the copyright owner is

19   entitled to guard against the unauthorized commercial

20   exploitation of that character."

21         And so memeification is not an open question of law,

22   as Infowars suggests.  And there are numerous cases enforcing

23   copyrights, and at least acknowledging the viability of

24   copyrights in memes.  That is the *Grumpy Cat* case that we

25   cited.  They actually cite the *Philpot* case about a Willie

1    Nelson meme.  There was no question that copyright existed in

2    these images, no question, the only question was you have to

3    look at the specific context in which the infringer is using

4    it and determine whether that infringer's context results in

5    fair use.  Memeification, that would be really cool to make

6    new law here.  There is no need for new law here.

7    Memeification is just copying of an image.  So we have to

8    look at the other factors and see how they copied the image

9    to determine how they copied the image and in that case the

10   fair use factors tip our way.

11           I think Mr. Randazza acknowledged that the picture

12   is on the third factor, the amount that is taken.

13   Mr. Randazza acknowledged that it is Pepe; and as a result,

14   that is the heart of the character, so the whole thing has

15   been taken.

16           And then on the fourth factor, the market impact

17   question, I think here is another place where we disagree

18   both on the law and on the facts.  So it may be valuable to

19   understand where -- to understand where the difference on the

20   law is, so we can understand what the fact difference is.

21           The position that I think Infowars has staked out is

22   that the only cognizable copyright harm is market

23   substitution, and that is just not correct.  There is

24   copyright harm separate and apart from market substitution.

25           First off, the *Monge* case sets it out very squarely

1          that we are looking at the potential harm if this kind of use
2          were going to be widespread.  So we don't care about the harm
3          that would be caused by an individual number of posters being
4          sold, we care about if everybody were putting Pepe in posters
5          and selling it, what would that look like?  So that is the
6          standard.
7                    There is no law in this circuit that says market
8          substitution matters.  The only cases where market
9          substitution even comes into play is the cases where we are
10         talking about a parody, which they have admitted this is not,
11         and the parody is making fun of the work; and therefore,
12         harming the value of the work, or a critique would be in the
13         same category.  So if Mr. Kinder writes a terrible novel and
14         I write a scathing critique of the novel, and as a result,
15         nobody buys his novel, he can't say that I hurt him that way.
16         That is not what this is.  This is not a critique of Pepe
17         that is an issue, this is an association of Pepe in a way
18         that cuts off a part of the market.  And that is for
19         Mr. Furie to be able to judge.
20                   So this would be kind of like if, for example,
21         somebody decided to make Mickey Mouse assault rifles.  There
22         is no question that Disney is not going to get in the assault
23         rifle business, but of course they can enforce their
24         copyright against that, because if that use were to be
25         widespread, it would limit the value for their copyrighted

1    character Mickey Mouse.  Not because everybody thinks assault

2    rifles is bad, but because some people do, and as a result,

3    you have to let the copyright owner decide when and how to

4    enforce their rights, and when and how they are going to

5    allow it to -- allow their work to be used in derivative

6    works.  So that is the legal distinction that I think they

7    are getting wrong.

8            On the factual disputes, there are numerous factual

9    disputes.  Mr. Furie has, in fact, sold posters.  He does, in

10   fact, do collages.  You actually saw one of the collages that

11   he has done.  And there is evidence in the record, we cited

12   in our brief, that shows the association of Pepe with certain

13   views has diminished his licensing ability.  So he used to

14   sell Pepe official clothes, socks and T-shirts and that kind

15   of stuff.  And one of the carriers said we are not carrying

16   that anymore because Pepe is being put next to these hateful

17   images.  Well, that is precisely the harm that the poster is

18   rendering.

19           So that is, I think, the fourth factor.  And so at

20   minimum we think there are disputed issues of fact on that --

21   we think that they carry our direction, but at minimum they

22   are disputed issues.

23           Can I address the statutory damages?

24           THE COURT:  Please.

25           MR. TOMPROS: So here is -- there are just a few

1    pieces of this.  I just want to make sure that the record is

2    clear on the meet and confer issue, though.  I know Your

3    Honor is not planning to enforce that, which is fine.  I just

4    want the record to be clear, because we haven't had a chance

5    to respond.  We said that they did not meet and confer on

6    statutory damages, and they pointed to an e-mail that we had

7    written about that previously.  Just to be clear, that issue

8    was not the issue on which they moved, which is why we

9    thought it was unfair to bring this new issue of statutory

10   damages.  The issue that they described in the e-mail was

11   this idea that statutory damages had to be in the same

12   ballpark as actual damages.  And we invited them to move on

13   that and they did not.

14        The issue that they actually moved on was the

15   registration issue.  This was a surprise for us when we got

16   it in their motion, and we did not invite them to move on

17   that.  And we did try to scramble to try to come up with the

18   best law and identify the correct exhibits in the one week

19   that we had. So that is that piece of it.

20        As to what the issue is, we actually do in substance

21   agree with Infowars on the law, and it's very well stated in

22   the *Derek Andrew* case.  The question is was the infringement

23   before the notice that they got -- was there a legally --

24        THE COURT:  I just want to say I noticed in your

25   opposition that you said as to statutory damages, Infowars

1    has the law right.

2              MR. TOMPROS: They have the law right, yes.

3              So that -- and the law is, is there a

4    legally-significant difference between the pre and

5    post-registration?  There is a factual dispute about exactly

6    that issue.  And respectfully, Your Honor, it's exactly the

7    kind of dispute that needs to be resolved by the jury,

8    because there are significant factual disputes about, number

9    one, whether the posters themselves were in some way

10   different; and number two, whether the infringement, and

11   we'll get to that, whether the infringement itself was

12   different.

13             But what are the differences between the posters?

14   It is not just the price.  The first is there is evidence in

15   the record, there is Mr. Jones' statement specifically that

16   he was going to sign 100 of the posters.  So we have a signed

17   poster prior to notice -- excuse me -- an unsigned poster

18   prior to notice, and a signed poster --

19             THE COURT:  There did seem to be no evidence that he

20   actually did sign or have those marketed.  I mean --

21             MR. TOMPROS: Well, you know, Your Honor, we don't

22   know because they did not produce the posters to us that are

23   in their inventory.

24             At his deposition, Mr. Jones, he didn't say that he

25   didn't sign them.  He said he couldn't remember if he signed

1    them or not.  And I think we should be allowed to take the

2    combination of his contemporaneous statement that day and his

3    lack of memory now, and ask the jury to infer whether there

4    was such a signature on these posters or not.  We have been

5    looking to see if we can find one of the signed ones.  We

6    could not during the course of fact discovery identify one,

7    and we agree with that.

8         But the fact that he said it on his show, the fact

9    that I think he will say that he does, when he makes

10   commercial statements on his show, that he honors them and

11   abides by them, and the fact that he couldn't remember that

12   at his deposition that he signs all kinds of things, at

13   minimum that is a disputed question of fact that should go to

14   the jury, and it would be inappropriate to take that

15   inference against us.

16        But that is not the only difference.  As we did talk

17   about, there were differences in the, not just the poster

18   itself, but the way that the poster was sold.  So as the

19   first poster was just sold as a poster, the second version

20   was not advertised -- the second version was advertised as

21   being something that was going to be taken down forever.  So

22   it went from being, you know, not, you know, a poster to a

23   rarity, right?  It went from being something that was

24   available to something that was being rare.  And it also

25   went, under their own description, from something that was

1    easily available to something the establishment wanted taken

2    down and we won't be able to print anymore.  So it basically

3    became a contraband poster.

4          So we have on the one -- and then as Your Honor

5    acknowledged, they charged a different price for this

6    immediately all at the same time.  All these changes happened

7    at the same time.  He's promising to sign them, he's charging

8    a higher price, he's saying it's a rare poster, he's saying

9    it's a contraband poster.  The combination of those things,

10   we think, Your Honor, is sufficient to allow there to be a

11   difference between the infringement that happened prior to

12   notice, and the infringement that happened after notice.  At

13   least, at least there is a disputed question of fact such

14   that a reasonable jury could find that that was -- that was

15   significantly different.

16         But just to be clear, even if the posters themselves

17   were the same, there has to be -- the difference is not

18   between -- not a legally-significant difference between the

19   infringing good and the other infringing good.  It's a

20   legally-sufficient difference between the pre and

21   post-registration infringement.

22         And here, there is definitely a legally-significant

23   difference between their infringement when they said they

24   knew nothing about this allegation, you know, they had no

25   idea that Mr. Furie had any copyright, and compare that with

1      after the -- after the -- after the notice has been given, at

2      that point they knew and they willfully chose to advertise

3      the fact of their own infringement.

4            So it goes from being effectively an innocent

5      infringement to a willful infringement.

6            THE COURT:  Wouldn't that only be for that handful

7      of posters?  You know, I don't know if as a matter of law the

8      damages are de minimis, but it seems a rather small amount to

9      be arguing about.

10           MR. TOMPROS: I'm not actually sure that it's what I

11     would call only a handful.  There are a lot.  There are

12     enough infringements certainly to trigger the statutory

13     damages amount, which is higher than the actual profits that

14     they made.  So it would be a significant amount of money.

15     And there were more -- so as we count up the different

16     infringements, and the different infringed copyrights, we are

17     talking about a very significant difference in the amount of

18     profits that would be due if there were -- if there were some

19     actions that counted for statutory damages if the jury were

20     to find that the statutory damages figure was satisfied.  And

21     of course, that would also result in an award of attorney's

22     fees.  So there are substantial differences.

23           And it is -- I don't have the number in front of me,

24     it was not like a handful of posters.  It was -- they

25     continued to sell the posters for I want to say several

1        months after this notice, and then only chose, as the

2        testimony we identified says, to take it down not because --

3        again, not because of any good faith, but because they

4        decided it wasn't making enough money at that point further

5        on down the line after the controversy about their

6        infringement had kind of worn off.  So that is a

7        legally-significant difference.

8               Infowars has argued that that would apply in every

9        case after notice.  And that is just not right.  After notice

10       infringement is not necessarily innocent before notice, it's

11       not necessarily willful after notice.  What has happened here

12       is Infowars has alleged its infringement is innocent

13       beforehand, and after the fact it's the combination, not just

14       of continuing to sell the poster, but in fact offering to

15       sign the poster and advertising it as infringing, that taken

16       together results in a different statutory category of

17       infringement, of willful infringement, and that statutory

18       category should, in fact -- does give rise to statutory

19       damages.

20              I do see Your Honor's point that perhaps the damages

21       prior to infringement -- excuse me -- prior to notice should

22       not qualify for statutory damages, and I think we would be

23       prepared to accept lost profits only on -- excuse me --

24       infringer's profits only on the pre-suit damages, and

25       statutory damages would only seek to assert them for the

```
 1      post-suit infringement.  But as to the post-suit
 2      infringement, the combination of the changes, and the change
 3      in the nature of the infringement from effectively innocent
 4      to willful is sufficient, at least to create a question of
 5      fact as to whether statutory damages are available.
 6              THE COURT:  All right.  Thank you.
 7              MR. TOMPROS: Thank you, Your Honor.
 8              THE COURT:  Mr. Randazza?
 9              MR. RANDAZZA: I might want to put counsel on the
10      witness list.
11              THE COURT:  I'm going to get a cup of water and I'm
12      going to invite the court reporter to rest her hands for a
13      minute.  She has been going quite a while.  So just let's do
14      that, and if you would stand there for a moment.
15              (Pause in proceedings.)
16              THE COURT:  Counsel, you may proceed.
17              MR. RANDAZZA: Okay.  Well, Your Honor, if this does
18      proceed to trial, I might need to put Mr. Tompros on as a
19      fact witness.  There seemed to be a lot of facts that only
20      exist in his mind.
21              For example, this claim that we were advertising it
22      as infringing, I don't have the benefit of having that
23      presentation in paper form, but I recall reading it when it
24      was on the screen.  And if you wouldn't mind pulling that up,
25      if it actually says that, then I will concede that point.
```

1          THE COURT:  What it says, I believe, is, "There is

2     only a few hundred left on this final run.  We'll be forced

3     to take it down forever when we run out, so make sure you get

4     this collectible poster today."

5          MR. RANDAZZA: Okay.  Had that said, because it's

6     infringing, I would concede the point.  But I think that is

7     just making something up.  And I have a problem with that.

8          You know, additionally, we were treated to a

9     discussion that somebody told him that they weren't going to

10    license somebody because they didn't like the association,

11    but again, this was -- this is at ECF 85-31, I don't -- they

12    didn't put that up on the screen, but we have it, it is in

13    the record.  This is an e-mail from a company called Bored

14    Teenager on December 2nd, 2016.  It says nothing about Alex

15    Jones.  It says nothing about Infowars.  And it is at least a

16    few months before this poster was ever created. So I don't

17    know how that says that this created a problem.  So I have a

18    problem with that.

19         So if it cut off part of the market, what part?  We

20    have nothing but speculation.  We have this one company that

21    said, before my client ever sold one of these, that they had

22    a problem with its affiliation, and it's an affiliation, I

23    believe it says, with the hate stuff.

24         Now, I recognize that Alex Jones is not everybody's

25    cup of tea.  In fact, they describe him in their briefing as

1    a universally hated character.

2              Do I have that wrong?

3              MR. TOMPROS: You do.

4              MR. RANDAZZA: I would like -- I don't want to

5    misrepresent it.  So if you could take a look at that, I want

6    to get that right.  Widely hated, is that about right?  I

7    just -- I don't want to mislead the Court.

8              THE COURT:  I don't remember.  Obviously in a court

9    of law, I'm indifferent to his popularity or not.  So it's

10   not something that I think is really germane to this, except

11   potentially to this argument that it would have an effect on

12   the market.  You know, just step back a minute, let's say

13   that there wasn't abandonment in the sense that Mr. Furie

14   gave up all his rights forever as to everyone, and he can

15   selectively decide against whom he enforces, or he can change

16   his mind on that.  It still -- that still leaves this issue,

17   and I don't know where it comes in in the midst of the

18   affirmative defenses or the four prongs, the fair use and all

19   this, but it just seems that somewhere it should matter that

20   if Mr. Furie either acquiesced or was pleased by what was

21   going on in the Internet, and then Mr. Allen used it in the

22   way that he did, that that -- and then Mr. Furie changes his

23   mind, well, maybe he can change his mind going forward, but

24   it does seem a little weird that then he could be -- have --

25   saying how outrageous it is for what happened before he

1    changed his mind.

2          And I guess that is why counsel is saying that all

3    of this is after being put on notice, and that is the point,

4    but there is -- it does seem that the evidence of what

5    happened before and after that being put on notice is not as

6    clearcut as what plaintiff is suggesting.

7          MR. RANDAZZA: Well, I think respectfully whether he

8    is hated does matter.  And I think it matters as to what they

9    are trying to do.  And I think this before and after issue

10   does matter.

11         Mr. Allen created this, you know, he's trying to

12   conflate the creation with the company that merely took it,

13   looked at it, said, this looks like fair use to us, we are

14   going to sell it because we do recall this guy saying anybody

15   can have this, anybody can do whatever they want with it.

16   That is really what happened.

17         Now he's going to David Jones, who is -- he works

18   for Infowars, he's Alex Jones' father, he's a resources

19   director, he was a 30(b)(6) person, and he asked him an

20   artistic question, and he said no.  He asked him, Is this a

21   poster about Pepe the Frog?  How the heck does he know?  What

22   does that matter?

23         Why didn't he ask -- why didn't he bring you the

24   testimony of what the artist said.  I'll bring that to you,

25   or my associate will bring that to you.  In his deposition,

1       he makes it very clear at pages 64 and 65 and in his

2       statement about the piece, exactly what this was.  He says

3       this was a political poster.  And he also shows that he had

4       absolutely no coordination with Infowars in its creation.

5               So Infowars gets something that it looks at and

6       says -- I mean, if they had asked me, is this fair use?  I

7       would have said all day long, go ahead and sell it.  They

8       didn't ask me, so luckily I don't have to answer that

9       question to them.  But I don't know of a licensed attorney

10      who wouldn't say, that is -- of course that is fair use.

11              Now, they try to say that this was, no, this is just

12      a -- this is just decorative.  If this had been one picture

13      of Pepe out of context on his own, that might be a better

14      argument.  Now they try to create that by claiming that in

15      this banner ad where you take a strip, you can't show the

16      whole thing in a banner ad, a banner ad is a narrow excerpt

17      from it, and they say there is only one face in that.  I

18      count at least two, including Donald Trump, arguably the most

19      important figure on that poster about the election of Donald

20      Trump.

21              So all of this attempt to conflate all the issues

22      and say, well, this all adds up to bad faith, because as soon

23      as we told you that we -- as soon as we sued you, you didn't

24      immediately capitulate and take it down, well, I'm very sorry

25      that we didn't do that -- and I'm being sarcastic -- if they

1       don't recognize it.  Because I don't know why any American

2       has to immediately capitulate on their freedom of expression

3       simply because somebody says so.  That is not how it works.

4       You get to keep selling it.  You get to keep doing it.  You

5       get to put it back up.  Sure, you might have to defend it,

6       but to say it's a bad faith, like this bad faith argument,

7       this is not reputation of fair use.

8              Now what he wants you to do is take this universally

9       hated or widely hated figure -- and I concede in this

10      district he's probably not all that popular, and I don't know

11      that we are going to find very many jurors that do like him,

12      and that is going to be a problem -- and he hopes that you

13      can get in front of that jury and say, bad faith, and they

14      are just going to say, Well, we don't like Alex Jones.  And

15      I'm asking you to protect the constitutional rights of my

16      client.  Don't let that happen just because --

17             THE COURT:  If he goes to trial, we'll -- whatever

18      has to be done in that regard will be done.  But right now we

19      are talking about summary judgment.  So let's focus on

20      summary judgment.  I fully expect that both parties will feel

21      that they are getting a fair trial.  And the way we do that

22      is to make sure the jury focuses on what it is that they are

23      supposed to focus on and not be making judgments on whether

24      or not they like somebody, anymore than happens in most

25      criminal cases, or indeed in most civil cases.  It's clear

1    one party may or may not be more likeable, but that has

2    nothing -- and generally individuals are more sympathetic

3    than corporations and corporations often win.  So we'll deal

4    with that if it comes to that.

5           MR. RANDAZZA: Let's take a look at Mr. Allen's

6    deposition, where he says at page 64, when he sent the

7    poster, he sent it out sometime in February of 2017.  He sent

8    it to Infowars with a letter offering to sell it.  Remember,

9    there is no dispute that that is months after this supposed

10   e-mail where they say somebody didn't want to do business

11   with them anymore because it was associated with the

12   Alt-Right.

13          If you look at their Complaint, I presume there is

14   no -- there should be no dispute here, their Complaint at

15   page 10 says, the fringe, Alt-Right, Neo-Nazis, white

16   supremacists reclaim Pepe, and they talk about it being used

17   in offensive material, being used as a campaign symbol for

18   The Deplorables, that Donald Trump Jr. tweeted out, being

19   used in this way.  And then they say this is not a criticism

20   of Pepe, as if fair use were limited to criticism.

21          Well, if it were limited to criticism, then we

22   couldn't have a positive movie review using a clip of a

23   movie, we could only have negative ones.  That is not how

24   fair use works.  It's a commentary upon the work.  It's a

25   commentary upon Pepe.  It's this very commentary that they

1    put in their Complaint.  It's the same thing as this

2    Deplorables poster, except it's created more in a collage

3    method rather than ripping off a movie poster.

4            So if you look at Mr. Allen's artist's statement,

5    there is no clearer discussion of the intent that Mr. Allen

6    had in creating it.  And I have no reason to dispute that,

7    they have nothing to dispute that.  So there is no disputed

8    fact here as far as what Mr. Allen intended.  So I don't

9    really see what the factual dispute is here.

10           You can look at *Campbell vs. Acuff-Rose*, and

11   *Campbell vs. Acuff-Rose*, yeah, that does say it was a

12   commentary on the, I believe the banality of the original.

13   Well, why can't we comment on the politics of the original?

14   Why can't we comment on the politics of what the original has

15   become?  Through no work of our own, and through no work of

16   theirs, what the culture has done to it.

17           So I can't see how a reasonable juror would look at

18   that and say, you know, this -- this poster, people bought

19   this instead of buying *Boy's Club*, and instead of -- and they

20   bought it for the aesthetic element of Pepe, and they are

21   using as evidence of that Alex Jones saying, Yeah, I guess

22   people like it.  I mean, that is a far cry from, I picked

23   this because of the aesthetic element of this little, tiny

24   corner of it, because I think if we black that out, we

25   probably have the same poster, but I think we have it without

 1    the commentary that this cartoon figure played a key role in

 2    the election.  And I just don't know how it would be possible

 3    if this case, if a jury finds -- and they could, I don't know

 4    what a jury is going to do, juries do crazy things -- if a

 5    jury were to find that you can't use that frog in order to

 6    talk about that frog's involvement in the election, I don't

 7    see how that doesn't get overturned on appeal anyway.  How

 8    else would you do it?  If anybody has a suggestion, I'm open

 9    to it, and I'll go back to my client and say, concede it,

10    what could we have done?  Could we have put the words Pepe

11    there?  I don't know how else you can do this.

12          So I don't see there being a factual dispute as to

13    fair use.  You know, to say that this was a commercial

14    decision, well, in *Campbell vs. Acuff-Rose*, that was at

15    issue.  You know, any time you have a fair use case, or any

16    time you have a free speech case, I always have the other

17    side say, This isn't a free speech case and it's not

18    nonprofit.  That is not what fair use is either.  Fair use

19    doesn't require that we give it away.  If we gave it away for

20    free, then it would be fair use.  That is not how that

21    element works.  Same with in *Campbell vs. Acuff-Rose*.  Nobody

22    gave away Big Hairy Woman.  That song was sold commercially.

23          In fact, in most fair use cases, you do have

24    commerce involved, but that is not what the commercial

25    element is, is it? It is, are you commercializing the

1    original work?  Are you supplanting the market for the

2    original?  That is the commerce element.  Not simply, if you

3    gave it away, it would be one thing, and if you don't give it

4    away, it's another thing.

5         So he did talk about -- so, you know, my colleague

6    did talk about how if you copy, you know, if you copied too

7    much of it, it changes the copyrightability.  It changes the

8    fair use element.  And then he talked about this Jim Davis

9    case, where they used Odie and Odie was very popular.  Yeah,

10   I agree that case, that case is highly distinguishable.  I

11   don't know of any time that Odie or Garfield or really any

12   other cartoon character has become a political issue.  It

13   just hasn't happened.

14        So if you have an element of somebody, somebody

15   takes a comic that has now -- that has become extremely

16   popular, remember in that case, there was a line in that case

17   that, I'm going to paraphrase, that said that Garfield had

18   become extremely popular through the hard work of Jim Davis.

19   Well, the fact is, this frog did not become popular through

20   the hard work of Matt Furie, it became popular because it

21   latched on to -- you know, there is some cultural stream that

22   flows through us all that at some point a piece of work, a

23   photograph, a song riff, or something attaches to it and all

24   of a sudden you lose control of it.

25        Now, this goes back to your first question when I

1    got up here I feel that it was a, you know, can he not then

2    reclaim it?  If he had simply let it go accidentally, if he

3    had simply rested on his rights, I think there might be a

4    latches argument.

5         But let's set that aside.  In the -- in the context

6    of this case, where the undisputed evidence is Mr. Furie

7    spent years, I think at least six years, telling the public

8    to go ahead and do it, can he then shut the barn door?  I

9    don't think he can at all.  I'm not saying he can't

10   selectively enforce.  You get to selectively enforce when it

11   comes to copyright.  A hundred people can infringe, and you

12   can sue the one person you don't want to have use it, you can

13   do that, but I don't think that argument bears out when you

14   have told everybody to go ahead and use it, when you have an

15   artist that hears that and goes ahead and uses it, when you

16   have a person who sells it, who says, go ahead and use it,

17   and when you have such fair clear use, I don't know how else

18   you can do that.  You don't need to be doing this solely to

19   criticize.

20        If there is a -- you know, there is a recent case, I

21   think it was a very good decision out of the Southern

22   District of California where somebody took the Dr. Seuss

23   book, *Oh, the Places You Will Go*, and changed it into a Star

24   Trek theme, and republished that as a kind of a separate work

25   that simply relied upon Dr. Seuss.  That was held to be fair

1    use, and I think properly so.  And if I'm not mistaken, I'm

2    taking this out of memory, I think it was at summary

3    judgment, because it didn't supplant the market for the

4    original.  It was a completely new element.

5          Now, there was an argument there that hypothetically

6    they might do that.  Well, hypotheticals don't get you past

7    summary judgment.  You need some kind of evidence.  There is

8    nothing here at all.

9          So what we have here is clear political speech, a

10   poster that is commenting on a character.  If this character

11   were a living person, he might have a 3344 claim here, but

12   it's not.  There is no other way to talk about this.  There

13   is no other way to tell you who were the players in the

14   election, but to show them.  It would be just as -- just as

15   unbelievable if you were to bring a claim against somebody

16   for writing about Pepe the Frog and saying Pepe the Frog -- I

17   mean, heck, Hillary Clinton did this -- said Pepe the Frog is

18   an Alt-Right hate symbol.  I don't happen to agree.  I've

19   seen it in all different context, but could you sue them for

20   that?  I don't think you could.  And I think that probably

21   did more to affect the market for the original than this ever

22   could.

23         So in closing, I would say that this is -- I cannot

24   possibly see a way that a juror could find that Mr. Allen

25   could have told this story and included a key element in this

```
 1        story.  I mean, he would have had to have censored a part of
 2        the story if he didn't include this frog.  And in doing -- in
 3        putting it there, he gave an accurate rendition of what went
 4        on in this election.  And I don't think that when Mr. Jones
 5        decides to say, well, when we run out, we are going to have
 6        to take this down all of a sudden changes things.  That is
 7        not an admission that it's infringing.  That is when you run
 8        out, you have to take it down because he doesn't have
 9        anymore.  I don't see how anyone could read that as to say
10        anything else.  So with that, I've run out.  So I'm going to
11        take myself down.
12                THE COURT:  Thank you, counsel.
13                Counsel, I appreciate your arguments this morning.
14        I certainly appreciate the briefing and the declarations and
15        all the effort that went into that.  The second summary
16        judgment motion, like the first, is taken under submission.
17                Thank you.
18                MR. RANDAZZA: Your Honor, just a couple of
19        housekeeping things.  We first, I think it would be proper if
20        we jointly move to everything that we brought up in this
21        hearing to be moved into evidence.
22                THE COURT:  Well, certainly it's part of the record
23        for summary judgment.  I don't -- in terms of whether it's,
24        you know, like you mentioned case law that is not in
25        evidence, I don't know that we have to finally determine what
```

1    is in evidence.  If you are referring to what you have handed

2    me, my understanding is that that was already part of the

3    record, except maybe for the first Sapo Pepe image.  And I

4    think I saw that in the record, as well.  So I guess

5    Mr. Randazza, I'm not exactly sure what it is that you are

6    asking of me.

7            MR. RANDAZZA: I have been before judges in the past

8    who have asked me to do that.  If you see no need, I agree.

9    I often found it overly pedantic myself.

10           The other thing is we did discuss the issue of your

11   ruling, since we do have, we think it would help us tomorrow,

12   bullet points.

13           THE COURT:  Just as I'm listening to you, I was

14   thinking it was Wednesday.  I'm just not going to be able to

15   do that.  I have given you some indication of what my

16   thoughts are, and hopefully that will be of some use to you.

17   But I -- in the unlikely event that I'm able to make that

18   more concrete between now and then, I'll do it, but I don't

19   think it's terribly likely.

20           MR. TOMPROS: Thank you.

21           THE COURT:  Thank you, counsel.  Good luck.

22                    *****     *****     *****

23

24

25

1

2        I certify that the foregoing is a correct transcript from the

3        record of proceedings in the above-titled matter.

4

5

6

7        ---------------------------

8

9        Amy C. Diaz, RPR, CRR            May 14, 2019

10       S/  Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25